## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Sleep Number Corporation, | Court File No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT**<br>**JURY TRIAL DEMANDED** |
| Steven Jay Young; Carl Hewitt; UDP Labs, Inc., a Delaware corporation, | |
| Defendants. | |

Plaintiff Sleep Number Corporation ("Sleep Number"), by and through its undersigned counsel, files this complaint against Steven Jay Young, Carl Hewitt, and UDP Labs, Inc. (collectively, "Defendants") for declaratory judgment, breach of contract, misappropriation of trade secrets, tortious interference, and conversion, among other claims.

### THE PARTIES

1.      Sleep Number is a Minnesota corporation with a principal place of business at 1001 Third Avenue South, Minneapolis, Minnesota 55404.

2.      Steven Jay Young ("Young") is an individual residing, on information and belief, in Los Gatos, California.

3.      Carl Hewitt ("Hewitt") is an individual residing, on information and belief, in San Jose, California.

4.      Young and Hewitt are former employees of a Sleep Number subsidiary and consultants to Sleep Number who formed their own entity, UDP Labs, Inc.

5.      UDP Labs, Inc. ("UDP") is a Delaware corporation with its principal place of business at 16615 Lark Avenue, #201, Los Gatos, California.

## JURISDICTION AND VENUE

6.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because (i) complete diversity exists amongst the parties in that Sleep Number is a resident of Minnesota, whereas the individual defendants are residents of California and UDP is a resident of California and Delaware; and (ii) the amount in controversy exceeds $75,000, exclusive of interest and costs.

7.      In addition, one of the claims at issue in this Complaint is under the Defend Trade Secrets Act, 18 U.S.C. § 1836.  Pursuant to 18 U.S.C. § 1836(c), "The district courts of the United States shall have original jurisdiction of civil actions brought under this section."

8.      This Court also has jurisdiction pursuant to 28 U.S.C. § 1331 because one of the claims relates to a determination that a contract provision created an assignment of a future interest, which is governed by federal law and therefore a federal question.

9.      This Court has personal jurisdiction over Young and Hewitt pursuant to Minn. Stat. § 543.19.  Young and Hewitt contracted with Sleep Number, a Minnesota based company.  Young and Hewitt both worked with and for Sleep Number for years; first as employees of a Sleep Number subsidiary and later working as consultants to Sleep Number, in each case reporting to Sleep Number personnel and making several work trips to Minnesota.  For example, both Young and Hewitt traveled to Minnesota for work related activities in or around November 6-8, 2017.  Young and Hewitt returned to Minnesota to

2

attend a product roadmap meeting in or around February 2018.  Young and Hewitt again traveled to Minnesota around October 2018 and met with several Sleep Number employees at Sleep Number's Minnesota headquarters.  Both Young and Hewitt reported directly to Annie Bloomquist, Sleep Number's Chief Product Officer, who was and is based in Minnesota.  In addition, Young's and Hewitt's actions have caused damage in Minnesota. Specifically, Young's and Hewitt's actions, which are further outlined below, include breach of contract, misappropriation of trade secrets, and conversion and their actions have injured and caused, or will cause, damage to Minnesota property owned by a Minnesota Corporation, Sleep Number.

10.     This Court has personal jurisdiction over UDP pursuant to Minn. Stat. § 543.19.  UDP had knowledge of contracts between Sleep Number, whom it knew to be a Minnesota Corporation, and its former employees/consultants at least because its corporate officers are comprised of former employees/consultants with whom Sleep Number entered into such contracts.  In addition, UDP's actions, which are further outlined below, include misappropriation of trade secrets, conversion, and tortious interference with contracts and its actions have injured and caused, or will cause, damage to Minnesota property owned by a Minnesota Corporation, Sleep Number.  UDP also maintains a highly interactive website at http://www.udplabs.com, which is accessible to residents of Minnesota and this District, through which UDP promotes its services.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b) because the acts and injury at issue in this Complaint occurred in this District; the contract involved a

Minnesota company and the property at issue is Minnesota property owned by a Minnesota company.

## FACTUAL BACKGROUND

### Sleep Number's Operations and Products

12.     Sleep Number is in the business of designing, manufacturing, and selling adjustable air beds, most notably Sleep Number® beds, including the Sleep Number 360® smart beds and bases, as well as related bedding products.  Sleep Number sells its products and services to consumers throughout the United States and the world.

13.     Sleep Number's beds are market successes.  Specifically, Sleep Number's beds, which are independently adjustable on each side with integrated sleep and biometric monitoring technologies, have significantly changed the sleep industry by providing an insight into consumer's health/wellness and sleep quality through biometric data.  Sleep Number has and continues to be at the forefront of innovation in the mattress industry. Sleep Number has repeatedly improved the technology behind its adjustable and smart mattresses.

14.     Traditional mattresses do not provide integrated sleep or biometric monitoring.  Furthermore, wearable biometric sensors (such as smart watches and fitness trackers), require a user to wear the device overnight to track sleep and may have limited accuracy.

15.     Sleep Number's smart beds, however, have SleepIQ® technology integrated into the bed/mattress product.  Sleep IQ® technology is a non-invasive and non-wearable technology, *i.e.*, it does not require connecting any devices or wires to the user.  SleepIQ®

technology is a product built on advanced Internet of Things ("IoT") architecture that incorporates a bed with integrated sensors, network connectivity and cloud communication, a cloud backend and databases, and a mobile app for consumer interaction. Once the bed connects to Sleep Number's SleepIQ® platform, a user does not need to wear anything or charge any batteries – all the user needs to do is lie down and sleep. The SleepIQ® technology uses high-resolution full body ballistocardiography readings to measure movements due to motion, breathing, or even small movements within the body generated by blood movement. The information sensed from the integrated sensors can be used to derive sleep and health/wellness information, which can then be used to improve sleep and overall wellbeing.

16. Indeed, Sleep IQ® technology is able to sense bed presence, motion, and a variety of physiological signals using sensors integrated into the product that work with advanced algorithms, artificial intelligence, and machine learning technology. This SleepIQ® technology is able to provide insights into when a user enters into or exits the bed, how restful or restless the sleep is, whether there are periodic leg movements, as well as respiratory-related and cardiac-related information. As shown below, the technology is able to provide information about a user's respiration rate and heart rate throughout the night, helping consumers monitor their own wellness:



An example of SleepIQ technology's BCG recording (black) that includes both the breathing pattern (blue) and heart rhythm (red). Individual heartbeats are denoted by small dots.

5

17.     The SleepIQ® technology evaluates this sensed and biometric data and devises a SleepIQ® score, a nightly measure of quality of sleep.

