## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| SLEEP NUMBER CORPORATION, | Case No. 20-CV-1507 (NEB/ECW) |
| Plaintiff, | |
| v. | ORDER ON MOTION TO DISMISS |
| STEVEN JAY YOUNG, CARL HEWITT, and UDP LABS, INC., | |
| Defendants. | |

---

This matter is before the Court on Defendants' motion to dismiss for lack of personal jurisdiction, improper venue, and failure to state a claim, or in the alternative to transfer venue under 28 U.S.C. § 1404(a). (ECF No. 54.) For the reasons that follow, the Court denies the motion in part and grants it in part.

## BACKGROUND

Plaintiff Sleep Number Corporation ("Sleep Number") is a Minnesota corporation that sells, among other things, adjustable beds. (ECF No. 1 ("Compl.") ¶¶ 1, 12.) Some of Sleep Number's beds include SleepIQ technology, a biometric monitoring system that can sense a variety of physiological signals of its occupant. (*Id.* ¶¶ 13, 15, 16.) Sleep Number developed part of this technology in partnership with BAM Labs, a California company for which Defendants Young and Hewitt both worked. (*Id.* ¶ 26.) In 2015, Sleep Number acquired BAM Labs and renamed it SleepIQ LABS. (*Id.*)

1

After the acquisition, Young and Hewitt continued to work for SleepIQ LABS; Young as the Chief Technology Officer and Hewitt as the Vice President of Engineering. (*Id.*) In these roles, Young and Hewitt worked on SleepIQ technology and other product development ideas. (*Id.* ¶ 42.) As a result, they had access to Sleep Number's confidential information and intellectual property. (*Id.*)

In November 2017, Young and Hewitt told Sleep Number that they wished to become consultants rather than employees. (*Id.* ¶ 27.) Roughly a month later, Young and Hewitt entered into consulting agreements, which acknowledged that Young and Hewitt wished to pursue an "alternative business venture." (*Id.* ¶¶ 28–29.) The next month, Young and Hewitt incorporated their venture and named it UDP Labs ("UDP"). (*Id.* ¶ 30.)

Meanwhile, Young and Hewitt also continued their work as Sleep Number consultants from California, reporting to Annie Bloomquist, who is based in Minnesota. (ECF No. 76 ¶ 12.) They still had access to Sleep Number's confidential information, some of which was stored in Minnesota. (*Id.*) They were paid from Minnesota and were in frequent contact with Sleep Number's Minnesota-based personnel. (*Id.* ¶¶ 13–14.)

Young and Hewitt also continued their UDP venture, and from October 2018 to January 2020, UDP filed four provisional patent applications ("Inventions"). (Compl. ¶¶ 46, 56, 57, 59, 76.) All four patent applications are for inventions that involve placing sensors under a substrate, such as a bed, to measure and predict sleep patterns, bed exits,

weight changes, and blood flow. (*Id.* ¶¶ 77–96.) Sleep Number claims ownership of these patent applications based on Young and Hewitt's consulting agreements, which require them to assign their rights to almost any inventions they developed during their consultancy to Sleep Number.[1] (*Id.* ¶¶ 100–02.) In November 2018, Young and Hewitt notified Sleep Number that they would be terminating their consulting agreements. (*Id.* ¶ 49.)

Sleep Number now alleges that Young and Hewitt breached their consulting agreements by not notifying and assigning their rights in the Inventions to Sleep Number. (*Id.* ¶¶ 119–36.) Sleep Number also brings claims of conversion, violation of federal and state trade secret statutes, and tortious interference with contract. (*Id.* ¶¶ 137–73.) In addition, Sleep Number seeks a declaratory judgment that it owns the Inventions, and specific performance requiring Young, Hewitt, and UDP to amend their patent applications to reflect Sleep Number's ownership of the Inventions. (*Id.* ¶¶ 97–118, 174–80.)

## ANALYSIS

Defendants move to dismiss on three bases: (1) the Court lacks personal jurisdiction over them; (2) Minnesota is an improper venue; and (3) several of Sleep Number's claims fail to state a claim on which relief may be granted. (ECF No. 54.) In the

---

[1] Young and Hewitt retained rights to inventions involving monitoring technologies for sudden infant death syndrome and blood pressure monitoring technologies. (ECF No. 77-1 at 2, § 1(E); ECF No. 77-2 at 2, § 1(E).)

alternative, Defendants seek to have this case transferred to the Northern District of California. (*Id.*) The Court concludes that it has personal jurisdiction over Defendants, Minnesota is a proper venue for this matter, the case should not be transferred, and only Sleep Number's tortious interference claim should be dismissed.

