# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Sleep Number Corporation,<br><br>                   Plaintiff,<br><br>v.<br><br>Steven Jay Young; Carl Hewitt; UDP Labs, Inc., a Delaware corporation,<br><br>                   Defendants. | Court File No. 20-cv-01507-NEB-ECW<br><br>**SLEEP NUMBER'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION** |

## INTRODUCTION

Plaintiff Sleep Number Corporation ("Sleep Number") respectfully moves this Court for a preliminary injunction against Defendants Steven Jay Young ("Young"), Carl Hewitt ("Hewitt"), and UDP Labs, Inc. ("UDP") (collectively "Defendants").

Defendants have misappropriated property that is rightfully owned by Sleep Number—and yet, despite the pendency of this lawsuit, Defendants have recently taken additional actions that harm Sleep Number. The injunctive relief sought by Sleep Number on this motion is necessary to preserve the status quo and prevent Defendants from taking further action to undermine and harm Sleep Number's property. Indeed, this motion is made necessary by Defendants' recent "amendments" to several of the patent applications at issue to change the effective filing date of the applications, potentially subjecting Sleep Number's property to additional "prior art" and limiting the scope of the patent claims rightfully owned by Sleep Number.

Beyond Defendants' transparent attempt to re-write history to assist their defense in this case, Defendants' conduct in prosecuting the patent applications causes real-world and irreparable harm to Sleep Number. In fact, Defendants' conduct at every juncture has been contrary and harmful to Sleep Number's rights—from Young and Hewitt failing to disclose and assign their inventions to Sleep Number as required by their Consulting Agreements, to Young and Hewitt secretly filing patent applications and assigning them to UDP, to Defendants' recent actions in changing the priority dates of those applications. Upcoming Office Actions from the United States Patent and Trade Office ("USPTO") related to the patent applications at issue will present another opportunity for Defendants to further harm Sleep Number. As the currently recognized owner of record of the patent applications at issue, only UDP may prosecute those applications and take further actions that impair the patents' value and harm Sleep Number. Defendants' recent conduct underscores how far they will go in attempting to benefit themselves to the detriment of the patents and their true owner, Sleep Number.

Due to Defendants' conduct, Sleep Number has and will continue to suffer irreparable harm and an injunction over Defendants' patent prosecution activities is warranted. *See Compact Van Equip. Co., Inc. v. Leggett & Platt, Inc.*, 566 F.2d 952, 955 (5th Cir. 1978) (affirming enjoinment of prosecuting patent application); *Ethicon Endo-Surgery, Inc. v. Crescendo Technologies, LLC*, No. 1:07CV1016, 2009 WL 2707805, *6–7 (S.D. Ohio Aug. 24, 2009). More specifically, Sleep Number requests that the Court enjoin Defendants from further prosecuting, amending, or abandoning claims or claim scope in the patent applications identified in Sleep Number's First Amended Complaint

("the Inventions-at-Issue"). Sleep Number also asks that the Court enjoin Defendants from filing any additional patent applications. This relief would not alter the ultimate prosecution of the claims—it would merely delay it in order to preserve the status quo.

## FACTUAL BACKGROUND

### I.   YOUNG AND HEWITT TRANSITION FROM SLEEP NUMBER EMPLOYEES TO CONSULTANTS .

In 2012, Defendants Young and Hewitt, by and through their roles at BAM Labs, partnered with Sleep Number to develop and commercialize SleepIQ® technology. (Am. Compl ("Dkt. 119"), ¶26; Dkt. 16, ¶7.) In September 2015, Sleep Number acquired BAM Labs, renaming it SleepIQ LABS, Inc. ("SleepIQ LABS"), and entered into employment agreements with Young and Hewitt. (Dkt. 119, ¶26; Dkt. 75, ¶¶4–5; Dkts. 59-1, 62-1.) Young continued as Chief Technology Officer; Hewitt continued as Vice President of Engineering. (Dkt. 119, ¶26; Dkt. 16, ¶¶7–8.) In November 2017, Young and Hewitt informed Sleep Number of their intent to transition away from being employees of SleepIQ LABS to pursue a new venture (UDP). (Dkt. 16, ¶9; Dkt. 58, ¶12; Dkt. 61, ¶10; Dkt. 75, ¶6.) Young and Hewitt represented to Sleep Number that UDP would not compete with Sleep Number. (Dkt. 119, ¶¶27, 54–55, 58; Dkt. 75, ¶7; Dkt. 76, ¶10.)

Based in part on this representation, Sleep Number agreed to enter into Consulting Agreements with Young and Hewitt, which were signed on December 4, 2017. (Dkt. 75, ¶¶6-7; Declaration of Lukas Toft ("Toft Decl.") Exs. 1, 2) (hereinafter "Consulting Agreements").) Pursuant to the Consulting Agreements, Young and Hewitt were responsible for "product development, ideation, and/or implementation of any ideas,

conceptions, inventions, or plans relating to sleep, mattresses, bedding, sleep monitoring, health or wellness as it relates to sleep (including biometric monitoring relating to sleep), or bedroom or sleep technologies." *(Id.* at Section 1.E.) To facilitate their work on SleepIQ® technology and other projects, Young and Hewitt continued to attend meetings where they participated in detailed discussions about Sleep Number's product development projects and plans, and viewed and discussed Sleep Number's proprietary and confidential information. (Dkt. 119, ¶¶9, 42; Dkt. 75, ¶8; *see also* Dkt. 76, ¶¶5, 8; Dkt. 77, ¶6.)

## II.   YOUNG AND HEWITT AGREE TO DISCLOSE AND ASSIGN ALL INVENTIONS WITHIN THE PRODUCT DEVELOPMENT SCOPE TO SLEEP NUMBER.

The Consulting Agreements contain detailed provisions related to Sleep Number's confidential information and intellectual property ("IP") rights. (*See* Dkt. 119, ¶¶27–41; Dkt. 75, ¶7; *see* Dkts. 57-1, 61-1.) For example, the Agreements include a detailed definition of "Confidential Information" and a Nonuse and Nondisclosure provision requiring Young and Hewitt to hold Sleep Number's confidential information in the strictest confidence and to not use or disclose such information. (*See* Consulting Agreements at Section 4.A–B.) Young and Hewitt also agreed to make full written disclosure to Sleep Number of any inventions, whether conceived or reduced to practice, during the term of the Agreements. (*Id*. at Section 5.A.) Finally, Young and Hewitt agreed to—and did—assign all right, title, and interest in such inventions to Sleep Number and agreed to assist Sleep Number with the filing and prosecution of any patents on the inventions. (*Id*. at Sections 5.A, 5.E.)

