# Exhibit 2

Declaration of Lukas Toft
in Support of Sleep Number's Motion
for a Preliminary Injunction

# Exhibit B

Declaration of Dennis Hansen
in opposition to Defendants' Motion to Dismiss

## CONFIDENTIAL CONSULTING AGREEMENT

This Consulting Agreement (this "***Agreement***") is made and entered into as of December 1, 2017 (the "***Effective Date***") by and between Sleep Number Corporation, a Minnesota corporation (the "***Company***"), and Carl Hewitt, an individual ("***Consultant***") (each herein referred to individually as a "***Party***," or collectively as the "***Parties***").

*Whereas*, Consultant has previously, and up until the Effective Date, been employed by SleepIQ LABS, Inc. and/or its predecessor ("SleepIQ LABS"), which is presently a wholly owned subsidiary of the Company;

*Whereas*, Consultant, as an employee of SleepIQ LABS, has accessed and used as part of his job responsibilities the Company's and its wholly owned subsidiaries' Confidential Information, including, but not limited to, certain of the Company's trade secrets;

*Whereas*, Consultant desires to resign his role as a SleepIQ LABS employee and pursue an alternative business venture outside the Product Development Scope ("Alternative Venture"), but desires to remain engaged with the Company as a consultant with responsibilities described as the Services and Deliverables herein, and Consultant is willing to perform such services on the terms described below; and

*Whereas,* the Company desires to retain Consultant as an independent contractor to perform consulting services for the Company with responsibilities described as the Services herein on the terms described below.

*Therefore,* in consideration of the mutual promises contained herein, the Parties agree as follows:

1.     **Scope of Services and Deliverables**

Consultant shall use good faith efforts to perform services (the "***Services***") for the Company (or its designee) for the term of this Agreement, and for any period of time thereafter agreed to the Parties pursuant to Section 8.A herein, consisting of the following:

        A.     Facilitate transition to new leadership team at SleepIQ LABS;

        B.     Support and publicly champion new leadership team at SleepIQ LABS;

        C.     Inspire and motivate SleepIQ LABS team members;

        D.     Talent acquisition and retention;

        E.     Product development, ideation, and/or implementation of any ideas conceptions, inventions, or plans relating to sleep, mattresses, bedding, sleep monitoring, health or wellness as it relates to sleep (including biometric monitoring relating to sleep), or bedroom or sleep technologies during the Term of this Agreement ("Product Development Scope"). Notwithstanding the foregoing, Product Development Scope does not include: (i) monitoring technologies for sudden infant death syndrome; or (ii) blood pressure monitoring technologies.

      The Consultant and Company agree to meet on a bi-monthly basis to identify and mutually agree in writing pursuant to a written amendment upon any new Product Development Scope to be added, provided that neither party has any obligation to agree to any change in the Product Development Scope;

  F. Other duties that may arise, subject to mutual agreement to be listed on Addendum 1.

As part of the Services listed above, Consultant shall use good faith to achieve the following specific deliverables (the "***Deliverables***"):

  G. Retention goal of 90% of personnel at SleepIQ LABS, exclusive of any personnel subject to involuntary dismissal, for the term of this Agreement; and

  H. Lead effort to identify and hire new VP, Engineering, subject to Chief Product Officer approval.

**2. Time Commitment; Priorities**

  A. Consultant's time commitment to the performance of the Services and Deliverables shall vary as set forth below, subject to adjustment as requested by Company and consented to by Consultant, such consent not to be unreasonably withheld:

    (1) <u>December 2017</u> – Consultant shall devote forty (40) hours per week to performance of the Services and Deliverables, with a presence in Company's office as needed or requested by Company.

    (2) <u>January 2018</u> – Consultant shall devote twenty-four (24) hours per week to the performance of the Services and Deliverables, with a presence in Company's office as needed or requested by Company.

    (3) <u>February 2018</u> – Consultant shall devote sixteen (16) hours per week to the performance of the Services and Deliverables, with a presence in Company's office as needed or requested by Company.

    (4) <u>March 2018</u> – Consultant shall devote eight (8) hours per week to the performance of the Services and Deliverables, with a presence in Company's office as needed or requested by Company.

    (5) <u>April 2018 through June 2018</u> – Consultant shall devote twenty-four (24) hours per month to the performance of the Services and Deliverables, with a presence in Company's office as needed or requested by Company.

    (6) <u>July 2018 through December 2018</u> – Consultant shall devote sixteen (16) hours per month to the performance of the Services and Deliverables, with a presence in Company's office as needed or requested by Company.

      (7)    <u>January 2019 through April 2019</u> – Consultant and Company shall assess and agree upon Consultant's time commitment in advance of January 2019.