18.     Such information can be provided to the user, e.g., via Sleep Number's mobile app.  For example, as shown below, a user may be able to see, among other things, what their average heart rate or respiration was throughout the night, how long they were in bed and when their sleep was most restful or restless, when they got out of bed, and how long it took them to fall asleep:



19.     Each user may also be provided a Monthly SleepIQ® Report or monthly wellness report, which, as shown below, may provide information about a sleeper's sleep and biometric trends over the course of time.  For example, the report may show a user what their average SleepIQ® score, sleep duration, heart rate, and respiration rate, among

other things, were for each month.  The report may also compare said data to prior months and detect trends or recognize other information related to a user's health and wellness:



20.     In addition, SleepIQ® technology tracks and provides users meaningful insights into their circadian rhythms.

21.     Sleep Number originally launched SleepIQ® technology in 2014 and has continually advanced the technology and its features ever since.  Sleep Number's 360® smart beds, which work with SleepIQ® technology, were launched in the spring of 2017.

In addition, Sleep Number's 360® smart beds and accompanied SleepIQ® technology work to effortlessly adjust the firmness, comfort, and support of the bed throughout the night to help users stay asleep and be comfortable.  The Sleep Number 360® smart beds also include additional smart features, like foot warming, which warms an individual's feet to help them fall asleep faster.

22.     Sleep Number's smart beds provide essential sleep solutions for improved health and well-being.  Sleep Number's research and data show that customers who use the features of its 360® smart beds and SleepIQ® technology can meaningfully improve their sleep.

23.     Sleep Number continues to invest resources in advancing its SleepIQ® and smart bed technologies.  Indeed, Sleep Number employs numerous engineers and data scientists dedicated to developing new technologies, including new methods of data collection, analysis, and reporting.

24.     Sleep Number has and continues to make considerable investment in the innovation and manufacturing of its products.  Sleep Number has invested significantly in the acquisition and maintenance of equipment used to engineer and manufacture its Sleep Number® smart beds.  Sleep Number also employs a large team of individuals in the United States in relation to the design, engineering, research and development, manufacture, marketing, and sale of the Sleep Number® beds.

25.     Sleep Number's products are recognized as leading and cutting-edge technology in the consumer electronics market and the health and wellness space.

## Sleep Number's Acquisition of Its Sleep IQ LABS

26.     In 2012, Sleep Number partnered with BAM Labs, a Silicon Valley based company, to develop and commercialize SleepIQ® technology.  Defendant Steven Young founded and worked for BAM Labs.  Defendant Carl Hewitt also worked for BAM Labs.  The SleepIQ® technology was launched in Sleep Number's air beds in 2014.  In the Fall of 2015, Sleep Number acquired BAM Labs, which thereafter operated as a business unit of Sleep Number called SleepIQ LABS.  Both Young and Hewitt continued to work for SleepIQ LABS after the acquisition as employees.  Steve Young continued on as the Chief Technology Officer and Carl Hewitt continued as the VP of Engineering.

## Young's & Hewitt's Consulting Agreements with Sleep Number

27.     On or around November 6-8, 2017, Young and Hewitt were in Minneapolis, MN for work; one of Sleep Number's regular product roadmap meetings.  While in Minnesota, Young and Hewitt expressed an interest to Sleep Number in transitioning from employees to consultants.  On November 8, during a lunch meeting, Sleep Number, Young, and Hewitt had preliminary discussions regarding the proposed Consulting Agreements as well as Young's and Hewitt's desire to start a new venture.  Sleep Number reminded Young and Hewitt of their existing contractual obligations, e.g., that any Inventions Young and Hewitt were working on for Sleep Number including those related to mattresses or sleep were owned by Sleep Number.  Sleep Number also stated that it would protect its intellectual property ("IP") rights, if necessary.  For example, Young and Hewitt were reminded that Sleep Number already owned all the ideas and work generated to date in their employment.  Young and Hewitt acknowledged this.  They also stated their new

venture would not compete with Sleep Number; that they were working on an idea for a smart home hub (to connect IoT devices), including blood pressure monitoring and other data.  Sleep Number reminded Young and Hewitt that it had already included similar ideas on its product roadmap and that Young and Hewitt were involved in those projects. Therefore, Sleep Number, Young, and Hewitt agreed that Sleep Number would prepare draft consulting agreements that would set out the product develop scope of work that would be considered Sleep Number's domain, and set out IP rights so that each party understood who owned what.

28.     On or around December 4, 2017, both Young and Hewitt entered into Confidential Consulting Agreements with Sleep Number ("Consulting Agreements").  The relevant portions of Young's and Hewitt's Consulting Agreements are the same.

29.     The Consulting Agreements stated that (i) Young and Hewitt had previously been employed by SleepIQ LABS, Inc. and/or its predecessor SleepIQ LABS, which at the time of the Consulting Agreements was a wholly-owned subsidiary of Sleep Number, (ii) that Young and Hewitt had accessed and used Sleep Number's confidential information, including trade secrets, and (iii) that Young and Hewitt desired to resign from their positions, pursue an alternative business venture, but continue to consult as independent contractors for Sleep Number.

30.     On January 19, 2018, the month after Young and Hewitt entered into the Consulting Agreements with Sleep Number, Young and Hewitt incorporated UDP under the laws of Delaware.

31.     The Consulting Agreements set forth a list of Services that Young and Hewitt would provide to Sleep Number, with agreed upon time commitments that scaled back over time, in exchange for significant monthly compensation.

32.     Those services included the following provision:

Product development, ideation, and/or implementation of any ideas conceptions, inventions, or plans relating to sleep, mattresses, bedding, sleep monitoring, health or wellness as it relates to sleep (including biometric monitoring relating to sleep), or bedroom or sleep technologies during the Term of this Agreement ("Product Development Scope").  Notwithstanding the foregoing, Product Development Scope does not include: (i) monitoring technologies for sudden infant death syndrome; or (ii) blood pressure monitoring technologies.

33.     The Consulting Agreements also contained detailed confidentiality provisions and IP ownership provisions.  In fact, the Consulting Agreements state that the terms of the Agreements shall be considered and kept confidential "[a]t all times."

34.     In addition, pursuant to the Consulting Agreements Young and Hewitt both agreed not to use or allow unauthorized use of any of Sleep Number's Confidential Information for any purpose other than for services provided to Sleep Number. Specifically, they agreed to "not use or disclose any Confidential Information to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design any invention, product or service."  The Consulting Agreements defined Confidential Information, in part, as "any Inventions and any information within the Product Development Scope, including without limitation technical data, trade secrets, know-how, research, product plans, [Sleep Number's] products or services and markets therefor, customer lists, customer data, customers, software, developments, inventions,

discoveries, ideas, processes, formulas, algorithms, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information…"

35.     Also, the assignment of inventions provision set forth in Section 5.B included the following:

> Consultant agrees that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, logos, inventions, improvements, developments, discoveries, ideas, and trade secrets conceived, discovered, authored, invented, developed, or reduced to practice by Consultant, solely or in collaboration with others, arising out of, or in connection with, performing the Services and/or completing the Deliverables under this Agreement, or with the use of Company's equipment, supplies, facilities, or Confidential Information, in each case that are within the Product Development Scope, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights in and to the foregoing (collectively, "Inventions"), are the sole property of the Company. Consultant also agrees to promptly make full written disclosure to the Company of any Inventions and to deliver and assign and hereby irrevocably assigns fully to the Company all right, title and interest in and to the Inventions. Consultant agrees that this assignment includes a present conveyance to Company of ownership of Inventions that are not yet in existence. Consultant further acknowledges that all original works of authorship that are made by Consultant (solely or jointly with others) within the Product Development Scope and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.