## I.      Personal Jurisdiction

Sleep Number's claims should not be dismissed if the pleadings, viewed in the light most favorable to it, are sufficient to support the exercise of jurisdiction over Defendants. *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015). "A federal court in a diversity action may assume jurisdiction over nonresident defendants only to the extent permitted by the long-arm statute of the forum state and by the Due Process Clause." *Dever v. Hentzen Coatings, Inc.*, 380 F.3d 1070, 1073 (8th Cir. 2004) (quoting *Morris v. Barkbuster, Inc.*, 923 F.2d 1277, 1280 (8th Cir. 1991)). As "Minnesota's long-arm statute authorizes courts to exercise jurisdiction to the full extent" of due process, the two prongs of the analysis collapse into a single due process inquiry. *Pederson v. Frost*, 951 F.3d 977, 980 (8th Cir. 2020). To comport with due process, a non-resident defendant must have sufficient contacts with the forum state such that exercising jurisdiction over him or her does not offend traditional notions of fair play and substantial justice. *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010).

The Eighth Circuit has set forth the following five-factor test to guide the due process inquiry: "(1) the nature and quality of defendant's contacts with the forum state; (2) the quantity of those contacts; (3) the relation of the cause of action to the contacts;" (4) the forum state's interest in providing a forum for its residents; and "(5) the convenience of the parties." *Id.* (citation omitted). Of these, the first three are afforded greater weight. *Datalink Corp. v. Perkins Eastman Architects, P.C.*, 33 F. Supp. 3d 1068, 1073 (D. Minn. 2014).

There are two types of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., San Francisco Cnty.*, 137 S. Ct. 1773, 1780 (2017). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). For a corporation, it is where the corporation is "fairly regarded as at home"—usually where the corporation is incorporated and where it has its principal place of business. *Id.* The parties do not dispute that the Court lacks general jurisdiction over Defendants—neither Young nor Hewitt live in Minnesota, and UDP is neither incorporated nor headquartered in Minnesota. Thus, if the Court has personal jurisdiction over defendants, it must be based on a finding of specific jurisdiction. Specific jurisdiction may only be exercised where the suit arises out of or relates to the defendant's contacts with the forum. *Id.* at 1780; *Myers v. Casino Queen, Inc.*, 689 F.3d 904, 912 (8th Cir. 2012) ("Specific personal jurisdiction, unlike general jurisdiction, requires a relationship between the forum, the

cause of action, and the defendant."). The Court finds that it has specific jurisdiction over all three defendants.

### A. Young and Hewitt

The quality and quantity of Young and Hewitt's contacts with Minnesota and the connection between those contacts and Sleep Number's claims are sufficient to establish this Court's specific jurisdiction over them. Taking Sleep Number's allegations as true, Young and Hewitt negotiated their consulting agreements, the breaches of which are at issue, at least in part, in Minnesota. (Compl. ¶ 27.) Young and Hewitt traveled to Minnesota on several occasions for work meetings.[2] (*Id.*; ECF No. 75 ¶¶ 6, 8.) Their immediate supervisor was based in Minnesota. (ECF No. 76 ¶ 7; Compl. ¶ 9.) And they used laptops issued by Sleep Number, through which they had access to Sleep Number's confidential information and intellectual property. (Compl. ¶ 42–43.)

Courts have routinely found such contacts to be sufficient to confer personal jurisdiction. *See, e.g.*, *ProMove, Inc. v. Siepman*, 355 F. Supp. 3d 816, 822 (D. Minn. 2019) (finding specific jurisdiction when defendants worked for and contracted with a forum-state company, even though those defendants had never traveled to the forum state);

---

[2] There is a dispute between the parties regarding for which meetings Young and Hewitt traveled to Minnesota and which they attended telephonically. (ECF No. 61 ¶ 9; ECF No. 58 ¶ 11.) It is uncontroverted that Young and Hewitt were in Minnesota for work on at least two occasions. (Compl. ¶¶ 27, 48; ECF No. 56 at 9.) Even ignoring this quibble, the fact that they traveled to the forum for work, when considered with their substantial other contacts with Minnesota, is sufficient to establish specific jurisdiction.