## III.   SLEEP   NUMBER   DEVELOPS   BIOMETRIC   MONITORING TECHNOLOGIES.

Sleep Number has a long history of work on biometric monitoring. In fact, SleepIQ® technology—the technology that Sleep Number partnered with and employed Young and Hewitt to develop—uses biometric monitoring. (Dkt. 119, ¶¶13, 42.) SleepIQ® technology is a non-invasive and non-wearable technology incorporated into a bed that uses high-resolution full body ballistocardiography ("BCG") sensor readings to measure a sleeper's movements throughout the night; these readings can be used to derive information about, and improve, the sleeper's sleep quality and health/wellness. (Dkt. 119, ¶¶15–23, 26.)

After developing its SleepIQ® technology, Sleep Number continued to work on inventions and products related to biometric monitoring, including while Young and Hewitt were consultants tasked with working on "biometric monitoring relating to sleep." (Dkt. 119, ¶¶23, 28, 31–32, 42, 48.) For example, on November 14, 2018, Sleep Number filed a patent application on a novel force sensing technology incorporated into the bed frame that can determine and monitor a variety of biometric signals, including heart rate, respiration, and motion—much like the Inventions-At-Issue. (*See* Toft. Decl. Ex. 3.) This biometric monitoring invention was conceived and worked on while Young and Hewitt were consultants and also working on biometric monitoring research and development at Sleep Number. (*See* Dkt. 119, ¶¶26, 28, 42.)

## IV.   YOUNG AND HEWITT, WHILE SLEEP NUMBER CONSULTANTS, FORM UDP AND FILE PATENT APPLICATIONS ON ITS BEHALF.

In January 2018, while consulting for Sleep Number, Young and Hewitt founded and incorporated UDP. (Dkt. 119, ¶30; Dkt. 58, ¶18; Dkt. 61, ¶16.) They are the corporate officers for UDP; Young is Chief Executive Officer and Hewitt is Chief Technology Officer. (Dkt. 119, ¶¶79–80.) UDP had knowledge of Young and Hewitt's Consulting Agreements with Sleep Number. (*Id.*, ¶10.)

Also while Young and Hewitt were Sleep Number consultants, on October 8, 2018, Defendants secretly filed a Provisional Patent Application No. 62/742,613, titled "Continuous Biometric Monitoring Sensors," ("the '613 Application") concerning sensing technology for use with and incorporation into a bed for biometric monitoring. (Dkt. 119, ¶¶46–47; *see* Dkt. 119-1.) Despite the obvious overlap in the '613 Application's title and disclosure and the terms of the Consulting Agreement, neither Young nor Hewitt ever informed Sleep Number about the filing of the '613 Application or the invention disclosed therein. (Dkt. 119, ¶34.) During this time, Sleep Number paid both Young and Hewitt $20,833.33 every month pursuant to Sleep Number's obligations under the Consulting Agreements. (Consulting Agreements at Section 3.)

## V.   YOUNG AND HEWITT SEEK TO MODIFY THE IP RIGHTS THEY HAD AGREED TO UNDER THEIR CONSULTING AGREEMENTS, AND, WHEN THAT FAILS, TERMINATE THE CONSULTING AGREEMENTS.

Later in October 2018, after filing the '613 Application, Young and Hewitt traveled to Minnesota to discuss their Consulting Agreements with Sleep Number. (Dkt. 58, ¶21; Dkt. 61, ¶19.) During an October 25, 2018 meeting at Sleep Number's headquarters in

Minnesota, Young and Hewitt sought to change their Consulting Agreements because the IP ownership obligations therein were preventing them from raising funding for UDP. (Dkt. 119, ¶48; Dkt. 75, ¶8; Dkt. 76, ¶17.) Sleep Number reminded them that, under the Consulting Agreements, they could not use Sleep Number's confidential information and Sleep Number owned the ideas and work generated during their consultancy; Young and Hewitt acknowledged these contractual terms. (Dkt. 119, ¶48; Dkt. 75, ¶8.)

On November 1, 2018, Young and Hewitt terminated their Consulting Agreements effective November 15, 2018. (Dkt. 58, ¶21; Dkt. 61, ¶19; Dkt. 75, ¶9; Dkt. 75-1; Dkt. 76, ¶18.) With their notice of termination, Young and Hewitt proposed an "addendum" that would declare their work for UPD to not fall within the Consulting Agreements. (Dkt. 119, ¶49; Dkt. 75, ¶9; Dkt. 75-1; Dkt. 76, ¶18.) Sleep Number declined the addendum. (*Id.*) Sleep Number again reminded Young and Hewitt that it owned any inventions falling under the Consulting Agreements and raised specific concerns about the work they claimed to be doing at UDP. (Dkt. 119, ¶50; Dkt. 75, ¶9; Dkt. 75-1.)

On November 16, 2018, Sleep Number requested that Young and Hewitt return all company-owned property, including any physical property (such as computers) and documents containing company confidential information (such as electronic documents). (Dkts. 76, ¶19, 76-1.) Pursuant to the Consulting Agreements, Young and Hewitt were required to do so. (*Id.*; Dkt. 59-3; Dkt. 62-3.) On November 19, 2018, Hewitt responded that they had shipped their laptops to Sleep Number; however, Young and Hewitt wiped the computers before doing so, depriving Sleep Number of its own information. (*Id.*, Dkt. 16, ¶14; Dkt. 17, ¶¶22–25; *see also* Dkt. 119, ¶51.)

## VI.   YOUNG AND HEWITT FILE ADDITIONAL PATENT APPLICATIONS FOR THE BENEFIT OF UDP DESPITE THEIR CONTRACTUAL OBLIGATIONS.

Within three months of terminating their Consulting Agreements, Young and Hewitt had filed another, related patent application. Specifically, on February 12, 2019, they filed Provisional Patent Application No. 62/804,623, entitled "Systems and Methods for Utilizing Gravity for Biometric Monitoring," ("the '623 Application"), concerning the same or related biometric sensing and monitoring technology for use with and incorporation into a bed as was disclosed in the '613 Application. (Dkt. 119-2.) The inventors listed on the '623 Application are Young, Hewitt, Jonathan Olson, Alan Luckow, and Robert Dobkin, the same as those listed for the '613 Application. (Dkt. 119, ¶¶46, 56; *see* Dkt. 119-1, 119-2.) Despite filing these applications, in or around April or May 2019, Young and Hewitt falsely represented to Annie Bloomquist, their former supervisor, that they were not competing with Sleep Number or working on any projects related to Sleep Number's technology. (Dkt. 119, ¶¶9, 57.)