B.    The priorities and focus toward specific Services and Deliverables at any time during the term of this Agreement shall be set in Company's sole discretion in consultation with Consultant. Subject to the foregoing, the Parties contemplate that during the following timeframes, the Consultant's primary focuses will include, without limitation:

      (1)    <u>December 2017 through March 2018</u>

- Facilitating the transition to the new leadership team at SleepIQ LABS;
- Driving retention, engagement and focus with key leaders; Sanjay Mahadi, Ramazan Demirli, Omid Sayadi, Mike Puckett, Kathy Simpson, Mike Wu, Steve Fontenot, Gordan Redzic, Cristina Jocson, John Bryant and Eric Hewitt, Kevin Blomseth, Yelena Hovsepyan, Kavita Kolli, Kyra Shuster;
- Facilitating and assist in effort to identify and hire new VP, Engineering; onboarding and assimilating new VP Engineering with foundational SleepIQ process and knowledge base;
- Executing projects as directed and identified by Company; and
- Transitioning work as appropriate.

      (2)    <u>April 2018 through April 2019</u>

- Participating as a member on the SleepIQ LABS Strategic Leadership Board;
- Supporting Company as an on-call resource for guidance and advice as issues arise;
- Engaging in leadership coaching;
  - Driving retention, engagement and focus with key leaders; Sanjay Mahadi, Ramazan Demirli, Omid Sayadi, Mike Puckett, Kathy Simpson, Mike Wu, Steve Fontenot, Gordan Redzic, Cristina Jocson, John Bryant and Eric Hewitt, Kevin Blomseth, Yelena Hovsepyan, Kavita Kolli, Kyra Shuster;
  - Facilitating and assist in effort to identify and hire new VP, Engineering; onboarding and assimilating new VP Engineering with foundational SleepIQ process and knowledge base;

- o Working to advance the SleepIQ platform with respect to, for example, scale, data, stability, engagement, and retention;

- o Motivating and inspiring SleepIQ LABS leaders and team; and

- o Supporting health/wellness platform expansion.

3.   **Compensation**

Provided this Agreement is not terminated pursuant to Section 8.B (but with the understanding that fees paid are non-refundable), over the term of the Agreement Company agrees to pay Consultant: (i) for the period beginning December 1, 2017 and ending March 31, 2018, monthly payments of $20,278.13; and (ii) for the period beginning April 1, 2018 and ending April 30, 2019, monthly payments of $20,833.33. Each monthly payment will be paid in 2 installments: on the first of each month and the 15th of each month. In addition to the foregoing compensation, Consultant shall also be entitled to receive a one-time payment of $22,461.91, which reflects the compensation he would have received under the Milestone Incentive Plan had he maintained his full employment status through the end of 2017, and which will be paid on the same schedule as Company's payments to other employees under the Milestone Incentive Plan.

Company agrees to reimburse Consultant for all actual, documented and reasonable travel and out of pocket expenses incurred by Consultant in connection with the performance of the Services and that have been approved in advance in writing by Company; provided, however, that such expenses conform to Company's standard travel and expense policy, which may be found at http://www.sleepnumber.com/vendor and may be amended by Company from time to time with notice to Consultant. The Consultant will be solely responsible for all additional expenses incurred by him in the performance of the Services and/or completion of the Deliverables.

4.   **Confidentiality**

A.   ***Definition of Confidential Information***. "***Confidential Information***" means any Inventions and any information within the Product Development Scope,, including without limitation technical data, trade secrets, know-how, research, product plans, the Company's products or services and markets therefor, customer lists, customer data, customers, software, developments, inventions, discoveries, ideas, processes, formulas, algorithms, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information, in each case to the extent related to and within the Product Development Scope disclosed by the Company, its affiliates or subsidiaries, either directly or indirectly, in writing, orally or by drawings or inspection of premises, parts, equipment, or other property of Company, its affiliates, or subsidiaries or generated by Consultants.  Notwithstanding the foregoing, Confidential Information shall not include any such information which Consultant can establish (i) was publicly known or made generally available prior to the time of disclosure to Consultant; (ii) becomes publicly known or made generally available after disclosure to Consultant through no wrongful action or inaction of Consultant; (iii) is in the rightful possession of Consultant, without confidentiality obligations and separate from his involvement, employment, or consultancy with Company or SleepIQ LABS, (iv) is provided by a third party without restriction to Consultant provided that Consultant does not know the information is confidential, or (v) is independently developed by a third party without the use of Confidential Information; provided that any combination of individual items of information shall not be deemed to be within any of the foregoing exceptions merely because one or more of the individual items are within such exception, unless the combination as a whole is within such exception.