36.     Additionally, Section 5.E of the Consulting Agreements required Young and Hewitt to assist Sleep Number to secure Sleep Number's rights in any inventions defined under the Consulting Agreements, including executing all instruments that Sleep Number may deem necessary to deliver, assign, and convey the exclusive right, title, and interest in such inventions to Sleep Number.

37.     Pursuant to Section 6.B of the Consulting Agreement, Young and Hewitt agreed not to, directly or indirectly, through an existing corporation, unincorporated business, affiliated party, successor employer, or otherwise, solicit for hire, employment, or work with, on any basis, any employee then employed by Sleep Number.  Young and Hewitt agreed not to so solicit any employee of Sleep Number for a period of 6 months after the termination of the Consulting Agreements.

38.     Section 7 of the Consulting Agreement requires delivery to Sleep Number, within five business days of Sleep Number's request, of all Confidential Information, tangible embodiments of Inventions, all devices and equipment belonging to Sleep Number, all electronically-stored information, and any records maintained related to the Inventions.  Section 7 further forbids the continued possession, recreation, and/or delivery to anyone else of any such information.

39.     Section 11.D of the Consulting Agreements provides that either party may initiate an action in court relating to allegations that the other party has violated an agreement regarding intellectual property or confidential information and that, in such an action, the prevailing party is entitled to seek reasonable costs and attorneys' fees.

40.     Further, Sections 11.D and 12.G of the Consulting Agreements provide that, in an action brought to enforce a provision of the agreement, the prevailing party is entitled to seek its reasonable attorneys' fees.

41.     Section 12.A of the Consulting Agreements provides that the agreements are governed by the laws of the State of Delaware.

### Young's & Hewitt's Work for Sleep Number and Associated Technology

42.     During their employment and consulting relationships, Young and Hewitt worked on Sleep Number's SleepIQ® technology and other innovative product development ideas, including near and long term ideas and innovations. This work included insight into how to accomplish these goals as well as engineering insight into particular product development plans and other concepts. In so doing, Young and Hewitt had access to and developed Confidential Information and Intellectual Property, as those terms are defined in their contracts.

43.     During their employment and consulting relationships, Young and Hewitt regularly accessed Sleep Number's offices, worked in and out of the office, and retained their company-issued laptops and other equipment.

44.     When performing work for Sleep Number, Young and Hewitt were involved in conceptualizing and developing products and product features. This included, among other things, conceptualizing or developing methods of collecting data related to sleepers and sleep environments, methods for analyzing data, and features and products that use the data collected to provide information to the user and/or enable automated product response. Indeed, Young and Hewitt worked with Sleep Number to roll out the SleepIQ® technology as well as the Sleep Number 360® smart beds, and therefore would have been aware of the information and biometrics Sleep Number was collecting using sensors and advanced algorithms, artificial intelligence, and machine learning technologies. Young and Hewitt also assisted in developing the company's strategic product roadmap, identifying potential future products, consumer benefits, and potential launch timing. Young and Hewitt were

aware of and contributed to Sleep Number's plan to further utilize and expand on sensed biometrics and bio-signal algorithms, including developing innovative solutions related to preventive and proactive health assessments.

45.     On October 4, 2018, during a dinner with Annie Bloomquist, Young and Hewitt indicated that their work on their alternative venture included work on sensors for congestive heart failure and further discussed a health bed.  They stated that their funding efforts had been slowed as potential investors have questioned whether Sleep Number owns the IP.

46.     On October 8, 2018, while Young and Hewitt were Sleep Number consultants, and before either had expressed an interest in terminating their Consulting Agreements, UDP filed Provisional Patent Application No. 62/742,613, entitled "Continuous Biometric Monitoring Sensors," (herein "the '613 Application").  The inventors listed on the '613 Application are Young, Hewitt, Jonathan Olson, Alan Luckow, and Robert Dobkin.  A copy of the '613 Application is attached hereto as **Exhibit 1**.

47.     On October 11, 2018, just three days after filing the '613 Application, Young and Hewitt informed Sleep Number that they believed their Consulting Agreements were preventing them from obtaining funding for UDP and they indicated an intent to terminate the Consulting Agreements at the end of October 2018.

48.     On October 25, 2018, Young and Hewitt traveled to Minneapolis, MN to meet with several executive officers of Sleep Number at Sleep Number headquarters.  At the meeting, Young and Hewitt expressed their intent to end their Consulting Agreements because the IP ownership provisions therein were preventing them from raising capital or

funding for their new venture. Young and Hewitt further disclosed that their goal was to develop technology related to sleep and bio tracking. Specifically, Young and Hewitt indicated they were working on a bed frame device with imbedded sensors. Sleep Number explained that that idea was already under development at Sleep Number. Sleep Number further reminded Young and Hewitt that they could not use Sleep Number's Confidential Information to obtain these goals. Young and Hewitt responded that they would just write new source code for their applications. Sleep Number explained to them that Sleep Number's Confidential Information covered more than just the code that had been written to date and included any ideas, specialized know-how, processes, product plans, etc.

49.     On November 1, 2018, Young and Hewitt provided official notice that they were terminating their Consulting Agreements effective November 15, 2018. On or around November 1, 2018, Young and Hewitt also proposed an "addendum" to the Consulting Agreements that would declare their work at UDP to not be within the "Product Development Scope" under the Consulting Agreements.

50.     On November 8, 2018, Sleep Number sent an email to Young and Hewitt rejecting their proposal and informing them that their work at UDP, as described by them, fell within the Product Development Scope and that Sleep Number owned any such inventions.

51.     At or around the time of their departure, Sleep Number requested that both Young and Hewitt return their company-issued computers to Sleep Number because they contained Sleep Number's Confidential Information. When Sleep Number received

Young's and Hewitt's laptops, both had been completely wiped clean, *i.e.*, everything had been deleted.

52.    On information and belief, Young and/or Hewitt retained some of Sleep Number's Confidential Information after the termination of the Consulting Agreements.

53.    On information and belief, Young and/or Hewitt used and/or disclosed some of Sleep Number's Confidential Information to allow them or otherwise enable others to invent, author, make, develop, or design an invention, product, or service, or make improvements thereon.