*Custom Conveyor Corp. v. Hyde*, 237 F. Supp. 3d 895, 900–01 (D. Minn. 2017) (concluding that the court had specific jurisdiction over defendant who traveled to Minnesota for work, communicated often with Minnesota-based employees, and was supervised by personnel in Minnesota); *Travel Leaders Leisure Grp., LLC v. Cruise & Travel Experts, Inc.*, No. 19-CV-2871 (SRN/ECW), 2020 WL 4604534, at *8–*9 (D. Minn. Aug. 11, 2020) (finding specific jurisdiction over defendant when he worked for a Minnesota company, used hardware and software provided by that company, reported to a supervisor in the forum state, and allegedly misappropriated trade secrets from the company).

The cases Defendants cite are largely inapposite. In *Sybaritic, Inc. v. Interport International, Inc.*, the court held that there was no jurisdiction over a company whose only contact with Minnesota was its president's two-day trip to Minnesota and where the contract giving rise to the cause of action was "negotiated, drafted, and apparently executed" in Japan. 957 F.2d 522, 523 (8th Cir. 1992). The Eighth Circuit in *Pangaea, Inc. v. Flying Burrito LLC* held that the district court did not have jurisdiction over defendants whose only contact with the forum state was a brief trip that was unrelated to the claim. 647 F.3d 741, 749 (8th Cir. 2011). Finally, in *Austad Co. v. Pennie & Edmonds*, the Eighth Circuit held that the district court did not have jurisdiction over a law firm where an attorney at the firm made one trip to the forum state, and the only other connection was that the firm represented a forum-state client. 823 F.2d 223, 226–27 (8th Cir. 1987).

If Young and Hewitt's trips to Minnesota were their only connection to the forum, these cases would be more compelling. But, as detailed above, their connections to Minnesota related to the claims at issue are much more numerous and substantial than in these cases. Based on these contacts with Minnesota, the Court has personal jurisdiction over Young and Hewitt.[3]

### B. UDP Labs

The Court also has personal jurisdiction over UDP. A court may have jurisdiction over a corporation based on the acts of its agents. *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014). Even absent actual or apparent authority for the agent to act, when a principal "supports, accepts, and follows through on" the agent's conduct, the principal may be subject to vicarious personal jurisdiction. *Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc.*, 65 F.3d 1427, 1433 (8th Cir. 1995) (cleaned up). Imputation of the agent's contact with the forum state is also appropriate when the corporation accepts the benefits of the agent's improper conduct. *Id.*

UDP was incorporated in January 2018. (Compl. ¶ 30.) Until UDP was incorporated, UDP could not have had agents, and thus the Court cannot exercise jurisdiction over UDP based on Young and Hewitt's contacts with Minnesota prior to its

---

[3] Because the Court has found personal jurisdiction under the traditional due process inquiry, it does not address Sleep Number's additional argument that the *Calder* "effects test" provides support for jurisdiction here. (ECF No. 72 at 14–16.); *Calder v. Jones*, 465 U.S. 783, 790 (1984).

incorporation. Pre-2018 contacts are unnecessary, however, because Young and Hewitt, as agents of UDP, had enough post-incorporation contacts with Minnesota for the Court to exercise vicarious jurisdiction over UDP.

Even if Young and Hewitt did not have actual or apparent authority to act on behalf of UDP, UDP benefitted from the pair's acts, making it appropriate to exercise jurisdiction over UDP. *Travel Leaders*, 2020 WL 4604534, at *13–*14. Young and Hewitt allegedly accessed Sleep Number's confidential information and used it in the development of the Inventions. (Compl. ¶¶ 121–25.) UDP currently owns the rights to the Inventions; hence, Young and Hewitt's acts benefitted UDP, making it appropriate for the Court to exercise vicarious jurisdiction over UDP. *Wessels, Arnold & Henderson*, 65 F.3d at 1433. Furthermore, Sleep Number alleges that Young and Hewitt were required to assign rights in any inventions developed during their time as consultants to Sleep Number. (*Id.* ¶ 35.) Instead, Young and Hewitt assigned these rights to UDP. (*Id.* ¶ 128; ECF No. 73, Exs. A–C.) Again, UDP benefitted from the acts and omissions of Young and Hewitt, meaning the Court may exercise jurisdiction over UDP under an agency theory of personal jurisdiction.