Between August 23–26, 2019, Defendants filed Non-Provisional Application No. 16/549,367, entitled "Load Sensor Assembly for Bed Leg and Bed with Load Sensor Assembly," ("the '367 Application") and Non-Provisional Application No. 16/551,087, entitled "Systems and Methods for Utilizing Gravity to Determine Subject-Specific Information," ("the '087 Application"), both of which relate to load-bearing sensors and assemblies for sensing biometrics. (Toft Decl. Exs. 4, 5.) Both the '367 and '087 Applications identified claims of priority to the '613 and '623 Applications and named

Young, Hewitt, Olson, and Luckow as inventors. (*Id.*) Dobkin is also named as an inventor on the '087 Application. (*Id.*)

On October 8, 2019, Defendants filed Non-Provisional Patent Application No. 16/595,848, entitled "Multidimensional Multivariate Multiple Sensor System," ("the '848 Application"). (Dkt. 16, ¶15; *see* Dkt. 119-3.) The '848 Application identified claims of priority to both the '613 and '623 Applications and again listed Young, Hewitt, Olson, and Luckow as inventors. (Dkt. 119-3.) It also listed as an inventor Omid Sayadi (*id.*), who had been a Sleep Number employee only 2.5 months earlier. (Dkt. 19, ¶8; Dkt. 42, ¶5.) On January 30, 2020, UDP filed Non-Provisional Patent Application No. 16/777,385, entitled "Systems and Methods for Generating Synthetic Cardio-Respiratory Signals," ("the '385 Application"). (Dkt. 119-4.) The '385 Application is a continuation-in-part of the '848 Application, claimed priority to the '613 and '623 Applications, and named Young and Sayadi as inventors. (*Id.*) Both the '848 and '385 Applications relate to determining and monitoring biometric signals using load-bearing sensors incorporated into a substrate, like a bed. (*Id.*; Dkt. 119-3.)

On April 9, 2020, the '848 Application published, which was the first time the existence of any of the Inventions-at-Issue, as well as the disclosures therein, became public. (Dkt. 119-3.) It was only after this that Sleep Number became aware of the Inventions-at-Issue, which led to the filing of the original complaint on July 2, 2020. (*See* Dkt. 1; *see also* Dkt. 119, ¶¶57–61.) Below is a summary of the above-referenced applications:

| App. No. | Date Filed | Inventors |
|---|---|---|
| '613 | 10/08/2018 | Young, Hewitt, Olson, Luckow, and Dobkin. |
| '623 | 2/12/2019 | Young, Hewitt, Olson, Luckow, and Dobkin. |
| '367 | 8/23/2019 | Young, Hewitt, Olson, and Luckow |
| '087 | 8/26/2019 | Young, Hewitt, Olson, Luckow, and Dobkin. |
| '848 | 10/8/2019 | Young, Hewitt, Olson, Luckow, and Sayadi |
| '385 | 1/30/2020 | Young and Sayadi |

## VII.   YOUNG AND HEWITT, AFTER SLEEP NUMBER COMMENCED THIS LAWSUIT, FILE AMENDMENTS TO THE INVENTIONS-AT-ISSUE.

In its original Complaint, Sleep Number put Defendants on notice that it was claiming property rights in certain of the Inventions-at-Issue. (Dkt. 1, ¶¶97–113.) Despite that notice, Sleep Number recently learned—on December 18, 2020—that, in November 2020, Defendants began affirmatively filing "amendments" to the Inventions-at-Issue. (Toft Decl. ¶9, Ex. 6.) More specifically, for each of the above-referenced non-provisional applications, Defendants began filing requests to remove any claim of priority to the '613 Application—which was filed on October 8, 2018, during the term of the Consulting Agreements—leaving only a claim of priority to the '623 Application, which was filed on February 12, 2019, after the term of the Consulting Agreements. (*Compare id. with* Factual Background § III–IV.) Accordingly, Defendants' actions in essence changed the earliest claim for priority for any of the Inventions-at-Issue from *before* to *after* the termination of

the Consulting Agreements. (*Supra* Factual Background § III.) Defendants did not notify Sleep Number of this change; Sleep Number only became aware of it through counsel. (Toft Decl. ¶9.)

Also recently, Sleep Number learned that Defendants intend to obstruct Sleep Number's discovery into any of their patent applications beyond those in the original Complaint. In fact, in discovery, Sleep Number requested an identification of each of the patent applications that have been filed by Defendants or that have been, or are under obligation to be, assigned to UDP. (Toft Decl. ¶10.) In response, Defendants refused to provide any information for patent applications beyond those attached to the original Complaint—the '612, '623, '848, and '385 Applications—even though Sleep Number identified in its discovery requests other applications of which it is aware that were filed by or assigned to UDP, including at least the '367 and '087 Applications. (*Id.*) Since then, pursuant to a Stipulation between the parties, Sleep Number has now amended its Complaint to identify additional patent applications. (*See* Dkts. 118, 119.) However, Defendants have not amended their discovery responses to account for these or any other applications. (Toft Decl. ¶10.)

## VIII.   UPCOMING OFFICE ACTIONS FOR THE INVENTIONS-AT-ISSUE.

As of the filing of this motion, the USPTO has not issued an Office Action, *i.e.*, a determination of the patentability of the claims, for any of the Inventions-at-Issue. (Toft Decl. ¶8.) Pursuant to the USPTO's website, an Office Action for a non-provisional application generally issues within 15 months from the date the application was filed. (*Id.*) As detailed above, the first non-provisional applications Defendants filed were the '367

and '087 Applications in August 2019. Because Office Actions on the '367 and '087 Applications were expected approximately 15 months later, which was two months ago, it is likely that the USPTO may begin issuing Office Actions at any point. (*See id*.)

During the meet-and-confer process, Sleep Number requested that Defendants take actions to preserve the status quo of the Inventions-at-Issue before the USPTO during the pendency of this litigation, but Defendants refused. (Toft Decl. ¶11, Ex. 7.) Sleep Number also requested that Defendants agree to forgo any patent activity while this motion is pending, but Defendants again refused. (*Id.*)

## ARGUMENT

Young and Hewitt had contractual obligations to disclose and assign their inventions to Sleep Number, which UDP knew. These contractual covenants are intended to protect Sleep Number's legitimate interests in retaining its confidential information, trade secrets, and skilled human capital as it develops new technology. In exchange for substantial compensation, Young and Hewitt agreed to respect, keep in confidence, and help Sleep Number develop these technologies. Instead, Defendants wantonly disregarded these obligations by secretly filing patent applications on the precise technology Sleep Number was working on and paying Young and Hewitt to develop.

Because Defendants' continued prosecution of the Inventions-at-Issue, including any further changes to the application, the filing, and subsequent publications of additional applications covered by the Consulting Agreements, will irreparably harm Sleep Number, a preliminary injunction is warranted to preserve the status quo until the resolution of this proceeding. *See Ethicon Endo-Surgery, Inc.*, 2009 WL 2707805, at *6–7 (issuing

12

injunction; holding that employee's breach of contractual obligation to assign inventions to employer entitled employer to reassignment of misappropriated patent applications and any patents and that money damages were inherently inadequate because they could not restore employer to position of being exclusive user of intellectual property); *Cherne Indus., Inc. v. Grounds & Associates, Inc.*, 278 N.W.2d 81, 92 (Minn. 1979) (noting court's ability to issue injunction even when violation of explicit agreement not to disclose confidential information had already occurred). As detailed blow, Sleep Number satisfies each of the factors warranting an injunction.