B. **_Nonuse and Nondisclosure._** During and after the term of this Agreement, Consultant will hold in the strictest confidence, and use reasonable precautions to prevent any unauthorized use or disclosure of Confidential Information, and Consultant will not (i) use the Confidential Information for any purpose whatsoever other than as necessary for the performance of the Services on behalf of the Company, or (ii) disclose the Confidential Information to any third party without the prior written consent of an authorized representative of Company, except that Consultant may disclose Confidential Information to the extent compelled by applicable law; *provided however*, prior to such disclosure, Consultant shall provide prior written notice to Company and seek a protective order or such similar confidential protection as may be available under applicable law. Consultant agrees that no ownership of Confidential Information is conveyed to the Consultant. Without limiting the foregoing, Consultant shall not use or disclose any Confidential Information to invent, author, make, develop, design, or otherwise enable others to invent, author, make, develop, or design any invention, product, or service. Consultant agrees that Consultant's obligations under this Section 4.B shall continue after the termination of this Agreement. Notwithstanding anything herein, Consultant may disclose, use and otherwise fully exploit any general ideas, general concepts, general know-how and general techniques that are generally known in the industry and not specific to the Company that are retained in his unaided memory and which are not the result of any intentional memorization in order to circumvent Consultant's confidentiality obligations.

C. **_Other Client Confidential Information._** Consultant agrees that Consultant will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former or concurrent employer of Consultant or other person or entity with which Consultant has an obligation to keep in confidence. Consultant also agrees that Consultant will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D. **_Third Party Confidential Information._** Consultant recognizes that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Consultant agrees that at all times during the term of this Agreement and thereafter, Consultant owes the Company and such third parties a duty to hold all such confidential or proprietary information that constitutes Confidential Information in the strictest confidence and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out the Services for the Company consistent with the Company's agreement with such third party.

E. **_Existence of Agreement._** The terms of this Agreement shall be considered Confidential Information. In addition, the existence of this Agreement is Confidential Information and Consultant shall keep the existence of this Agreement and the fact that Consultant has changed his status from an employee of SleepIQ LABS strictly confidential until the Company determines otherwise in its sole discretion. Consultant shall not inform any third-party or any employees, agents, representatives, contractors, or consultants of Company or Company's subsidiaries, including, but not limited to, SleepIQ LABS, of the existence of this Agreement or the fact that Consultant has changed his employment status in any manner. Subject to the foregoing, Consultant may inform his advisors, actual or potential investors, lenders or acquirers, or other persons necessary to further Consultant's Alternative Venture of the existence of this Agreement or the fact that Consultant has changed his status from an employee of SleepIQ LABS to consultant, provided that those advisors or persons are subject to confidentiality restrictions prohibiting further dissemination of this information and provided that no such information is reported back to any employees, agents, representatives, contractors, or consultants of Company or Company's subsidiaries, including, but not limited to, SleepIQ LABS. At all times, regardless of the disclosure of the existence of a consulting agreement, the specific terms of this Agreement will remain Confidential Information, except

that such terms may be disclosed to actual or potential investors, lenders or acquirers subject to a confidentiality agreement.

**5.     Ownership**

A.     ***Assignment of Inventions.*** Consultant agrees that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, logos, inventions, improvements, developments, discoveries, ideas, and trade secrets conceived, discovered, authored, invented, developed, or reduced to practice by Consultant, solely or in collaboration with others, arising out of, or in connection with, performing the Services and/or completing the Deliverables under this Agreement, or with the use of Company's equipment, supplies, facilities, or Confidential Information, in each case that are within the Product Development Scope, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights in and to the foregoing (collectively, "***Inventions***"), are the sole property of the Company. Consultant also agrees to promptly make full written disclosure to the Company of any Inventions and to deliver and assign and hereby irrevocably assigns fully to the Company all right, title and interest in and to the Inventions.  Consultant agrees that this assignment includes a present conveyance to Company of ownership of Inventions that are not yet in existence.  Consultant further acknowledges that all original works of authorship that are made by Consultant (solely or jointly with others) within the Product Development Scope and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act.  Consultant understands and agrees that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to Consultant as a result of the Company's efforts to commercialize or market any such Inventions.