54.    On November 15, 2018, during a dinner with Annie Bloomquist, Young and Hewitt indicated that their new venture would not be competing with Sleep Number, at least because it was not related to sleep.  Again, however, Young and Hewitt mentioned working on a health bed, which Sleep Number understood to mean would be competition with, and may involve information or ideas that were taken from, Sleep Number.  Young and Hewitt stated that their attorney was working on a response to proclaim that their work at UDP was not within the Product Development Scope of their work at Sleep Number. Sleep Number never received said response.

55.    In December 2018, Young and Hewitt had another discussion with Annie Bloomquist in which Young and Hewitt indicated that they were "starting over" with their venture and proposed assisting in the development for version "2.0" of SleepIQ®.

56.    On October 8, 2019–the one year deadline to file a non-provisional that may claim priority to the '613 Application–UDP filed non-provisional Patent Application No. 16/595,848, entitled "Multidimensional Multivariate Multiple Sensor System," which

published as U.S. Pat. App. Pub. No. 2020/0110194 on April 9, 2020 ("the '194 Application"). The '194 Application claims priority to the '613 Application and the '623 Application. The inventors listed on the '194 Application are Young, Hewitt in which Young and Hewitt indicated that they were "starting over" with their venture and proposed assisting in the development for version "2.0" of SleepIQ®.

57. On February 12, 2019, UDP filed Provisional Patent Application No. 62/804,623, entitled "Systems and Methods for Utilizing Gravity for Biometric Monitoring," (herein "the '623 Application"). The inventors listed on the '623 Application are Young, Hewitt, Jonathan Olson, Alan Luckow, and Robert Dobkin. A copy of the '623 Application is attached hereto as **Exhibit 2**.

58. In or around April or May 2019, Young and Hewitt had a discussion with Annie Bloomquist in which they reiterated they were not competing with Sleep Number or working on any projects related to Sleep Number's technology. Young and Hewitt did state they would be interested in partnering with Sleep Number in the future, but were otherwise evasive in letting Sleep Number know what projects or market they intended, Jonathan Olson, Alan Luckow, and Omid Sayadi. A copy of the '194 Application is attached hereto as **Exhibit 3**. It was only after the '194 Application published that Sleep Number became aware that the '613, '623, and '194 Applications had been filed.

59. On January 30, 2020, UDP filed Patent Application No. 16/777,385, entitled "Systems and Methods for Generating Synthetic Cardio-Respiratory Signals," which published as U.S. Pat. App. Pub. No. 2020/0163627 on May 28, 2020 ("the '627 Application"). The '627 Application is a continuation-in-part of the '194 Application and

claims priority to the '613 Application and the '623 Application. The inventors listed on the '627 Application are Young and Omid Sayadi. A copy of the '627 Application is attached hereto as **Exhibit 4**. It was only after the '627 Application published that Sleep Number became aware that the '627 Application had been filed.

### Other Persons Employed by Sleep Number

60.   Sleep Number also employed other individuals at SleepIQ LABS that were former BAM Labs employees. For example, Eric Hewitt, Alan Luckow, Omid Sayadi, and Mike Puckett were also employees of Sleep Number's SleepIQ LABS working on SleepIQ® technology and other innovative product development ideas. In addition, Mark Seibert formerly worked as a consultant developing SleepIQ® technology. As discussed above, with reference to paragraph 46-59, Alan Luckow and Omid Sayadi are also named inventors on UDP's pending patent applications. As detailed below in paragraphs 69-75, all of these former Sleep Number employees now work for UDP with Steve Young and Carl Hewitt.

61.   Eric Hewitt was employed by BAM Labs. On September 9, 2015, Eric Hewitt signed an employment agreement to work as an employee of SleepIQ LABS. This agreement included similar confidentiality and IP ownership provisions as Hewitt's and Young's Consulting Agreements, discussed above. Eric Hewitt was employed at Sleep IQ LABS as a Senior Director of Embedded Software.

62.   On or around May 8, 2019, Eric Hewitt resigned and indicated in his exit interview that he was not planning to take a role with any other company, but felt it was the right time for him to leave. That same month, Eric Hewitt reported his company-issued

laptop and portable hard-drive had allegedly been stolen from his car. Eric Hewitt subsequently went to work for UDP with Young and Hewitt. On information and belief, Eric Hewitt started with UDP in June of 2019.

63.     Alan Luckow was employed at BAM Labs when Sleep Number acquired it in 2015. On September 9, 2015, Luckow signed an employment agreement to work as an employee of SleepIQ LABS. This agreement included similar confidentiality and IP ownership provisions as Hewitt's and Young's Consulting Agreements, discussed above.

64.     On or around May 5, 2018, Luckow resigned from Sleep Number. Mr. Luckow now works for UDP with Young and Hewitt.

65.     Omid Sayadi was employed at BAM Labs when Sleep Number acquired it in 2015. On September 9, 2015, Sayadi signed an employment agreement to work as an employee of SleepIQ LABS. This agreement included similar confidentiality and IP ownership provisions as Hewitt's and Young's Consulting Agreements, discussed above. Sayadi was employed as a Senior Principal Scientist working on Research and Development of Algorithms.

66.     On or around July 27, 2019, Omid Sayadi resigned from Sleep Number. Mr. Sayadi now works for UDP with Young and Hewitt.

67.     Mike Puckett was employed by BAM Labs. On September 9, 2015, Mike Puckett signed an employment agreement to work as an employee of SleepIQ LABS. This agreement included similar confidentiality and IP ownership provisions as Hewitt's and Young's Consulting Agreements, discussed above. Mike Puckett was employed at

SleepIQ LABS as a Manager of Device Software Engineering.  Mr. Puckett now works for UDP with Young and Hewitt.

68.     Mark Seibert was employed at SleepIQ LABS as a contractor.  Mr. Seibert now works for UDP with Young and Hewitt.

### UDP's Operations & Employees

69.     UDP was incorporated in the State of Delaware on January 19, 2018, and registered with the State of California on February 22, 2018.

70.     UDP touts itself as being a company focused on Bio-Signals and what those signals can tell us.  UDP claims to offer "Advanced sensors, AI, and machine learning for the mainstream."

71.     UDP purports to offer services in the markets of Medical (including "Biometric Analysis and Monitoring"), Family Health (including "Peace of Mind and Optimal Sleep"), and Caregiving (including "Advanced Tools for Remote and Local Caregiving").

72.     On its website, UDP states, "You know how it is, we're a startup in stealth mode.  You'll have to contact us to find out more."

73.     According to UDP's website, Young is the Chief Executive Officer of UDP and is "responsible for the leadership, vision and strategy for the company."   Also according to UDP's website:  "Prior to starting UDP Labs, [Young] was CEO & CTO of BAM Labs.  At BAM, [Young] was responsible for co-founding and the product vision for BAM Labs.  Designing and producing a novel Touchless Human Biometric sensing

platform that that became SleepIQ® and was acquired by Sleep Number Corporation, where he served as CTO."