## II.     Venue

Minnesota is a proper venue for this suit because a substantial part of the events or omissions giving rise to it occurred in Minnesota. 28 U.S.C. § 1391. The Court rejects

Defendants' argument that this case should be transferred to the Northern District of California.

### A.  Venue is Proper in Minnesota

Defendants argue that this case should be dismissed because Minnesota is not a proper venue for Sleep Number's claims. (ECF No. 56 at 14–16.) But because a substantial part of the acts and omissions that give rise to Sleep Number's claims occurred in Minnesota, venue here is proper.

As a threshold matter on venue, Sleep Number's argument that Young and Hewitt waived any objection to venue in their consulting agreements is a non-starter. (ECF No. 72 at 20–21.) The consulting agreements state that the parties "may petition or file an action in a court with jurisdiction." (ECF No. 77-1 at 11, § 11(D); ECF No. 77-2 at 11, § 11(D).) Although the provision is phrased permissively, Sleep Number claims it operates as a waiver to Young and Hewitt's ability to object to venue. (ECF No. 72 at 20.) Sleep Number cites several cases in support, none of which concern similar contractual language.[4] No reasonable construction of the consulting agreements operates to foreclose Defendants' objection to venue.

---

[4] *E.g.*, *In re RFC and ResCap Liquidating Trust Litig.*, No. 13-CV-3451 (SRN/HB), 2017 WL 1483374, at *13 (D. Minn. Apr. 25, 2017) ("Each of the parties irrevocably submits to the jurisdiction of any state or federal court located in Hennepin County, Minnesota."); *Huawei Techs. Co., Ltd. v. Yiren Huang*, No. 4:17-CV-00893, 2018 WL 1964180, at *8 (E.D. Tex. Apr. 25, 2018) ("I hereby irrevocably agree that the exclusive forum for any suit, action, or other proceeding arising out of or in any way related to this Agreement shall be in the state or federal courts in Texas, and I agree to the exclusive personal jurisdiction

Nonetheless, Minnesota is a proper venue for Sleep Number to bring these claims. The parties seem to agree that whether venue is proper in Minnesota depends on whether "a substantial part of the events or omissions giving rise to the claim" occurred in Minnesota. 28 U.S.C. § 1391(b)(2); (ECF No. 56 at 15; ECF No. 72 at 22–25.) Venue may be proper in multiple districts, but the case need not proceed in the district where venue would be "best." *Steen v. Murray*, 770 F.3d 698, 702 (8th Cir. 2014) (citations omitted).

A substantial part of the events giving rise to Sleep Number's claims occurred in Minnesota. First, Young and Hewitt were in Minnesota when they notified Sleep Number that they wished to transition to consultant roles. (Compl. ¶ 27.) Initial discussions about this transition occurred at the same meeting. (*Id.*) Additionally, by virtue of consulting for Sleep Number, Young and Hewitt had access to Sleep Number's confidential information. It is reasonable to infer that Young and Hewitt gleaned at least some of this information from meetings that took place in Minnesota or conversations with Minnesota-based employees. This access underlies Sleep Number's trade secret, breach of contract, and conversion claims.

Defendants argue that finding venue proper in Minnesota would require the Court to improperly assess Sleep Number's acts, rather than Defendants'. (ECF No. 56 at 15.) Although Defendants are correct that the Court's venue determination turns on its

---

and venue to any court [in] Collin County Texas."). The forum selection clauses in those cases are mandatory, in contrast with the permissive clause in the consulting agreements here.

consideration of their actions, not Sleep Number's, their application of this principle is erroneous. and the Court finds that venue is proper in Minnesota based on Defendants' acts.

### B.   *Transfer to the Northern District of California is Not Warranted*

Defendants argue that this case should be transferred to the Northern District of California because it would be more convenient for the parties and witnesses and the interests of justice would be served by such a transfer.

A district court may transfer a case to another district for the convenience of parties and witnesses when the case could have initially been brought in the transferee court. 28 U.S.C. § 1404(a). When determining whether to transfer a case, a court should consider "(1) the convenience of the parties, (2) the convenience of the witnesses, and (3) the interests of justice." *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 691 (8th Cir. 1997). Motions to transfer venue under section 1404(a) "should not be freely granted as federal courts give considerable deference to a plaintiff's choice of forum." *ProMove*, 355 F. Supp. 3d at 824 (internal quotations omitted). The party seeking a transfer of venue faces a heavy burden—it must show that the factors strongly favor transfer. *Id.* (citation omitted); *Graff v. Qwest Commc'ns Corp.*, 33 F. Supp. 2d 1117, 1121 (D. Minn. 1999). A plaintiff's choice of forum is given "considerable deference." *ProMove*, 355 F. Supp. 3d at 824 (citation omitted).