## I.  SLEEP NUMBER SATISFIES THE DATAPHASE FACTORS AND DEMONSTRATES THE NEED FOR THIS COURT TO ENJOIN DEFENDANTS.

Sleep Number is entitled to the equitable relief it seeks because it is likely to succeed on the merits, will suffer irreparable harm if an injunction is not granted, and the balance of harm and public interest support an injunction. When determining whether to issue a preliminary injunction, the court considers: "(1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant in the absence of relief; (3) the balance between that harm and the harm injunctive relief would cause to the other litigants; and (4) the public interest." *Bos. Sci. Corp. v. Duberg*, 754 F. Supp. 2d 1033, 1038 (D. Minn. 2010) (citing *Dataphase Sys., Inc. v. C L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*)). "'No single [*Dataphase*] factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction.'" *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994) (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc*., 815 F.2d 500,

503 (8th Cir. 1987) (citing *Dataphase*)); *Bandag, Inc. v. Jack's Tire & Oil, Inc.*, 190 F.3d 924, 926 (8th Cir. 1999) ("These factors are not a rigid formula.").

### A.  Sleep Number Is Likely to Prevail on the Merits of Its Claims Relating to Ownership of the Inventions-at-Issue.

While not determinative, "the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quotation marks and internal citations omitted). "In considering the likelihood of the movant prevailing on the merits, a court does not decide whether the movant will ultimately win." *PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1143 (8th Cir. 2007). Instead, this factor simply requires the movant to show that it has a "fair chance of prevailing" on its claims. *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008); *Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044–45 (8th Cir. 2020); *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018). Thus, the test is not whether the movant has "prove[d] a greater than fifty percent likelihood that [it] will prevail," *PCTV Gold*, 508 F.3d at 1143, but rather whether any of its claims provide a "fair ground for litigation," *Faegre & Benson, LLP v. Purdy*, 129 F. App'x 323, 324 (8th Cir. 2005); *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 865 (D. Minn. 2015). A "fair chance" or "fair ground" is defined as "less than a preponderance of the evidence (i.e. greater than fifty percent chance of success), but more than an outside chance of success." *Let Them Play MN v. Walz*, No. CV 20-2505 (JRT/HB), 2020 WL 7425278, at *4 (D. Minn. Dec. 18, 2020). To satisfy this factor, the movant need only show likelihood of success on the merits

on a single cause of action it asserts. *See United Healthcare Ins. Co. v. Advance PCS*, 316 F.3d 737, 742–43 (8th Cir. 2002); *CPI Card Grp.*, 294 F. Supp. 3d at 807.

Although Sleep Number has a strong likelihood of success on all of its claims, this is particularly true for its declaratory judgment and breach-of-contract claims, addressed in detail below.

### 1.    The Inventions-at-Issue Are Covered by the Consulting Agreements' Product Development Scope.

Under Section 1.E. of the Consulting Agreements, the services that Young and Hewitt were to provide for the benefit of Sleep Number broadly relate to sleep and include biometric monitoring:

> Product development, ideation, and/or implementation of ***any ideas, conceptions, inventions, or plans relating to sleep, mattresses, bedding, sleep monitoring, health or wellness as it relates to sleep (including biometric monitoring relating to sleep), or bedroom or sleep technologies*** during the Term of this Agreement ("Product Development Scope"). Notwithstanding the foregoing, Product Development Scope does not include: (i) monitoring technologies for sudden infant death syndrome or (ii) blood pressure monitoring technologies.

(Consulting Agreements at Section 1.E (emphasis added).)

There can be no doubt that all of the Inventions-at-Issue relate to "sleep, mattresses, bedding, sleep monitoring, health or wellness as it relates to sleep (including biometric monitoring relating to sleep), or bedroom or sleep technologies"—the precise language describing the technologies that belong solely to Sleep Number. Indeed, ***all*** of the Inventions-at-Issue explicitly pertain to ***beds***, and the very technology that Sleep Number sought to incorporate into its products:

- The '613 Application is titled "Continuous Biometric Monitoring Sensors" and discloses an invention using sensors built into a bed to monitor biometrics and other information, including "to predict [direction and location] of **bed** exits," and to discriminate between signals from an animal or another person "jumping [or] sitting on [or] laying in **bed** . . . ." (Dkt. 119-1 (emphasis added).)

- The '623 Application is titled "Systems and Methods for Utilizing Gravity for Biometric Monitoring" and discloses "[t]he sensors are designed to be placed under, or be built into a substrate, such as a **bed**[.]" (Dkt. 119-2 (emphasis added).)

- The '848 Application is titled "Multidimensional Multivariate Multiple Sensor System," depicts figures of a human lying in a **bed**, and discloses "[t]he systems and methods use multiple sensors to sense a single subject's or multiple subjects' body motions against the force of gravity on a substrate, including **beds** [] and transforms those motions into macro and micro signals." (Dkt. 119-3 (emphasis added).)

- The '385 Application is titled "Systems and Methods for Generating Synthetic Cardio-Respiratory Signals" and discloses the use of one or more ballistocardiogram sensors that can be "located in a variety of locations including but not limited to, **bed** frame, mattress, and the like" for use in determining biometrics parameters and other person-specific information, including cardiac and respiratory signals. (Dkt. 119-4.)

- The '367 Application is titled "Load Sensor Assembly for **Bed** Leg and **Bed** with Load Sensor Assembly" and discloses "systems and methods for sensing biometrics and other subject-specific information of one or more subjects using multiple sensors that are positioned in or replace a **bed** leg." (Toft Decl. Ex. 4 (emphasis added).)

- The '087 Application is titled "Systems and Methods for Utilizing Gravity to Determine Subject-Specific Information" and discloses "[t]he systems and methods use multiple sensors to sense a single subject's or multiple subjects' body motions against the force of gravity on a substrate, including **beds**, furniture or other objects, and transforms those motions into macro and micro signals." (Toft Decl. Ex. 5 (emphasis added).)

There are only two narrow exceptions to the Product Development Scope of the Consulting Agreements. (Consulting Agreements at Section 1.E (containing limited carve-outs for sudden infant death syndrome and blood pressure monitoring).) Exclusion provisions like this are to be narrowly construed and not construed in a way that would render the rest of the contract meaningless. *See IMATEC, Ltd. v. Apple Computer, Inc.*, 15 F. App'x 887, 894 (Fed. Cir. 2001) (interpreting exclusion provision of patent assignment clause of contract narrowly and to only include the specific language as written in the original contract); *Preston v. Marathon Oil Co.*, 684 F.3d 1276, 1288 (Fed. Cir. 2012) (rejecting inventor's interpretation of contract language which would exclude certain inventions from the assignment clause, noting that the proposed interpretation would render the rest of the contract "meaningless").