B.     ***Pre-Existing Materials.*** Subject to Section 5.A, Consultant shall use good faith efforts to provide the Company with prior written notice if, in the course of performing the Services, Consultant incorporates into any Invention or utilizes in the performance of the Services any invention, discovery, idea, original works of authorship, development, improvements, trade secret, concept, or other proprietary information or intellectual property right owned by Consultant or in which Consultant has an interest, prior to, or separate from, performing the Services under this Agreement ("***Prior Inventions***") With respect to Prior Inventions owned by Consultant, Consultant hereby grants the Company a nonexclusive, royalty-free, perpetual, irrevocable, transferable, worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with solely as incorporated in such Invention, and to practice any method related thereto.  With respect to Prior Inventions that Consultant does not own but has an interest in, Consultant hereby grants the Company a nonexclusive, royalty-free, perpetual, irrevocable, transferable, license to the full extent of Consultant's sublicense rights therein. Consultant will use good faith efforts not to incorporate any invention, discovery, idea, original works of authorship, development, improvements, trade secret, concept, or other proprietary information or intellectual property right owned by any third party into any Invention without Company's prior written permission, and will cooperate with the Company in good faith to obtain any necessary licensing rights in relation thereto at the Company's expense.

C.     ***Moral Rights.*** Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "***Moral Rights***"). To the extent that Moral Rights cannot be assigned under applicable law, Consultant hereby waives and agrees not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

-6-

      D.     ***Maintenance of Records.*** Consultant agrees to keep and maintain adequate, current, accurate, and authentic written records of all Inventions under Section 5.A for the term of this Agreement and upon termination of this Agreement to provide all such records to the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that is customary in the industry and/or otherwise specified by the Company. Such records are and remain the sole property of the Company at all times and upon Company's request, Consultant shall deliver (or cause to be delivered) the same.

      E.     ***Further Assurances.*** Consultant agrees to assist Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments that the Company may deem necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns and nominees the sole and exclusive right, title, and interest in and to all Inventions and testifying in a suit or other proceeding relating to such Inventions. Consultant further agrees that Consultant's obligations under this Section 5.E shall continue after the termination of this Agreement.

      F.     ***Attorney-in-Fact.*** Consultant agrees that, if the Company is unable because of Consultant's unavailability, dissolution, mental or physical incapacity, or for any other reason, to secure Consultant's signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to the Company in Section 5.A, then Consultant hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as Consultant's agent and attorney-in-fact, to act for and on Consultant's behalf to execute and file any papers and oaths and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by Consultant. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

  **6.**    **Conflicting Obligations**

      A.     ***Conflict of Interest.*** Consultant represents and warrants that Consultant has no agreements, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, Consultant's obligations to the Company under this Agreement, and/or Consultant's ability to perform the Services. Consultant will not enter into any such conflicting agreement during the term of this Agreement.

If any such actual or potential conflict of interest arises under this Agreement, Contractor shall immediately inform the Company in writing of such conflict. If, in the reasonable judgment of the Company, such conflict poses a material conflict to and with the performance of Contractor's obligations under this Agreement, then as its sole and exclusive remedy the Company may terminate the Agreement immediately upon written notice to Contractor; such termination of the Agreement shall be effective upon the receipt of such notice by Contractor. For clarity, the parties agree that activities outside the Product Development Scope do not constitute a conflict of interest hereunder.

      B.     ***Non-Solicitation.*** Consultant covenants and agrees that during the term of this Agreement, and for a period of six (6) months thereafter, Consultant will not, directly or indirectly, through an existing corporation, unincorporated business, affiliated party, successor employer, or otherwise, solicit for hire, employment, or work with, on a part-time, consulting, advising, or any other basis, other than on

behalf of the Company any employee then employed by the Company. Nothing set forth in this Section shall prohibit Consultant from soliciting any such employee through the use of advertisements or other general solicitations or from discussing opportunities with any such employee to the extent such employee contacts Consultant first. This Section 6.B supersedes any other non-solicitation obligations Consultant may have with the Company.

**7.     Return of Company Materials**

Within five (5) business days after Company's request, Consultant shall deliver to the Company, and will not keep in Consultant's possession, recreate, or deliver to anyone else, any and all Confidential Information, tangible embodiments of the Inventions, all devices and equipment belonging to the Company, all electronically-stored information and passwords to access such property, those records maintained pursuant to Section 5.D and any reproductions of any of the foregoing items, whether in hard-copy or otherwise, that Consultant may have in Consultant's possession or control. Notwithstanding the foregoing, Consultant may maintain possession of the beds obtained from Company during his past employment or during the term of this Agreement. Consultant may maintain possession of such beds for his own personal, non-commercial use and enjoyment only, may not sell or gift the beds to any third-party, and must destroy the beds or return the beds to Company after Consultant ceases his personal use. Consultant understands and agrees that all such beds are pre-production beds that have not undergone or passed all applicable mattress quality and safety testing or satisfied any related mattress regulations, and ACCEPTS THE BEDS "AS-IS" WITHOUT ANY WARRANTY AS TO THE BEDS' QUALITY OR SAFETY. COMPANY DISCLAIMS ANY AND ALL WARRANTIES WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. CONSULTANT AGREES TO FOREVER RELEASE AND DISCHARGE COMPANY FROM ANY AND ALL HARM, DAMAGE, OR INJURY OF ANY KIND RESULTING FROM CONSULTANT'S POSSESSION AND/OR USE OF THE BEDS.