74.     According to UDP's website, Hewitt is Chief Technology Officer of UDP and is "responsible for the UDP Labs' technological vision, strategy and its implementation."  Also according to UDP's website: "Prior to starting UDP Labs, [Hewitt] was VP of Engineering for SleepIQ LABS (formerly BAM Labs until acquired by Sleep Number in 2015 and renamed SleepIQ Labs).  SleepIQ® technology touchlessly monitors various aspects of a sleeper's experience and can adjust the bed to provide better comfort and health."

75.     After leaving Sleep Number, Eric Hewitt, Alan Luckow, Omid Sayadi, Mike Puckett, and Mark Seibert all took jobs with UDP.  Indeed, each of these individuals is listed as one of UDP's "Team" on UDP's website: https://www.udplabs.com/team/. According to UDP's website, Eric Hewitt is the Chief Software Architect at UDP, Alan Luckow is the Creative Director at UDP, Omid Sayadi is the Chief Data Scientist at UDP, Mike Puckett is the Device Software Engineer at UDP, and Mark Seibert is a Senior Electrical Engineer at UDP.

## The Inventions-at-Issue

76.     The '613 Application, the '623 Application, the '194 Application, and the '627 Application are collectively referred to herein as the "Inventions-at-Issue."

**(The '613 Application)**

77.     The invention disclosed in the '613 Application is titled "Continuous Biometric Monitoring Sensors" and relates to the field of sensing biometrics of people using sensors that are not connected to a person.

78.     The '613 Application discloses:

> This invention describes a method that employs gravity and motion to determine biometric parameters for subjects in a medical setting. The invention senses a single subject's or multiple subjects' body motions against the force of gravity on a substrate, furniture or other object and transforms those motions to biometric signals and measurements. Those signals and measurements can be further processed to generate additional data, including information that can be used to further enhance the ability of the sensors to obtain accurate readings. The sensors are connected either with a wire or wirelessly to a host computer with may be local or remote and running artificial intelligence software.

79.     The '613 Application discloses that the sensors are meant to be used in a medical setting and that they are designed to be placed under, or be built into an object, such as a bed. The '613 Application also discloses that some "examples of the types of data that this invention provides are the ability to provide dynamic center of mass locations and movement vectors for a subject, while eliminating those from other subjects and other objects or animals on the bed."

80.     The '613 Application states the "invention senses a single subject's or multiple subjects' body motions… and transforms those motions to biometric signals and measurements" that "include: presence, motions, position, direction and rate of movement, respiration rate, respiration condition, heart rate, heart condition, instantaneous weight and weight trends." The processing of these signals "can be used to predict bed exits, including

direction and location of a bed exit…"   In the Detailed Descriptions section, the '613

Application depicts the signal analysis for an occupant in a bed as shown below:



81.    The '613 Application's depiction of an "Application Example" for the

"Continuous Biometric Monitoring" depicts monitoring of a user in a bed with the ability

to monitor subject weight changes from the night or week before, which may be used to

alert the user to seek medical attention:



**(The '623 Application)**

82.    The invention disclosed in the '623 Application is titled "Systems and Methods for Utilizing Gravity for Biometric Monitoring" and relates to systems and methods for sensing biometrics of one or more subjects using multiple sensors that are not in contact with the subjects.

83.    The '623 Application discloses:

Disclosed herein are implementations of systems and methods employing gravity and motion to determine biometric parameters for single or multiple subjects at rest. The systems and methods use multiple sensors to sense a single subject's or multiple subjects' body motions against the force of gravity on a substrate, including beds, furniture or other objects, and transforms those motions into biometric signals and measurements. Those signals and measurements can be further processed to generate additional data, including information that can be used to further enhance the ability of the sensors to obtain accurate readings. The sensors are connected either with a wire or wirelessly to a host computer which may be on the internet and running artificial intelligence software.

84.    The '623 Application also discloses that the sensors are designed to be placed under, or be built into a substrate, such as a bed. The application provides that the sensors can be used to detect presence of an object on a substrate and that such information "is

useful for calculating in/out statistics for a subject such as: time spent in bed, time of falling asleep, time of waking up, time spent out of bed."

85.     In summarizing the invention, the '623 Application states the "systems and methods use multiple sensors to sense a single subject's or multiple subjects' body motions against the force of gravity on a substrate, including beds."   It further states the "signals and metrics generated for subjects include: presence, motions, position, direction and rate of movement, respiration rate, respiration condition, heart rate, heart condition, beat to beat variation, supine or side lying, instantaneous weight and weight trends" and that secondary processing of these signals "can be used to predict bed exists, including direction and location of a bed exit, medical conditions such as heart arrhythmia, sleep apnea, restless leg, etc."   The '623 describes the "standard configuration [to] be four sensors per single bed and eight sensors for a multiple person bed."   The '623 Application also provides that some "examples of the additional types of data that this invention provides are the ability to provide dynamic center of mass locations, bed exit prediction, the ability to differentiate between two bodies on a bed, supine/side analysis and movement vectors for multiple subjects and other objects or animals on the bed."

86.    The '623 further depicts multiple examples of its application to a user in a bed, for example:






**(The '194 Application)**

87.    The invention disclosed in the '194 Application is titled "Multidimensional Multivariate Multiple Sensor System" and relates to systems and methods for determining biometric parameters and other person-specific information.  The background of the '194 Application describes the problem with prior art was that the "nature and limitations of various sensing mechanisms make it difficult or impossible to accurately determine a subject's biometrics, presence, weight, location and position on a bed due to factors such as air pressure variations or the inability to detect static signals.

88.    The '194 Application discloses:

Devices and methods for determining item-specific information for single or multiple items on one or multiple substrates are described.  The method includes generating multiple sensor multiple dimensions array (MSMDA) data from multiple sensors, where each of the multiple sensors capture sensor data for one or more items in relation to a substrate.  For each item, the method includes determining relationships between the multiple sensors based on characteristics of the MSMDA data, determining a location of the item on the substrate based on at least the determined relationships between the multiple sensors, determining an angular orientation of the item on the substrate based on at least the determined relationships between the multiple sensors, and determining a body position of the subject on the substrate based

at least the determined relationships between the multiple sensors, the location of the subject, and the angular orientation of the item.

89.    The '194 Application also discloses that the systems and methods use multiple sensors to sense a single subject's or multiple subjects' body motions against the force of gravity on a substrate, including beds, and that the sensors are designed to be placed under, or be built into a substrate, such as a bed.  Four of the pending claims refer to a "bed presence."  In addition, multiple of the '194 Application's Figures illustrate a bed or bed frame.  For example, as shown below Figures 1 and 3 of the '194 Application depict a "bed" or "bed frame with sensors incorporated, the bed frame configured to support [one or two] subjects."