Defendants have not established that the case should be transferred, much less met the "heavy burden" to merit transfer. First, it is not clear that litigating in the Northern District of California would be more convenient for the parties. Although Defendants rightly point out that Sleep Number has a number of retail locations in California, (ECF No. 56 at 17), having retail locations in a state does not necessarily mean that it would be convenient for that party to litigate in the forum. Sleep Number is, after all, headquartered and incorporated in Minnesota. (Compl. ¶ 1.)

Second, the Court has no reason to believe that transferring this case would be more convenient for possible witnesses. Defendants list four potential California-based witnesses who they believe have relevant information (ECF No. 56 at 18); Sleep Number identifies seven Minnesota-based potential witnesses. (ECF No. 77 ¶ 10.) On this record, the Court cannot conclude that transferring the case will serve the convenience of the witnesses.

Finally, the interests of justice do not require transfer. *See Terra Int'l*, 119 F.3d at 696 (listing factors to consider). Sleep Number chose Minnesota as a forum, and its choice is entitled to deference. *Terra Int'l*, 119 F.3d at 695. Defendants have not established that litigating in Minnesota would be costlier, nor have they credibly argued that Sleep Number would be unable to enforce a judgment rendered by this Court.[5] There is no

---

[5] Defendants' argument on this point is confusing: "Sleep Number is unable to enforce a judgment in Minnesota, because Defendants do not have property, offices, or assets in California. This factor favors transfer." (ECF No. 56 at 19.) First, the Court assumes that

conflict of laws issue, since this Court is able to apply Delaware law, the relevant law based on the Consulting Agreements. (Compl. ¶ 41); *e.g., Transocean Grp. Holdings Pty Ltd. v. S.D. Soybean Processors, LLC*, 663 F. Supp. 2d 731, 737–38 (D. Minn. 2009).

Finally, Defendants argue that since a significant portion of the events giving rise to this claim occurred in California, California has an interest in deciding this case. Even if California did have such an interest, it would not override the other factors, which are neutral or weigh against transfer. Transfer in this case would, at best, shift inconvenience from one party to the other, which is not a permissible basis for transferring a case. *Terra Int'l*, 119 F.3d at 696–97. Defendants have not met their heavy burden to show that this case should be transferred.

## III.    Failure to State a Claim

Defendants seek dismissal of Sleep Number's declaratory judgment, breach of contract, trade secrets, conversion, and tortious interference claims for failure to state a claim. The Court concludes that only the tortious interference claim should be dismissed.

Rule 12(b)(6) of the Federal Rules of Civil Procedure requires the Court to dismiss a complaint for failure to state a claim upon which relief can be granted if it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). When reviewing a Rule 12(b)(6) motion to dismiss, a

---

Defendants meant that they do not have property in Minnesota, rather than California. Second, Defendants identify no obstacle to Sleep Number enforcing a judgment rendered in Minnesota, even if Defendants have no assets in the state.

14

court must "tak[e] all facts alleged in the complaint as true, and mak[e] reasonable inferences in favor of the nonmoving party." *Smithrud v. City of St. Paul*, 746 F.3d 391, 397 (8th Cir. 2014). Although the factual allegations need not be detailed, they "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court "is not limited to the allegations in the complaint but may also consider materials that do not contradict the complaint, or materials that are necessarily embraced by the pleadings." *Smithrud*, 746 F.3d at 397 (internal quotation marks omitted).

### A. Declaratory Judgment

Defendants claim that Sleep Number's declaratory judgment claim should be dismissed because it is not ripe and because deciding this claim would not accord finality to the dispute.[6] (ECF No. 56 at 21–24.) The dispute is ripe and deciding it would fully and finally resolve the issue, so this count will not be dismissed.