17

Here, the Inventions-at-Issue are clearly not directed to either of the exceptions. (*See* Dkts. 112-1, 112-2, 112-3, 112-4; Toft Decl. Exs. 4, 5.) Indeed, *none* of the Inventions-at-Issue reference "SIDS," "infant," or "blood pressure," much less describe how the disclosed technology can be used to monitor or predict either SIDS or blood pressure. To the contrary, as detailed above, *all* of the Inventions-at-Issue explicitly pertain to biometric monitoring of individuals in *beds*. Therefore, when construing the two exceptions to the Product Development Scope provision narrowly, as required, and considering the lack of *any* reference to SIDS or blood pressure in the Inventions-at-Issue, only one logical conclusion remains: Young and Hewitt have performed work for UDP that falls within their Consulting Agreements with Sleep Number.

## 2.   Sleep Number's Declaratory Judgment Claim Is Likely to Be Meritorious.

Sleep Number has a substantial likelihood of prevailing on its declaratory judgment claim—that Sleep Number, and not UDP, owns the Inventions-at-Issue. The inventions were conceived and worked on while Young and Hewitt were working for Sleep Number and therefore, under the terms of the Consulting Agreements, have already been assigned to Sleep Number. (Dkt. 119, ¶¶103–124.) Further, this Court has already held that there is an actual controversy between the parties with respect to ownership of the Inventions-at-Issue. (*See* Dkt. 112 at 16–18); *see also* 28 U.S.C. § 2201; *Mayo Clinic v. Elkin*, No. CIV 09-322 DSD/JJK, 2010 WL 5421322, at *2 (D. Minn. Dec. 27, 2010), *aff'd*, 540 F. App'x 546 (8th Cir. 2013); *Balallan Ltd. v. Green Oasis Envtl.*, Inc., No. 06 CV 5959 (RJD) (VVP), 2008 WL 897540, at *3 (E.D.N.Y. Mar. 31, 2008).

There is little question that Young and Hewitt already assigned rights to the Inventions-at-Issue to Sleep Number through the Consulting Agreements. Where an assignment of rights to an invention is made before the invention exists, this constitutes a present assignment of a future or expectant interest. *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1572 (Fed. Cir. 1991). The question of whether a patent assignment clause constitutes a present assignment of future interest is "treated . . . as a matter of federal law." *DDB Techs., L.L.C. v. MLB Adv. Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008). The Federal Circuit has explained that a present assignment requires "no further act . . . once an invention [comes] into being." *Id.* At the time an assignment of an expectant interest is made, the assignee holds an equitable title to the expectant interest. *Filmtec Corp.*, 929 F.2d at 1572. Thus, "[o]nce the invention is made and an application for patent is filed . . . legal title to the rights accruing thereunder would be in the assignee . . . and the assignor-inventor would have nothing remaining to assign." *See id.* Where, as here, the contract expressly grants—in the present tense—rights in future inventions, "the transfer of title [occurs] by operation of law." *DDB Techs.*, 517 F.3d at 1290 (citing *Filmtec Corp.*, 939 F.2d at 1573) (alterations in original).

The language and meaning of the Consulting Agreements unambiguously fits these criteria and qualifies as a present assignment that attached to the '613 Application and subsequent, related applications. Section 5.A. of the Consulting Agreements plainly provides a broad assignment clause as follows:

> [A]ll right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, logos, inventions, improvements, developments, discoveries, ideas, and trade secrets conceived, discovered,

19

authored, invented, developed, or reduced to practice by Consultant, solely or in collaboration with others, arising out of, or in connection with, performing the Services and/or completing the Deliverables under this Agreement, or with the use of [Sleep Number's] equipment, supplies, facilities, or Confidential Information, in each case that are within the Product Development Scope, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights in and to the foregoing (collectively, "Inventions"), are the sole property of [Sleep Number]. ***Consultant also agrees to promptly make full written disclosure to [Sleep Number] of any Inventions and to deliver and assign and hereby irrevocably assigns fully to [Sleep Number] all right, title and interest in and to the Inventions. Consultant agrees that this assignment includes a present conveyance to [Sleep Number] of ownership of Inventions that are not yet in existence***.

(Consulting Agreements at Section 5.A (emphasis added).)

Under settled law, this conveys a present grant of future rights. *See Venture Corp. v. Barrett*, No. 5:13-CV-03384-PSG, 2015 WL 8479475, at *4 (N.D. Cal. Dec. 9, 2015), *aff'd sub nom. Venture Corp., Ltd v. Barrett*, 694 F. App'x 597 (9th Cir. 2017) (finding present grant of future right where contract provided that inventor "hereby assign[s] to [VDSI] . . . my entire right, title and interest") (alterations in original); *see also Filmtec*, 939 F.2d at 1573 (finding present grant of future right where contract provided that inventor "agrees to grant and does hereby grant" all rights in future inventions); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000) (finding present grant of future right where contract provided that employee's inventions within scope of agreement "shall belong exclusively to [employer] and [employee] hereby conveys, transfers, and assigns to [employer] . . . all right, title and interest in and to Inventions").

Here, the Inventions-at-Issue are well within the Product Development Scope of the Consulting Agreements and are subject to the present assignment. As detailed above, the

Product Development Scope includes ideas and inventions relating to "sleep monitoring," "health or wellness as it relates to sleep (including biometric monitoring relating to sleep)," and "bedroom or sleep technologies," and the Inventions-at-Issue each relate to sleep and, more specifically, to biometric monitoring relating to sleep. (*Supra* Argument § I.A.1.) For example, the '613 Application is directed to "continuous biometric monitoring" and references or depicts a "bed" approximately three dozen times. (*See* Dkt. 119-1 at 32–50.) Similarly, the '623 Application is directed to "biometric monitoring," references or depicts a "bed" approximately five dozen times, and describes using sensors for biometric monitoring "during a sleep session." (Dkt. 119-2 at 10–28.) Therefore, the Inventions-at-Issue fall within the scope of the Consulting Agreements' assignment. *See*, *e.g., AgroFresh Inc. v. MirTech, Inc.*, 257 F. Supp. 3d 643, 664 (D. Del. 2017) (upholding broad assignment provision in consulting agreement); *Affymetrix, Inc. v. Illumina, Inc.*, 446 F. Supp. 2d 292, 295 (D. Del. 2006) (finding technology in question fell within scope of consulting agreement); *VEC Tech., L.L.C. v. Acrylon Plastics, Inc.*, No. 04-3086 DWF/JSM, 2004 WL 2595894, at *5–6 (D. Minn. Nov. 12, 2004) (finding invention fell within scope of agreement because it related to plaintiff's reasonably foreseeable business interest in consulting work performed by defendants).

Accordingly, the meaning and effect of the provisions of the Consulting Agreements are clear, and Sleep Number has—at a minimum—a fair chance of success on its declaratory judgment claim.