**8.     Term and Termination**

A.     ***Term***. The term of this Agreement will begin on the Effective Date of this Agreement and will continue until April 30, 2019 or upon termination as provided in Section 8.B. The term of this Agreement may be extended or renewed upon agreement of the parties.

B.     ***Termination***. Either Party may terminate this Agreement upon giving the other Party fourteen (14) days prior written notice of such termination of this Agreement. Either Party may terminate this Agreement immediately and without prior notice if the other Party is in breach of any material provision of this Agreement or, in the case of Consultant, refuses to or is unable to perform the Services. .

C.     ***Survival***. Upon any termination, all rights and duties of the Company and Consultant toward each other shall cease except:

(1)     The Company will pay, within thirty (30) days after the effective date of termination, all amounts owing to Consultant for Services completed and accepted by the Company prior to the termination date; and

(2)     Section 3 (Confidentiality), Section 5 (Ownership), Section 6 (Non-Solicitation) Section 7 (Return of Company Materials), Section 8 (Term and Termination), Section 9 (Independent Contractor), Section 10 (Limitation of Liability), Section 11 (Arbitration and Equitable Relief), and Section 12 (Miscellaneous) will survive termination or expiration of this Agreement in accordance with their terms.

(3) Except as set forth in Section 6.B herein, any rights and duties then-existing and surviving pursuant to the terms of any other agreement between the parties including, without limitation, the (1) At-Will Employment, Confidential Information, Invention Assignment, And Arbitration Agreement between Consultant and SleepIQ LABS and (2) At-Will Employment, Confidential Information, Invention Assignment, And Arbitration Agreement between Consultant and BAM Labs, Inc.

9. **Independent Contractor**

It is the express intention of the Company and Consultant that Consultant perform the Services as an independent contractor to the Company. Nothing in this Agreement shall in any way be construed to constitute Consultant as an agent, employee or representative of the Company. Without limiting the generality of the foregoing, Consultant is not authorized to bind the Company to any liability or obligation or to represent that Consultant has any such authority. Consultant is solely responsible for payment of all federal, state and local taxes or contributions imposed or required under unemployment insurance, social security, medical insurance, income tax or other applicable laws, rules or regulations with respect to the Consultant's performance or rendering of the services under this Agreement.

10. **Limitation of Liability**

EXCEPT FOR WILFUL MISCONDUCT, IN NO EVENT SHALL COMPANY EITHER PARTY BE LIABLE TO THE OTHER PARTY OR TO ANY OTHER PARTY FOR ANY INDIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGES, OR DAMAGES FOR LOST PROFITS OR LOSS OF BUSINESS, HOWEVER CAUSED AND UNDER ANY THEORY OF LIABILITY, WHETHER BASED IN CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHER THEORY OF LIABILITY, REGARDLESS OF WHETHER SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. EXCEPT FOR WILFUL MISCONDUCT AND THE COMPANY'S PAYMENT OBLIGATIONS, IN NO EVENT SHALL EITHER PARTY'S LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT EXCEED THE AMOUNTS PAID BY COMPANY TO CONSULTANT UNDER THIS AGREEMENT FOR THE SERVICES, DELIVERABLES OR INVENTION GIVING RISE TO SUCH LIABILITY.

11. **Arbitration and Equitable Relief**

A. *Arbitration.* IN CONSIDERATION OF CONSULTANT'S CONSULTING RELATIONSHIP WITH COMPANY, ITS PROMISE TO ARBITRATE ALL DISPUTES RELATED TO CONSULTANT'S CONSULTING RELATIONSHIP WITH THE COMPANY AND CONSULTANT'S RECEIPT OF THE COMPENSATION AND OTHER BENEFITS PAID TO CONSULTANT BY COMPANY, AT PRESENT AND IN THE FUTURE, CONSULTANT AGREES THAT ANY AND ALL CONTROVERSIES, CLAIMS, OR DISPUTES WITH ANYONE (INCLUDING COMPANY AND ANY EMPLOYEE, OFFICER, DIRECTOR, SHAREHOLDER OR BENEFIT PLAN OF THE COMPANY IN THEIR CAPACITY AS SUCH OR OTHERWISE), ARISING OUT OF, RELATING TO, OR RESULTING FROM CONSULTANT'S CONSULTING OR OTHER RELATIONSHIP WITH THE COMPANY OR THE TERMINATION OF CONSULTANT'S CONSULTING OR OTHER RELATIONSHIP WITH THE COMPANY, INCLUDING ANY BREACH OF THIS AGREEMENT, SHALL BE SUBJECT TO BINDING ARBITRATION UNDER THE FEDERAL ARBITRATION ACT AND SHALL BE BROUGHT IN CONSULTANT'S INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF, REPRESENTATIVE OR CLASS MEMBER IN ANY PURPORTED CLASS, COLLECTIVE OR REPRESENTATIVE PROCEEDING. NOTWITHSTANDING THE FOREGOING, CONSULTANT UNDERSTANDS THAT CONSULTANT MAY BRING A PROCEEDING AS A