FIG. 1



FIG. 3

90.     The '194 Application states that multiple sensors in a bed or bed frame can be used to obtain information on dynamic center of mass and center of signal locations, accurate bed exit prediction (timing and location of bed exit), the ability to differentiate between two or more bodies on a bed, body position analysis (supine/prone/side), movement vectors for multiple subjects and other objects or animals on the bed, presence, motion, location, angular orientation, direction and rate of movement, respiration rate, respiration condition, heart rate, heart condition, beat to beat variation, instantaneous weight and weight trends, and medical conditions such as heart arrhythmia, sleep apnea, snoring, restless leg, etc." and that at least some of this information can be measured "the entire time a subject is in bed every night."

91.     The '194 Application repeatedly describes its applications for one or more "sleepers" in bed.

**(The '627 Application)**

92.    The invention disclosed in the '627 Application is titled "Systems and Methods for Generating Synthetic Cardio-Respiratory Signals" and relates to systems and methods for determining and monitoring bio-signals, such as cardiac respiratory bio-signals, based on contactless sensor signals.

93.    The '627 Application discloses:

Devices and methods for generating synthetic cardio-respiratory signals from one or more ballistocardiogram (BCG) sensors. A method for determining item specific parameters includes obtaining ballistocardiogram (BCG) data from one or more sensors, where the one or more sensors capture BCG data for one or more subjects in relation to a substrate. For each subject, the captured BCG data is pre-processed to obtain cardio-respiratory BCG data. The cardio-respiratory BCG data is sub-sampled to generate the cardio-respiratory BCG data at a cardio-respiratory sampling rate conducive to cardio-respiratory signal generation. The sub-sampled cardio-respiratory BCG data is cardio-respiratory processed to generate a cardio-respiratory parameter set. A synthetic cardio-respiratory signal is generated from at least the cardio-respiratory parameter set and a cardio-respiratory event morphology template. A condition of the subject is determined based on the synthetic cardio-respiratory signal.

94.    The '627 Application also discloses that the contactless signals can be obtained from one or more sensors that are implemented in a variety of forms or structuring, including a bed, and that the sensors can be located in a variety of locations, including the bed frame or mattress.

95.    Further, multiple of the '627 Application Figures illustrate a bed or bed frame. The '627 Application includes similar figures and description as the '194 Application, including Figures 1 and 3 replicated above. The '627 Application also describes the use of various sensors incorporated into a "bed" or "bed frame" to collect

data and information including the period of time in bed, when the subject fell asleep or

woke up and the time the subject spent on their back, side, etc. For example:

> The long-term collected data can be used in both a medical and home setting
> to learn and predict patterns of sleep, illness, etc. for a subject. As algorithms
> are continually developed, the long-term data can be reevaluated to learn
> more about the subject. Sleep patterns, weight gains and losses, changes in
> heart beat and respiration can together or individually indicate many different
> ailments. Alternatively, patterns of subjects who develop a particular ailment
> can be studied to see if there is a potential link between any of the specific
> patterns and the ailment.

96.     The '627 Application describes several other sleep and health related

information that can be obtained from a user of the system.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment of Sleep Number's Ownership of The Inventions-at-Issue)

97.     Sleep Number re-alleges and incorporates by reference the allegations

contained in the paragraphs above of this Complaint as though fully set forth herein.

98.     Pursuant to 28 U.S.C. § 2201(a), the Court may declare the rights, status, or

legal relations of interested parties to a contract when a controversy exists between the

parties regarding the contract.

99.     As set forth above, an actual controversy exists among the parties as to Sleep

Number's right, title, and interest in the designs, inventions, improvements, developments,

discoveries, ideas, and trade secrets conceived, discovered, authored, invented, developed,

or reduced to practice pursuant to the Consulting Agreements.

100.    Under the contracts, Young and Hewitt assigned to Sleep Number, as its

exclusive property, all designs, inventions, improvements, developments, discoveries,

ideas, and trade secrets, conceived, discovered, authored, invented, developed or reduced

to practice, alone or in collaboration with others, that arose from or were in connection with performing services and/or completing deliverables, or that used Sleep Number's equipment, supplies facilities, or Confidential Information that are within the Product Development Scope of the Consulting Agreements as well as any patents or other IP rights in and to the foregoing (collectively, "Inventions").

101.    Under the contracts, Young and Hewitt were obligated to promptly make full written disclosure to Sleep Number of any Inventions.

102.    Under the contracts, Young and Hewitt agreed that all right, title and interest in the Inventions was and is "the sole property" of Sleep Number and agreed to and already did irrevocably assign all right, title and interest of any Inventions to Sleep Number. Young and Hewitt also agreed that "this assignment includes a present conveyance to [Sleep Number] of ownership of Inventions that are not yet in existence."

103.    Young and Hewitt acknowledged their obligations and understandings under the Consulting Agreements by signing them on December 4, 2017.

104.    The Consulting Agreements are valid and legally binding contracts.

105.    Sleep Number has fully performed its contractual obligations under the Consulting Agreements.

106.    Under the express terms of the contracts, Sleep Number owned any invention falling under the definition of Product Development Scope and Young and Hewitt were obligated to assign any rights in such inventions to Sleep Number.

107.    The definition of Product Development Scope Product under the contracts included "development, ideation, and/or implementation" of "any ideas conceptions,

inventions, or plans" relating to the areas of "sleep, mattresses, bedding, sleep monitoring, health or wellness as it relates to sleep (including biometric monitoring relating to sleep), or bedroom or sleep technologies."

108.    The Inventions-at-Issue are within the Product Development Scope of the contracts.    The Inventions-at-Issue all relate to sleep, mattresses, bedding, sleep monitoring, and health or wellness, including biometric monitoring relating to sleep, or are otherwise related to bedroom or sleep technologies.

109.    Any conception of the Inventions-at-Issue by Young and Hewitt was during their consulting relationship with Sleep Number where they were engaged in development, ideation, implementation, and/or reduction to practice of the invention.  Indeed, the '613 Application was filed on October 8, 2018, over a month before Young and Hewitt terminated the Consulting Agreements.  The '623 Application was filed less than three months after the termination of the Consulting Agreements.  Both the '194 and '627 Applications claim priority to the '613 and '623 Applications.  Indeed, the Inventions-at-Issue generally relate to biometric and/or bio signal monitoring and/or sensing, including through a bed.

110.    The Inventions-at-Issue relate to Sleep Number's business in these areas, relate to Young's and Hewitt's actual or anticipated work for Sleep Number, and resulted from work they performed for Sleep Number.

111.    Accordingly, the Inventions-at-Issue are covered by the scope of the contractual agreements.

112. Young and Hewitt agreed that all right, title and interest in the foregoing was and is "the sole property" of Sleep Number and agreed to and already did irrevocably assign all right, title and interest in the Inventions-at-Issue to Sleep Number.