---

[6] The Court notes that challenges to the ripeness of a claim are usually brought under Rule 12(b)(1), rather than Rule 12(b)(6). *Wax 'n Works v. City of St. Paul*, 213 F.3d 1016, 1020 (8th Cir. 2000) (noting that dismissals for lack of ripeness are more properly made pursuant to Rule 12(b)(1) than Rule 12(b)(6)); *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989) ("Whether a claim is ripe for adjudication goes to a court's subject matter jurisdiction under the case or controversy clause of article III of the federal Constitution."). Although the ripeness claim may not be properly presented, the Court has an "obligation to determine whether subject-matter jurisdiction exists," and will nevertheless analyze this claim. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 501 (2006).

The Declaratory Judgment Act requires an "actual controversy." 28 U.S.C. § 2201(a). The dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quotation omitted). Defendants claim that Sleep Number's declaratory judgment claim is not ripe because it concerns patent applications, not issued patents. Courts have regularly found, however, that a patent need not issue before ownership of the patent application is decided. *E.g.*, *Allergia, Inc. v. Bouboulis*, No. 14-CV-1566 JLS (RBB), 2015 WL 11735654, at *5 (S.D. Cal. Aug. 17, 2015) (finding a justiciable controversy when the parties disagree over ownership of patent applications).

The cases Defendants rely on focus on patent validity or infringement, not ownership. *See GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479 (Fed. Cir. 1996) (patent validity and infringement); *Superior Indus., L.L.C. v. Thor Glob. Enters.*, No. 10-CV-2524 (MJD/LIB), 2011 WL 601217 (D. Minn. Feb. 11, 2011) (patent infringement). The difference is critical. In validity or infringement cases, it makes sense for courts to defer until the exact bounds of the patents are determined, since validity or infringement depend on the final details of the patent. The issue of who owns a patent, however, need not be deferred until the patent is issued because the construction of the patent application's claims does not affect ownership. A court can determine who owns a patent application even if all the details are not yet finalized. *Allergia*, 2015 WL 11735654, at *5.

Defendants also claim that the declaratory judgment claim is not ripe because it is not yet clear whether the Inventions fall within Young and Hewitt's product development carve-out. Under their consulting agreements, Young and Hewitt retain rights to "monitoring technologies for sudden infant death syndrome" and "blood pressure monitoring technologies." (ECF No. 58-1, Ex. C at 2.) In Young and Hewitt's view, since no patents have yet issued, there is still factual uncertainty, and the Court cannot declare whether the Inventions fall within the carve out. (ECF No. 79 at 11.) This argument is unavailing because the Court need not decide at this stage whether the Inventions fall within the carve-out. Sleep Number has adequately pled that it is the rightful owner of the patent applications, and this is enough to survive a motion to dismiss. Thus, Sleep Number's declaratory judgment claim is ripe for adjudication.

Defendants next argue that the Court should refuse to adjudicate the declaratory judgment claim because doing so would not fully and finally resolve the issue of ownership, since not all inventors listed on the applications were joined in this lawsuit. (ECF No. 56 at 23–24); *Calderon v. Ashmus*, 523 U.S. 740, 747 (1998) (holding the case to be nonjusticiable when a declaratory judgment would not resolve the entire case or controversy). Like the ripeness argument, this argument also fails.

As explained above, the declaratory judgment claim concerns ownership of the patent applications. Thus, whether resolving this dispute would accord finality to the controversy depends on whether all people or entities with a claim to ownership to the

applications are present in this suit; the Court finds that they are. Sleep Number alleges that rights to the Inventions were assigned to UDP. (Compl. ¶¶ 114, 128, 168.)  The issue of additional owners, if any, is not properly before this Court at this stage of the litigation. The claim is adequately pled.

### B. Breach of Contract

Defendants argue that Sleep Number's breach of contract claim should be dismissed because Sleep Number did not provide fair notice of the confidential information at issue in this claim. Since the pleadings are adequately specific on this point, Sleep Number's breach of contract claim will not be dismissed.