### 3. Sleep Number's Breach-of-Contract Claim Is Likely to Be Meritorious.

Sleep Number is also likely to succeed on the merits of its claim that Defendants Young and Hewitt have breached their Consultant Agreements. (Dkt. 119, ¶¶125–142.) Under the Delaware law that controls these contracts (Consulting Agreements at Section 12.A), a breach-of-contract claim has essentially three elements: "(1) the existence of a contract, whether express or implied; (2) the breach of an obligation imposed by that contract; and (3) the resultant damage to the plaintiff." *CH Bus Sales, Inc. v. Geiger*, No. 18-CV-2444 (SRN/KMM), 2019 WL 1282110, at *5 (D. Minn. Mar. 20, 2019) (applying Delaware law and quoting *VLIW Tech., LLC v. Hewlett-Packard, Co.*, 840 A.2d 606, 612 (Del. 2003)). The conclusion that the Inventions-at-Issue fall within the Product Development Scope and are subject to the assignment and disclosure requirements in the Consulting Agreements is—at the very least—"plausible" and therefore gives Sleep Number "a fair chance of prevailing on the merits" of its contact claim. *Paisley Park Enters., Inc. v. Boxill*, 253 F. Supp. 3d 1037, 1045 (D. Minn. 2017) (finding likelihood of success even where plaintiff's "plausible" interpretation was disputed by defendant); *see also VEC Technology LLC*, 2004 WL 2595894, at *6 (finding that plaintiff showed likelihood of success on merits because "evidence in the record reflects that . . . the [invention] was developed while [defendant] was consulting with [plaintiff]"). As detailed above, Defendants are unlikely to establish the applicability of an exception to the Consulting Agreements' Product Development Scope. (*Supra* Argument § I.A.1.)

Moreover, Sleep Number is likely to succeed whether or not the Court finds that the Consulting Agreements have already effectuated an assignment of the Inventions-at-Issue to Sleep Number. Indeed, even if the Court finds no such assignment has occurred, Sleep Number will likely prevail on its contract claim because Young and Hewitt were obligated under the Consulting Agreements to "promptly make full written disclosure to [Sleep Number] of any Inventions" and take all actions necessary to assign those inventions to Sleep Number. (Consulting Agreements at Sections 5.A and 5.E.) It is undisputed that Young and Hewitt have never done that and therefore Sleep Number is likely to succeed in establishing a breach of contract. *See Donophan v. Hughes*, No. CIV.A. 0022-08-84, 1985 WL 664556, at *1 (Del. Com. Pl. May 14, 1985) (holding failure to perform under terms of contract results in breach).

**B.      Sleep Number Has Suffered and Will Continue to Suffer Irreparable Harm Without an Injunction.**

To meet the second *Dataphase* factor, a plaintiff must demonstrate it will suffer irreparable harm absent an injunction. 640 F.2d at 114. While there must be more than a mere possibility the harm will come to pass, "the alleged harm need not be occurring or be certain to occur before a court may grant relief." *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1037 (8th Cir. 2016). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Even where disclosure of confidential information has already occurred, the court may issue an injunction against a party who has, in violation of

an explicit agreement, wrongfully used another's confidential information. *See Cherne Indus., Inc.*, 278 N.W.2d at 92 ("Where the information has, subsequent to the wrongful taking and use, become generally available, the initial conduct is still wrongful and the employer is still entitled to relief for any injury suffered as a result of the wrongful use.").

Because Young and Hewitt failed to disclose their invention(s) to Sleep Number, as obligated under their Consulting Agreements, Sleep Number was deprived of its opportunity to decide what, if anything and to what extent, to disclose in the Inventions-at-Issue. To address this, Sleep Number filed this lawsuit immediately after it became aware of this harm. But awaiting the conclusion of this litigation will not be sufficient to preserve Sleep Number's rights, particularly in light of Defendants' recent conduct amending the effective filing dates and refusing to forego prosecution activities during the pendency of this motion. Sleep Number is entitled to an injunction to prevent at least three present and continuing ways in which Sleep Number is being or may be irreparably harmed by Defendants' conduct, which are identified in turn below.

First, Defendants have recently attempted to manufacture a defense to Sleep Number's claims and to cause significant harm to Sleep Number and its rights in the Inventions-at-Issue. Specifically, because Sleep Number's claims are based, in part, on the filing of the '613 Application *during* the term of the Consulting Agreements, Defendants filed amendments with the USPTO in November 2020 that *removed* the Inventions-at-Issue's claims of priority to the '613 Application. (*See* Toft Decl. ¶9.) In fact, Defendants moved the claim of priority to a date *after* the termination of the Consulting Agreements, a transparent attempt to rewrite history and manufacture a defense to Sleep Number's

claims after the litigation had commenced. (*See id.*) This action has harmful consequences to the true owner of the Inventions-at-Issue. For prior art purposes, Defendants' dubious and ill-fated attempt to try to avoid liability moves the effective filing date of each patent application forward more than four months, thus creating a new class of potentially invalidating prior art. Specifically, any application that was filed or any reference that was published during this four-month period could now be used in an attempt to render a claim of any of the patents unpatentable and/or could now require a change in claim scope. Therefore, because Sleep Number is the rightful owner of the Inventions-at-Issue and would need to defend any attempt to invalidate, Defendants' recent actions have irreparably harmed Sleep Number. This conduct shows the lengths Defendants will go to undermine the patents and their true owner, as well as why Defendants must be enjoined before any further harm results.

Second, Sleep Number will suffer new irreparable harm if Defendants file additional patent applications covered by the Consulting Agreements, and more so if Defendants have already surreptitiously done so. Defendants' refusal to provide discovery related to applications other than those listed in the original Complaint (*supra* Factual Background § V) reveals their intent to keep their patent prosecution activities secret from Sleep Number. Further, any future publication of another application could further irreparably harm Sleep Number. *See*, *e.g.*, *Centrifugal Acquisition Corp. v. Moon,* No. 09-C-327, 2012 WL 718999, at *2 (E.D. Wis. Mar. 5, 2012) (finding irreparable harm established "by the imminent publication" of a patent application due to "potential disclosure in that publication of the proprietary process deemed to be a trade secret by the Court").

Lastly, absent an injunction, Sleep Number will suffer additional imminent and ongoing irreparable harm once responses to USPTO Office Actions begin—which is likely any day now and which is exacerbated by Defendants' refusal to forgo any prosecution activities while this motion is pending. (Toft Decl. ¶¶8, 11.) To obtain a patent, an inventor begins by submitting an application describing the proposed claims to the USPTO. *Return Mail, Inc. v. U.S. Postal Serv.,* 139 S. Ct. 1853, 1859 (2019); *see also* Manual of Patent Examining Procedure § 2161 (citing 35 U.S.C. § 112). During the prosecution process, an Office Action identifies an examiner's reasons for approving or rejecting the proposed claims based upon, among other things, the prior art. *See id.* The patent applicant must respond to each Office Action, *e.g.*, by amending the claims to traverse the prior art rejection and/or making arguments about what the prior art discloses or what claim terms mean. *See id.* During that process, an applicant may narrow, modify, or even abandon certain claims of the patent, which can irreversibly affect future patent scope. *See PrinterOn Inc. v. BreezyPrint Corp.*, 93 F. Supp. 3d 658, 672 (S.D. Tex. 2015) ("The prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be.") (internal citations and quotations omitted).