PRIVATE ATTORNEY GENERAL AS PERMITTED BY LAW. FOR THE AVOIDANCE OF DOUBT, THE FEDERAL ARBITRATION ACT GOVERNS THIS AGREEMENT. **CONSULTANT AGREES TO ARBITRATE ANY AND ALL COMMON LAW AND/OR STATUTORY CLAIMS UNDER LOCAL, STATE, OR FEDERAL LAW, INCLUDING, BUT NOT LIMITED TO, CLAIMS UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE OLDER WORKERS BENEFIT PROTECTION ACT, THE SARBANES-OXLEY ACT, THE WORKER ADJUSTMENT AND RETRAINING NOTIFICATION ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, THE FAMILY AND MEDICAL LEAVE ACT, THE CALIFORNIA FAMILY RIGHTS ACT, THE CALIFORNIA LABOR CODE, CLAIMS RELATING TO EMPLOYMENT OR INDEPENDENT CONTRACTOR STATUS, CLASSIFICATION AND RELATIONSHIP WITH THE COMPANY, AND CLAIMS OF HARASSMENT, DISCRIMINATION, WRONGFUL TERMINATION, AND BREACH OF CONTRACT, EXCEPT AS PROHIBITED BY LAW. CONSULTANT ALSO AGREES TO ARBITRATE ANY AND ALL DISPUTES ARISING OUT OF OR RELATING TO THE INTERPRETATION OR APPLICATION OF THIS AGREEMENT TO ARBITRATE, BUT NOT TO DISPUTES ABOUT THE ENFORCEABILITY, REVOCABILITY OR VALIDITY OF THIS AGREEMENT TO ARBITRATE OR ANY PORTION HEREOF OR THE CLASS, COLLECTIVE AND REPRESENTATIVE PROCEEDING WAIVER HEREIN. WITH RESPECT TO ALL SUCH CLAIMS AND DISPUTES THAT CONSULTANT AGREES TO ARBITRATE, CONSULTANT HEREBY EXPRESSLY AGREES TO WAIVE, AND DOES WAIVE, ANY RIGHT TO A TRIAL BY JURY.** CONSULTANT FURTHER UNDERSTANDS THAT THIS AGREEMENT TO ARBITRATE ALSO APPLIES TO ANY DISPUTES THAT THE COMPANY MAY HAVE UNDER THIS AGREEMENT WITH CONSULTANT.

    B.  ***Procedure.*** CONSULTANT AGREES THAT ANY ARBITRATION WILL BE ADMINISTERED BY JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("***JAMS***"). CONSULTANT AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO DECIDE ANY MOTIONS BROUGHT BY ANY PARTY TO THE ARBITRATION, INCLUDING MOTIONS FOR SUMMARY JUDGMENT AND/OR ADJUDICATION AND MOTIONS TO DISMISS AND DEMURRERS APPLYING THE STANDARDS SET FORTH UNDER THE FEDERAL RULES OF IVIL PROCEDURE. CONSULTANT AGREES THAT THE ARBITRATOR SHALL ISSUE A WRITTEN DECISION ON THE MERITS. CONSULTANT ALSO AGREES THAT THE ARBITRATOR SHALL HAVE THE POWER TO AWARD ANY REMEDIES AVAILABLE UNDER APPLICABLE LAW, AND THAT THE ARBITRATOR SHALL AWARD ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY WHERE PROVIDED BY APPLICABLE LAW. CONSULTANT AGREES THAT THE DECREE OR AWARD RENDERED BY THE ARBITRATOR MAY BE ENTERED AS A FINAL AND BINDING JUDGMENT IN ANY COURT HAVING JURISDICTION THEREOF. CONSULTANT AGREES THAT THE ARBITRATOR SHALL ADMINISTER AND CONDUCT ANY ARBITRATION IN ACCORDANCE WITH DELAWARE LAW AND THAT THE ARBITRATOR SHALL APPLY SUBSTANTIVE LAW OF DELAWARE AND THE FEDERAL RULES OF CIVIL PROCEDURE TO ANY DISPUTE OR CLAIM, WITHOUT REFERENCE TO RULES OF CONFLICT OF LAW. TO THE EXTENT THAT THE JAMS RULES CONFLICT WITH DELAWARE LAW, DELAWARE LAW SHALL TAKE PRECEDENCE.