113. As a result of the signed contracts, Sleep Number is the rightful and sole owner of the Inventions-at-Issue.

114. Neither Young nor Hewitt, nor any individual or company working on their behalf, was permitted to file patent applications and assign away interest in the patent applications for the Inventions-at-Issue because the legal title to those Inventions was already owned by Sleep Number. The assignment to UDP of the Inventions-at-Issue was willful and improper. Accordingly, any assignment of the Inventions-at-Issue to UDP are null and void.

115. Sleep Number has a legally protected interest in the prosecution of the '194 and '627 Applications.

116. There exists an actual, immediate, real, and substantial controversy between the parties having adverse legal interests regarding the ownership of all rights, title, and interest to the Inventions-at-Issue and claims on similar subject matter in any divisional, renewal, substitute, continuation, continuation-in-part, reissue, and reexamination applications that have or will be filed.

117. For the reasons set forth above, Sleep Number is entitled to a declaratory judgment that:

a.     Defendants have no ownership, authority, control, rights, title, and/or interest in the Inventions-at-Issue and may exercise no rights in, or utilize in any way, such applications;

b.     The contracts granted to Sleep Number all rights, title, and interest to the applications containing Claims;

c.     Sleep Number is the sole owner of the '613, '623, '194, and '627 Applications and any patent application that has or will been filed that claims priority thereto;

d.     Sleep Number is entitled to all royalties, proceeds, and benefits wrongfully earned, realized, and/or obtained by Defendants in any way arising from the Inventions-at-Issue and any intellectual property claiming similar subject matter; and

e.     Young, Hewitt, and UDP are not entitled to any payments or transfers of rights from Sleep Number with respect to the Inventions-at-Issue and any intellectual property claiming similar subject matter.

118.   Further, Sleep Number has suffered irreparable harm for which it is entitled to preliminary and permanent injunctive relief.

**SECOND CLAIM FOR RELIEF**

**(Breach of Contract Against Young & Hewitt)**

119.   Sleep Number re-alleges and incorporates by reference the allegations contained in the paragraphs above of this Complaint as though fully set forth herein.

120.   Young and Hewitt, separately as individuals, entered into valid and binding contracts with Sleep Number and Sleep Number has fully performed its contractual obligations under the agreements.

121.   Under the contracts, Young and Hewitt agreed to hold all of Sleep Number's Confidential Information in the strictest of confidence and to use reasonable precautions to prevent any unauthorized use or disclosure of the Confidential Information.  Young and Hewitt also agreed they would not (1) use the Confidential Information for any purpose whatsoever other than as necessary to perform services on behalf of Sleep Number or (2) disclose the Confidential Information to any third party without prior written consent of an authorized representative of Sleep Number.

122.   Under the contracts, no ownership interest of the Confidential Information was conveyed to either Young or Hewitt.  In addition, both Young and Hewitt agreed not to use or disclose any Confidential Information to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design any invention, product, or service.

123.   Young and Hewitt agreed that each of the foregoing obligations shall continue during and after the termination of the contracts.

124.   On information and belief, Young and/or Hewitt have used or retained some of Sleep Number's Confidential Information after the termination of the Consulting Agreements, including testing data, schematics, source code, and other confidential documents.

125.    On information and belief, Young and/or Hewitt have used, and/or have disclosed some of Sleep Number's Confidential Information to third-parties, which allowed them, or otherwise enabled others, to invent, author, make, develop, or design an invention, product, or service.

126.    In addition, to the extent Section 5.B of the Consulting Agreements is construed as a promise to assign in the future, Young and Hewitt were obligated to assign their rights, title, and interest in the Inventions-at-Issue to Sleep Number.

127.    Under the contracts, Sleep Number is the exclusive owner of all rights, title, and interest in the Inventions-at-Issue.

128.    Young and Hewitt deliberately and willfully withheld information related to the Inventions and the filing of the patent applications.  Further, neither Young nor Hewitt assigned any rights, title, or interest in the Inventions-at-Issue to Sleep Number.  Rather, both improperly assigned their rights in the Inventions-at-Issue to UDP.

129.    On information and belief, Young and Hewitt also solicited one or more employees of Sleep Number to leave Sleep Number and/or to provide Confidential Information to Young, Hewitt, or UDP.

130.    Based on the foregoing actions, Young breached one or more contractual provisions.  Based on the foregoing actions, Hewitt breached one or more contractual provisions.

131.    Even in the absence of the contracts, Young and Hewitt were hired to work on a specific project in an inventive or design capacity and/or were hired to solve a

particular problem and did so, thus creating an implied-in-fact contract to assign their rights to the Inventions-at-Issue to Sleep Number.

132.    Young and Hewitt have failed to assign Sleep Number all rights, title, and interest in the Inventions-at-Issue.  This is a breach of their express and/or implied contracts with Sleep Number.

133.    As a direct and proximate result of Young's and Hewitt's actions, Sleep Number is entitled to specific performance by Young, Hewitt, and UDP regarding the assignment of the Inventions-at-Issue to Sleep Number.

134.    As a direct and proximate result of Young's and Hewitt's willful breaches of contract, and pursuant to Section 10 of the Consulting Agreements removing any limitation on liability for such willful misconduct, Sleep Number has suffered damages in an amount to be determined at trial.

135.    In addition, pursuant to the contracts, Sleep Number is entitled to its costs and reasonable attorneys' fees from Young and Hewitt.

136.    Further, as a result of Young's and Hewitt's willful actions, Sleep Number has suffered irreparable harm for which it is entitled to preliminary and permanent injunctive relief and any other damages as allowed by law.

### THIRD CLAIM FOR RELIEF
### (Conversion Against All Defendants)

137.    Sleep Number re-alleges and incorporates by reference the allegations contained in the paragraphs above of this Complaint as though fully set forth herein.

38

138.    Sleep Number has a property interest in all of its confidential and/or proprietary business information, including but not limited to data, hardware, software, electronic files, products, services, code, practices, procedures, testing protocols, test results, etc.

139.    Sleep Number's confidential and proprietary business information includes tangible property.

140.    Defendants intentionally and substantially interfered with and deprived Sleep Number of its property interest in confidential and/or proprietary business information.

141.    Sleep Number did not consent to Defendants' actions with respect to Sleep Number's confidential and/or proprietary business information.

142.    As a direct and proximate result of Defendants' conversion, Sleep Number has suffered damages in an amount to be determined at trial.

143.    Further, Sleep Number has suffered irreparable harm for which it is entitled to preliminary and permanent injunctive relief.

## FOURTH CLAIM FOR RELIEF

### (Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq*., Against All Defendants)

144.    Sleep Number re-alleges and incorporates by reference the allegations contained in the paragraphs above of this Complaint as though fully set forth herein.