To state a claim for breach of contract, a plaintiff must plead "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). When the breach of contract involves misuse of confidential information, the confidential information need not be enumerated exactly; rather, it is enough to plead facts that establish the nature of the confidential information. *E.g.*, *Akzo Nobel Coatings Inc. v. Dow Chem. Co.*, No. 8666–VCP, 2015 WL 3536151, at *8–*9 (Del. Ch. June 5, 2015) (explaining that there is no requirement that a breach of contract claim based on misuse of confidential information be pled with particularity and finding that allegations concerning the categories of confidential information defendant misused were sufficient to survive a motion to dismiss); *Schlief v. Nu-Source, Inc.*, No. 10-CV-4477

(DWF/SER), 2011 WL 1560672, at *4 (D. Minn. Apr. 25, 2011) (noting that, at a minimum, the plaintiff must plead facts identifying the type of confidential information at issue); *Mattern & Assocs., LLC v, Latham & Watkins LLP*, No. 13-CV-6592, 2014 WL 4804068, at *2 (E.D. Pa. Sept. 26, 2014) (finding plaintiff's allegations of the nature of the information sufficient to withstand a motion to dismiss); *Dorset Indus., Inc. v. Unified Grocers, Inc.*, 893 F. Supp. 2d 395, 412 (E.D.N.Y. 2012) (concluding that allegations that the defendant violated a confidentiality provision, supported by inferences, adequately pled).

Here, the allegations in the Complaint are more than sufficient to give notice to Young and Hewitt about the categories of confidential information at issue. Sleep Number alleges that the confidential information includes "testing data, schematics, source code, and other confidential documents." (Compl. ¶ 124.) When meeting with Young and Hewitt, Sleep Number alleges that it told Young and Hewitt that confidential information included not only source code, but also "any ideas, specialized know-how, processes, [and] product plans." (*Id.* ¶ 48.) The Complaint also provides context for the claim, alleging that when Young and Hewitt consulted for SleepIQ they worked on SleepIQ technology and other "methods of collecting data related to sleepers and sleep environments." (Compl. ¶¶ 42, 44.) The Inventions all relate to monitoring the biometric information of people in beds. (Compl. ¶¶ 77–96.) Considering the explicit allegations, paired with the context provided by other parts of the Complaint, Young and Hewitt have sufficient notice of what confidential information is at issue here.

### C. Conversion

Defendants next argue that Sleep Number's Delaware Uniform Trade Secrets Act ("DUTSA") claim preempts its conversion claim. (ECF No. 56 at 26–27.) The DUTSA preempts "conflicting tort, restitutionary and other law[s] . . . providing civil remedies for misappropriation of a trade secret." Del. Code Ann. tit. 6, § 2007. The DUTSA "preserves a single tort cause of action under state law for misappropriation of trade secrets and eliminate[s] other tort causes of action founded on allegations of trade secret misappropriation." *Overdrive, Inc. v. Baker & Taylor, Inc.*, No. 5835-CC, 2011 WL 2448209, at *4 (Del. Ch. June 17, 2011) (quotation omitted). Thus, a common law claim is preempted if it is "grounded in the same facts which purportedly support the [DUTSA] claim." *Ethypharm S.A. France v. Bentley Pharms., Inc.*, 388 F. Supp. 2d 426, 433 (D. Del. 2005) (citing *Savor, Inc. v. FMR Corp.*, No. 00C-10-249-JRS, 2001 WL 541484, at *4 (Del. Super. Ct. 2001)).

Sleep Number's conversion claim is not wholly preempted by the DUTSA because the conversion claim is not coterminous with the trade secrets claims. Specifically, the conversion claim is based in part on conversion of tangible goods such as Sleep Number's hardware. (Compl. ¶¶ 138–39.) This is distinct from the information that underlies the trade secret claims; Sleep Number's conversion claim does not depend on it being able to establish a trade secret violation. *See Moon Express, Inc. v. Intuitive Machines, LLC*, No. 16-CV-344-LPS-CJB, 2017 WL 4217335, at *12 (D. Del. Sept. 22, 2017), *report and recommendation adopted*, 2017 WL 11554232 (D. Del. Oct. 30, 2017). As such, the conversion

20

claim may go forward, but only to the extent that it is supported by allegations distinct from those that support Sleep Number's trade secrets claims.

### D. Trade Secrets

Similar to the breach of contract claim, Defendants contend that Sleep Number's trade secrets claims are not pled specifically enough to give them to give them notice of the claim. (ECF No. 56 at 27–30.) A party bringing a trade secrets claim must "identify a trade secret with sufficient particularity so as to provide notice to a defendant of what he is accused of misappropriating and for a court to determine whether misappropriation has or is threatened to occur." *Flexible Techs., Inc. v. SharkNinja Operating LLC*, No. 18-CV-348-CFC, 2019 WL 1417465, at *2 (D. Del. Mar. 29, 2019) (quotation omitted). But the trade secret need not be described in significant detail in a complaint, because doing so would "result in public disclosure of the purported trade secrets." *Id.* (quotation omitted).