Because Defendants filed the Inventions-at-Issue in secret and assigned them to UDP, it is only UDP who is allowed to respond to any imminent Office Actions, and only UDP who will be able to formulate the response and characterize or amend the claims. *See Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985) (noting that

prosecution history includes "all express representations made by or on behalf of the applicant to the examiner to induce a patent grant . . . includ[ing] amendments to the claims and arguments made to convince the examiner that the claimed invention meets the statutory requirements"). The scope and nature of Defendants' Office Action responses could abandon claim scope to the public domain or alter the scope of what is ultimately granted in any issued patents. *E.g., Sanofi-Aventis Deutschland GmbH v. Genetech, Inc.*, 473 F. App'x 885, 888 (Fed. Cir. 2012) ("We have held that an otherwise broadly defined term can be narrowed during prosecution through arguments made to distinguish prior art."). This means that Defendants alone have the ability to control the ultimate patent rights that are granted, despite the Inventions-at-Issue belonging to Sleep Number.

As described herein, Sleep Number's inability to control the patent prosecution process and prosecute the claims as it sees fit presents a new and ongoing threat of immediate irreparable harm, which Defendants have demonstrated no interest in minimizing, including even during the pendency of this motion. *See*, *e.g.*, *Compact Van*, 566 F.2d 952, 954 (enjoining prosecution of patent application so that party had "right to litigate its entitlement to [claims]" that might otherwise "be permanently lost"); *Ethicon Endo-Surgery*, 2009 WL 2707805, at *6 ("EES would suffer irreparable harm if Crescendo retains control over the misappropriated patent applications, because EES would no longer be free to pursue patents or maintain protection for its ideas as it sees fit, free of interference or complication from Crescendo's public disclosure and claiming of EES's own ideas."); *Moller-Maersk A/S v. Escrub Sys., Inc.*, No. 1:07CV1276JCC, 2007 WL 4562827, at *3–4 (E.D. Va. Dec. 21, 2007) (enjoining defendant from filing or prosecuting patent

applications on relevant technology due to potential irreparable harm to plaintiff); *Hallmark Cards v. Tackbary*, No. 99 C 344, 1999 WL 688722, at *8 (N.D. Ill. Apr. 9, 1999) (finding irreparable harm where defendant was prosecuting disputed patents and might not have taken action that would be necessary to fully protect plaintiff's patent rights).

Accordingly, and particularly in light of Defendants' recent conduct revealing their self-interested intent not to preserve the status quo, Sleep Number has suffered and will continue to suffer immediate irreparable harm, justifying the relief it is requesting.

## C. The Balance of Harms Favors Issuing a Preliminary Injunction.

When considering the third *Dataphase* factor—the balance of harms—courts must weigh "the threat to each of the parties' rights and economic interests that would result from either granting or denying the preliminary injunction." *Cenveo Corp. v. S. Graphic Sys., Inc.*, No. CIV. 08-5521 JRT/AJB, 2009 WL 161210, at *4 (D. Minn. Jan. 22, 2009) (quotations omitted). The goal is to assess the harm the movant would suffer absent an injunction, as well as the harm other interested parties and the public would experience if the injunction is issued. *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994).

As detailed above, Sleep Number would be irreparably harmed absent an injunction. The same, however, is not true for Defendants. At most, Defendants would have to delay prosecution of the Inventions-at-Issue pending a full and fair resolution on the merits pertaining to ownership of the Inventions-at-Issue. Courts have reasoned that a slight delay in enjoying property rights is insufficient to tip the balance of harms in a defendant's favor.

28

*See Hallmark Cards*, 1999 WL 688722, at *9 (issuing preliminary injunction requiring defendant to file continuing patent application until court later determined merits of ownership of patent rights, noting that harm to plaintiff absent an injunction would be severe and irreparable, whereas harm to defendant would only be slight delay in obtaining patent rights); *see also Compact Van*, 566 F.2d at 955 ("The preliminary injunction does no more than to assure that all disputed property is held intact pending trial on the merits[.]").

Notably, the injunction that Sleep Number seeks does not prevent Young and Hewitt from working at UDP, earning a living, or continuing product development and ideation. Moreover, an injunction would not require UDP to shutter; UDP may continue operations that fall outside of the Consulting Agreements' Product Development Scope. Thus, there is no harm to Defendants negating imposition of an injunction. Further, any harm Defendants may suffer by being forced to comply with the Consulting Agreements is self-inflicted. *See*, *e.g.*, *Buffalo Wild Wings Int'l, Inc. v. Grand Canyon Equity Partners, LLC*, 829 F. Supp. 2d 836, 846–47 (D. Minn. 2011) ("[Plaintiff] has shown that it faces a substantial likelihood of irreparable harm if an injunction is not granted. Furthermore, [d]efendants have indeed brought this harm upon themselves through their non-payment and infringement.").

Accordingly, the balance of harm favors the entry of Sleep Number's requested injunction.

**D.**   **The Public Interest Heavily Favors the Protection of Confidential Information and Enforcement of Contractual Agreements.**

The public interest is served by "the enforcement of valid business agreements and the protection of legitimate business interests in an industry propelled by vigorous but fair competition." *Bos. Sci. Corp.*, 754 F. Supp. 2d at 1042 (quotations omitted). Thus, "the public interest is served by upholding the parties' contractual obligations." *Allan Block Corp. v. E. Dillon & Co.*, No. CIV. 04-3511JNEJGL, 2005 WL 1593010, at *8 (D. Minn. July 1, 2005), *aff'd*, 170 F. App'x 130 (Fed. Cir. 2006). Accordingly, it is acknowledged in this District that "a core component of the role of a court is to uphold valid contracts and, therefore, this factor weighs in favor of granting injunctive relief." *Id.*; *see also*, *e.g.*, *Paisley Park Enters.*, 253 F. Supp. 3d at 1051 ("The public has a strong interest in preserving the ability to enter contracts and in the availability of a forum for the enforcement of contract and property rights. . . . [B]ecause Plaintiffs have demonstrated a likelihood of success on their breach-of-contract claim, this factor weighs in favor of issuing a preliminary injunction to preserve the availability of a meaningful remedy pending the resolution of the merits of the dispute."); *Ethicon Endo-Surgery*, 2009 WL 2707805, at * 7 ("Enforcement of contractual duties is in the public interest."); *VEC Tech. LLC*, 2004 WL 2595894, at *8 ("The Court finds that the public's interests in this matter are best served by application of the doctrine of *pacta sunt servanda*."); *Hallmark Cards*, 1999 WL 688722, at *10 ("The significant public interest in enforcing contracts and agreements cannot be overstated."). The public interest does not favor unfair competition. *See Millard v. Elec. Cable Specialists*, 790 F. Supp. 857, 863 (D. Minn. 1992).