    C.  ***Remedy.*** EXCEPT AS PROVIDED BY THE FEDERAL ARBITRATION ACT AND THIS AGREEMENT, ARBITRATION SHALL BE THE SOLE, EXCLUSIVE, AND FINAL REMEDY FOR ANY DISPUTE BETWEEN CONSULTANT AND THE COMPANY. ACCORDINGLY, EXCEPT AS PROVIDED FOR BY THE FEDDERAL ARBITRATION ACT AND THIS AGREEMENT,

NEITHER CONSULTANT NOR THE COMPANY WILL BE PERMITTED TO PURSUE COURT ACTION REGARDING CLAIMS THAT ARE SUBJECT TO ARBITRATION.

        D.     ***Court Actions Allowed.*** NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, THE PARTIES AGREE THAT ANY PARTY NEED NOT ARBITRATE AND MAY PETITION OR FILE AN ACTION IN A COURT WITH JURISDICTION SEEKING RELIEF (INCLUDING TO ANY RELIEF AVAILABLE IN EQUITY OR AT LAW, INCLUDING WITHOUT LIMITATION INJUNCTIVE RELIEF, DAMAGES, AND/OR OTHER MONETARY RELIEF) AIRISING OUT OF OR RELATING TO ALLEGATIONS OR CLAIMS THAT THE OTHER PARTY VIOLATED ANY AGREEMENT REGARDING INTELLECTUAL PROPERTY, CONFIDENTIAL INFORMATION, AND/OR NON-SOLICITATION. IN SUCH AN ACTION, THE PREVAILING PARTY SHALL BE ENTITLED TO SEEK REASONABLE COSTS AND ATTORNEYS' FEES.

        E.     ***Administrative Relief.*** CONSULTANT UNDERSTANDS THAT EXCEPT AS PERMITTED BY LAW THIS AGREEMENT DOES NOT PROHIBIT CONSULTANT FROM PURSUING CERTAIN ADMINISTRATIVE CLAIMS WITH LOCAL, STATE OR FEDERAL ADMINISTRATIVE BODIES OR GOVERNMENT AGENCIES SUCH AS THE DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, THE NATIONAL LABOR RELATIONS BOARD, OR THE WORKERS' COMPENSATION BOARD. THIS AGREEMENT DOES, HOWEVER, PRECLUDE CONSULTANT FROM BRINGING ANY ALLEGED WAGE CLAIMS WITH THE DEPARTMENT OF LABOR STANDARDS ENFORCEMENT. LIKEWISE, THIS AGREEMENT DOES PRECLUDE CONSULTANT FROM PURSUING COURT ACTION REGARDING ANY ADMINISTRATIVE CLAIMS, EXCEPT AS PERMITTED BY LAW.

        F.     ***Voluntary Nature of Agreement.*** CONSULTANT ACKNOWLEDGES AND AGREES THAT HE/SHE IS EXECUTING THIS AGREEMENT VOLUNTARILY AND WITHOUT ANY DURESS OR UNDUE INFLUENCE BY THE COMPANY OR ANYONE ELSE. CONSULTANT FURTHER ACKNOWLEDGES AND AGREES THAT HE/SHE HAS CAREFULLY READ THIS AGREEMENT AND THAT CONSULTANT HAS ASKED ANY QUESTIONS NEEDED FOR CONSULTANT TO UNDERSTAND THE TERMS, CONSEQUENCES AND BINDING EFFECT OF THIS AGREEMENT AND FULLY UNDERSTAND IT, INCLUDING THAT **CONSULTANT IS WAIVING HIS/HER RIGHT TO A JURY TRIAL** WITH RESPECT TO CERTAIN CLAIMS. FINALLY, CONSULTANT REPRESENTS AND AGREES THAT HE HAS CONSULTED WITH AND OBTAINED THE ADVICE OF AN ATTORNEY OF HIS CHOOSING BEFORE SIGNING THIS AGREEMENT.

    **12.**    **Miscellaneous**

        A.     ***Governing Law.*** This Agreement shall be governed by the laws of the State of Delaware, without regard to the conflicts of law provisions of any jurisdiction.