145.    Sleep Number owned and possessed the information used by Defendants to design and develop their technologies.

146. The information used by Defendants to design and develop their technologies comprises technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, or photographically.

147. The information used by Defendants to design and develop their technologies are confidential, proprietary, and trade secret information (the "Trade Secrets"), as those terms are used under the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

148. Sleep Number has taken reasonable measures to keep the Trade Secrets secret and confidential.

149. The Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

150. In violation of Sleep Number's rights, Defendants misappropriated the Trade Secrets.

151. Defendants also disclosed the Trade Secrets.

152. As a direct and proximate result of Defendants' misappropriation of Sleep Number's trade secret information, Sleep Number has suffered damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### (Violation of Delaware Uniform Trade Secrets Act, 6 De. Code § 2000, *et seq,* Against All Defendants)

153.    Sleep Number re-alleges and incorporates by reference the allegations contained in the paragraphs above of this Complaint as though fully set forth herein.

154.    Sleep Number owns the Trade Secrets described in paragraphs 144-152 above.

155.    Sleep Number has taken reasonable measures to keep the Trade Secrets secret and confidential.

156.    The Trade Secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by another person who could obtain independent economic value from the disclosure or use of the information.

157.    In violation of Sleep Number's rights, Defendants misappropriated the Trade Secrets.

158.    Defendants also disclosed the Trade Secrets.

159.    As a direct and proximate result of Young's and Hewitt's actions, Sleep Number is entitled to specific performance by Young, Hewitt, and UDP regarding the assignment of the Inventions-at-Issue to Sleep Number.

## SIXTH CLAIM FOR RELIEF

### (Tortious Interference with Contract Against UDP)

160.    Sleep Number re-alleges and incorporates by reference the allegations contained in the paragraphs above of this Complaint as though fully set forth herein.

41

161.    The contracts between Young/Hewitt and Sleep Number are valid and binding contracts.

162.    UDP is and has been aware of these contracts.

163.    UDP's executive officers signed and acknowledged their obligations under the contracts.

164.    On information and belief, UDP through its officers and agents, was aware of other contracts Sleep Number had with its current and former employees and consultants.

165.    On information and belief, Young and Hewitt deliberately failed to disclose the Inventions-at-Issue, including the filed and pending '613 Application, which covers subject matter within the Product Development Scope, while employed or consulting for Sleep Number.  On information and belief, this deliberate and willful breach of the contracts was done at the direction of and for the benefit of UDP.

166.    On information and belief, Young and Hewitt deliberately withheld information related to the Inventions-at-Issue in order to form UDP in an effort to commercialize the Inventions-at-Issue.

167.    On information and belief, UDP, through its officers and agents including but not limited to Young and Hewitt, deliberately used or disclosed Sleep Number's Confidential Information to invent, author, make, develop or design inventions, products, or services, or to enable others to do the same.

168.    On information and belief, UDP, through its officers and agents including but not limited to Young and Hewitt, deliberately sought from those that had Inventions,

within the scope of the contracts, or who used Sleep Number's Confidential Information to invent, author, make, develop, or design inventions, products or services to assign their rights, titles, and interests to UDP knowing that Sleep Number was the rightful and sole owner of said rights, titles, and interests.

169.   UDP intentionally interfered with the contracts by, without justification, accepting assignment of the Inventions-at-Issue and filing patent applications covering the Inventions-at-Issue.

170.   UDP intentionally interfered with the contracts by, without justification, soliciting or encouraging Sleep Number's employees to leave Sleep Number to join UDP.

171.   This in turn denied Sleep Number the right to seek patent protection of the Inventions-at-Issue as it sought fit.

172.   Further, on information and belief, UDP, through its officers and agents including but not limited to Young and Hewitt, deliberately sought to have current or former employees or consultants of Sleep Number breach one or more contracts to obtain, use, and/or disclose Sleep Number's Confidential Information.

173.   As a direct and proximate result of UDP's tortious interference, Sleep Number has suffered damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
### (Specific Performance/Mandatory Injunctive Relief)

174.   Sleep Number re-alleges and incorporates by reference the allegations contained in the paragraphs above of this Complaint as though fully set forth herein.

175.    Young, Hewitt, and UDP have refused and/or neglected to take the necessary steps in the United States Patent and Trademark Office to file the correct assignment showing the Inventions-at-Issue are owned by Sleep Number.

176.    Young, Hewitt, and UDP have refused and/or neglected to take the necessary steps in the United States Patent and Trademark Office to correct the improper assignment of the Inventions-at-Issue to UDP or to assign the Invention-at-Issue to Sleep Number as the proper owner by contract between the parties.

177.    Sleep Number will be irreparably harmed if it is not granted the right to prosecute the Inventions-at-Issue.

178.    Sleep Number has demonstrated a likelihood of success on the merits and it knows of no legal or equitable defense to its claims.

179.    Sleep Number's request is in the public interest, at least because it allows the owner of a property right to be able to prosecute and use its property right as it sees fit.

180.    Sleep Number believes, and therefore avers, that the balance of harms requires that an injunction or specific performance issue against Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Sleep Number prays for judgment against Defendants as follows:

A.     A declaration that Sleep Number is the sole owner of all rights, title, and interests in the Inventions-at-Issue;

B.     A judgment declaring that Defendants Young and Hewitt have breached their contracts with Sleep Number;

C.     A judgment requiring Defendants Young, Hewitt, and UDP to assign their rights in the Inventions-at-Issue to Sleep Number;

D.     A judgment declaring that Defendants Young, Hewitt, and UDP have engaged in unlawful conversion;

E.     A judgment declaring that Defendants Young, Hewitt, and UDP have misappropriated Sleep Number's trade secret;

F.     A judgment declaring that Defendant UDP has tortuously interfered with Sleep Number's contracts;

G.     A judgment awarding Sleep Number damages resulting from Defendants' actions;

H.     A judgment against Young and Hewitt awarding Sleep Number its reasonable attorneys' fees;

I.     A judgment requiring Defendants to pay Sleep Number costs and expenses;

J.     A permanent mandatory injunction for specific performance requiring all Defendants to take all steps necessary to assign and convey to Sleep Number the applications for the Inventions-at-Issue, and all applications claiming priority thereto; and

K.     Such other relief as the Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Sleep Number hereby demands a trial by jury on all issues so triable.

Dated:  July 2, 2020

**FOX ROTHSCHILD LLP**

By:  <u>s/ Lukas Toft</u>
Andrew S. Hansen (285894)
Randall J. Pattee (184962)
Lukas Toft (395984)

222 South Ninth Street, Suite 2000
Minneapolis, Minnesota  55402
Telephone:  (612) 607-7000
Facsimile:  (612) 607-7100
Email:  ahansen@foxrothschild.com
        rpattee@foxrothschild.com
        ltoft@foxrothschild.com

**ATTORNEYS FOR PLAINTIFF
SLEEP NUMBER CORPORATION**