Here, Sleep Number has identified the trade secrets with sufficient particularity to survive a motion to dismiss. Sleep Number alleged that it "owned and possessed the information used by Defendants to design and develop their technologies." (Compl. ¶ 145.) Read in context with the rest of the Complaint, it is evident that the trade secrets involve biometric monitoring technology. Sleep Number uses proprietary sleep-monitoring technology in some of its beds, (Compl. ¶¶ 14–22), Young and Hewitt worked with such technology when they were consulting for Sleep Number, (*id.* ¶ 42), and similar technology is used in the Inventions, (*id.* ¶¶ 76–96). Because the type of information at

issue in Sleep Number's trade secrets claims is sufficiently clear, these claims will not be dismissed.

### E. Tortious Interference

Finally, Defendants claim that Sleep Number's tortious interference claim against UDP fails because Sleep Number failed to allege that UDP acted in bad faith. Under Delaware law, the elements of a tortious interference with contractual relations claim are "(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." *Grunstein v. Silva*, No. 3932–VCN, 2009 WL 4698541, at \*16 (Del. Ch. Dec. 8, 2009). In addition, Delaware recognizes an affiliate privilege—the principle that "a party to a contract cannot tortiously interfere with its own contractual relations, and affiliates can be understood to share in the contractual interest." *Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*, No. 7668–VCN, 2015 WL 394011, at \*9 (Del. Ch. Jan. 29, 2015). The applicability of the affiliate privilege is not limited solely to parent/subsidiary relationships. Rather, "where an entity under the control of a contracting party is used by that party as an instrument to breach the contract, it is improper to accord it separate status as a tortfeasor." *Grunstein*, 2009 WL 4698541, at \*16; *see also Tenneco Auto. Inc. v. El Paso Corp.*, No. Civ.A. 18810-NC, 2007 WL 92621, at \*6 n.33 (Del. Ch. Jan. 8, 2007) ("Because one need not be a party to a contract to be deemed not to be a stranger to the contract, officers, subsidiaries, and agents, such as lawyers, benefit from a privilege

against tortious interference with contract claims because they are so closely related to the parties to the contract."). Thus, when a contracting party and an allegedly interfering party "share common economic interests," the affiliate privilege applies. *Grunstein*, 2009 WL 4698541 at *17. To overcome this privilege, the plaintiff must allege that the interfering party "was motivated by some malicious or other bad faith purpose to injure the plaintiff." *Id.* at *16 (citation omitted).

Here, the affiliate privilege applies to Sleep Number's tortious interference claim. UDP, the allegedly interfering party, is an entity under the control of both Young and Hewitt, the contracting parties. (Compl. ¶¶ 30, 73–74 (alleging that Young and Hewitt incorporated UDP, that Young is the Chief Executive Officer of UDP, and that Hewitt is the Chief Technology Officer of UDP); *Grunstein*, 2009 WL 4698541, at *16. Further, Young and Hewitt share common economic interests with UDP. (*See* Compl. ¶¶ 165–66 (alleging that UDP benefitted from Young and Hewitt's filing of the patent applications).) Therefore, the affiliate privilege applies to Sleep Number's tortious interference claim, and, to state a claim, Sleep Number is required to plead that UDP acted maliciously or in bad faith.

Sleep Number has made no such allegations. Sleep Number alleges that UDP acted without justification (Compl. ¶¶ 169–70), but acting without justification and acting maliciously or in bad faith are two different things. *See, e.g., Renco Grp.*, 2015 WL 394011, at *9 (noting that alleging bad faith or malice is an additional requirement on top of

23

alleging, among other things, lack of justification). Sleep Number's Complaint is devoid of any allegations that UDP acted with bad faith or malice, and, as such, Sleep Number's tortious interference claim is dismissed without prejudice.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1. Defendants' Motion to Dismiss (ECF No. 54) is GRANTED IN PART and DENIED IN PART.

2. Count VI of Sleep Number's Complaint is DISMISSED WITHOUT PREJUDICE.

3. Sleep Number's remaining claims remain pending.

Dated: December 16, 2020                    BY THE COURT:

                                            s/Nancy E. Brasel
                                            Nancy E. Brasel
                                            United States District Judge