Here, the public interest favors holding Defendants to their contractual obligations and protecting Sleep Number's confidential information and legitimate business interests. It does not favor allowing Defendants to engage in unfair competition and skirt their obligations. Thus, the only way the Court may preserve the status quo is to enjoin Defendants' patent prosecution activities pending resolution of Sleep Number's claims.

## II. THE SCOPE OF SLEEP NUMBER'S REQUESTED INJUNCTION IS PROPER AND WILL PRESERVE THE STATUS QUO.

In light of Defendants' conduct, particularly their recent conduct regarding changing priority dates and refusing to temporarily forego patent prosecution activities, it is clear that the scope of Sleep Number's proposed injunction is proper and is the only way by which to preserve the status quo. The scope of what Sleep Number seeks is twofold: first, enjoining Defendants from further prosecuting, amending, or abandoning claims or claim scope in the Inventions-at-Issue, and second, enjoining Defendants from filing any additional patent applications without Court approval. *See Centrifugal Acquisition Corp.*, 2012 WL 718999, at *3 (granting injunctive relief in form of mandatory abandonment of patent application before USPTO); *Dermworx, Inc. v. Cooper*, No. 09-cv-60284, 2009 WL 1726333, at *8 (S.D. Fla. June 16, 2009) (recommending granting preliminary injunction prohibiting defendant from "[f]iling a patent application, or making other filings or taking other steps, alone or in concert with others, to obtain patent rights…" and from "mak[ing] other statements or tak[ing] other actions with the purpose of preventing Plaintiff from obtaining the patent rights sought by Plaintiff through its prosecution of the Application").

31

Specifically, and as set forth in detail in the accompanying Proposed Order, Defendants should be required to readily pause the prosecution of the patent applications by delaying any response to Office Actions and requesting the maximum extension (resulting in six months to respond to Office Actions), at which point Defendants should (1) file continuation applications with the same claims that claim priority to the current applications, and (2) after any Office Actions on any new application, continue to file extensions and continuations as needed. *See* M.P.E.P. § 710.02 (explaining that an extension can be requested up to six months and that no reply is necessary where extension is taken for codependency with a continuation application). None of these actions would alter the ultimate prosecution of the claims—it would merely delay it in order to preserve the status quo.

In the alternative, Defendants should be required to place the patent applications in a trust managed by a neutral third party selected by the parties (or the Court if needed) to act as trustee to prosecute the claims and respond to Office Actions during the pendency of this action. A court can issue an injunction placing a property interest in trust while litigation proceeds. *See, e.g., AAAG-California, LLC v. Kisana*, 439 F. Supp. 3d 1265, 1274–75, 1281–82 (D. Utah 2020) (enjoining selling or transferring activity and placing cars in constructive trust based on likelihood of success on conversion claim). Here, in the event the Court does not enjoin Defendants' patent prosecution activities as requested, placing the patent applications in trust is a method that would maintain the status quo pending this litigation and prevent further irreparable harm to Sleep Number.

## III.   SLEEP NUMBER SHOULD NOT BE REQUIRED TO POST ANY SECURITY.

A party moving for a preliminary injunction need only provide a security or bond "in an amount… proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Courts in this district have held that no bond is required where the plaintiff has shown a high likelihood of success on the merits. *See*, *e.g.*, *Eagle Creek Software Services*, *Inc. v. Jones*, No. 14-4925 ADM/FLN, 2015 WL 1038534, at *11 (D. Minn. Mar. 10, 2015) (no bond required where plaintiff was likely to succeed on breach-of-contract claims); *Country Inn & Suites by Carlson*, *Inc. v. 3 AM*, *LLC*, No. 14-CV-03126 MJD-FLN, 2014 WL 5431621, at *4 (D. Minn. Oct. 24, 2014) (same). Here, as detailed above, Sleep Number has established a high likelihood of success on the merits and therefore no bond is appropriate.

Further, even in the unlikely event that Defendants could show enjoinment was wrongful, Defendants will not sustain damages or incur additional costs from the grant of the requested injunction. Patents confer only exclusionary property rights. *See Dawson Chem. Co. v. Rohm & Haas Co.*, 448 U.S. 176, 215 (1980) (observing "the long-settled view that the essence of a patent grant is the right to exclude others from profiting by the patented invention"). Until the USPTO issues a patent with an allowed claim, there is no exclusionary right to enforce. *DeFerranti v. Lyndmark,* 30 App. D.C. 417, 425 (D.C. Cir. 1908) ("[I]n a patent, no vested right of which the applicant cannot be deprived is acquired under the preliminary proceedings leading up to its issuance."). Once an exclusionary right does exist, the revenue from a patent is usually achieved through successful assertion of

infringement and/or licensing agreements. Because the scope of the claims allowed by the USPTO, if any, is entirely speculative, so too is any contention that anyone infringes or would take a license. In addition, because the requested injunction would halt Defendants' prosecution efforts, there will be little to no costs incurred by Defendants in the form of filing fees or attorney fees (indeed, Defendants would be saving such money).

The relief requested here—enjoining patent prosecution activities—is analogous to an antisuit injunction, for which courts have held no bond is required. *See ProBatter Sports*, *LLC v. Joyner Techs., Inc.*, 463 F. Supp. 2d 949, 958 (N.D. Iowa 2006) (collecting cases and concluding no bond required for injunction preventing patent holder from further prosecuting lawsuits against competitor's customers until final resolution of holder's infringement suit against competitor).

Accordingly, no security under Rule 65(c) is warranted or required.

## CONCLUSION

For the foregoing reasons, Sleep Number respectfully requests that the Court grant Sleep Number's motion for a Preliminary Injunction, as set forth in the Proposed Order submitted herewith.

Dated: January 15, 2021                      **FOX ROTHSCHILD LLP**

                                             By:  s/Lukas Toft
                                                  Andrew S. Hansen (#285894)
                                                  Randall J. Pattee (#184962)
                                                  Lukas Toft (#395984)
                                                  Natalie I. Uhlemann (#392148)

                                             222 South Ninth Street, Suite 2000
                                             Minneapolis, Minnesota  55402-3338
                                             Telephone:  (612) 607-7000
                                             Facsimile:  (612) 607-7100
                                             Email:  ahansen@foxrothschild.com
                                                     rpattee@foxrothschild.com
                                                     ltoft@foxrothschild.com
                                                     nuhlemann@foxrothschild.com

                                             **ATTORNEYS FOR PLAINTIFF
                                             SLEEP NUMBER CORPORATION**