        B.     ***Assignability.*** This Agreement will be binding upon Consultant, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as expressly stated. Except as may otherwise be provided in this Agreement, neither party may sell, assign or delegate any rights or obligations under this Agreement. Notwithstanding anything to the contrary herein, Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, change of control or otherwise.

   C. **Entire Agreement.** With the exceptions of (1) Consultant's separate At-Will Employment, Confidential Information, Invention Assignment, And Arbitration Agreement with SleepIQ LABS and (2) Consultant's At-Will Employment, Confidential Information, Invention Assignment, and Arbitration Agreement with BAM Labs, Inc., this Agreement constitutes the entire agreement and understanding between the Parties with respect to the consultancy agreed to herein and supersedes all prior written and oral agreements, discussions, or representations between the Parties with respect to the consultancy agreed to herein. Consultant represents and warrants that he/she is not relying on any statement or representation not contained in this Agreement. To the extent any terms set forth in any exhibit or schedule conflict with the terms set forth in this Agreement, the terms of this Agreement shall control unless otherwise expressly agreed by the Parties in such exhibit or schedule.

   D. **Headings.** Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

   E. **Severability.** If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

   F. **Modification, Waiver.** No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the Parties. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

   G. **Attorneys' Fees.** In any court action at law or equity that is brought by one of the Parties to this Agreement to enforce or interpret the provisions of this Agreement, the prevailing Party will be entitled to seek reasonable attorneys' fees, in addition to any other relief to which that Party may be entitled.

   H. **Signatures.** This Agreement may be signed in two counterparts, each of which shall be deemed an original, with the same force and effectiveness as though executed in a single document.

(*signature page follows*)

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

| CONSULTANT | SLEEP NUMBER CORPORATION |
|---|---|
| By: *Carl Hewitt* | By: *Annie Bloomquist* |
| Name: Carl Hewitt | Name: Annie Bloomquist |
| Date: Dec 4, 2017 | Title: Chief Product Officer |
| | Date: Dec 4, 2017 |

▮▮▮

▮▮▮

-2-



| | |
|---|---|
| INTERNAL APPROVALS AS TO FORM | |
| Business: *Annie Bloomquist* | |
| Legal: | |
| Sourcing: | N/R ☑ |
| Finance: | N/R ☑ |
| IT: | N/R ☑ |

3



# Hewitt -- SNBR -- Consulting Agreement (12.1.2017) (FINAL)

Adobe Sign Document History                                     12/04/2017

| | |
|---|---|
| Created: | 12/01/2017 |
| By: | Dennis Hansen (░░░░░░░░░░░░░░░░░░) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAXVXsm55UombN3LOuYQJxmDnrCFDstocX |

## "Hewitt -- SNBR -- Consulting Agreement (12.1.2017) (FINAL)" History

📄 Document created by Dennis Hansen (░░░░░░░░░░░░░░░░░░░░░░)
12/01/2017 - 8:21:15 PM CST- IP address: 67.6.33.144

✉️ Document emailed to Sam Hellfeld (░░░░░░░░░░░░░░░░░░░░░░) for signature
12/01/2017 - 8:25:37 PM CST

📄 Document viewed by Sam Hellfeld (░░░░░░░░░░░░░░░░░░░░░░)
12/01/2017 - 8:32:07 PM CST- IP address: 172.58.23.137

✍️ Document e-signed by Sam Hellfeld (░░░░░░░░░░░░░░░░░░░░░░)
Signature Date: 12/01/2017 - 8:32:44 PM CST - Time Source: server- IP address: 172.58.23.137

✉️ Document emailed to Carl Hewitt (░░░░░░░░░░░░░░) for signature
12/01/2017 - 8:32:45 PM CST

📄 Document viewed by Carl Hewitt (░░░░░░░░░░░░░░)
12/01/2017 - 11:35:56 PM CST- IP address: 173.239.228.81

✍️ Document e-signed by Carl Hewitt (░░░░░░░░░░░░░░)
Signature Date: 12/04/2017 - 3:43:54 PM CST - Time Source: server- IP address: 50.207.74.62

✉️ Document emailed to Annie Bloomquist (░░░░░░░░░░░░░░░░░░░░░░) for signature
12/04/2017 - 3:43:55 PM CST

📄 Document viewed by Annie Bloomquist (░░░░░░░░░░░░░░░░░░░░░░)
12/04/2017 - 4:18:36 PM CST- IP address: 63.137.118.29

✍️ Document e-signed by Annie Bloomquist (░░░░░░░░░░░░░░░░░░░░░░)
Signature Date: 12/04/2017 - 4:20:11 PM CST - Time Source: server- IP address: 63.137.118.29



