# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

SLEEP NUMBER CORPORATION,          Case No. 20-CV-1507 (NEB/ECW)

         Plaintiff,

v.                        ORDER ON MOTION FOR
                         PRELIMINARY INJUNCTION

STEVEN JAY YOUNG; CARL HEWITT;
and UDP LABS, INC.,

         Defendants.

---

Defendants Steven Young and Carl Hewitt were employees of, and later consultants for, Plaintiff Sleep Number Corporation. During the consulting period, Young and Hewitt, through their company, Defendant UDP Labs ("UDP"), filed a patent application for an invention to which Sleep Number claims it owns the rights. After Young and Hewitt terminated their consultancy, UDP filed additional patent applications, and Sleep Number claims they own the rights to these too. Sleep Number moved for a preliminary injunction, which, for the reasons below, the Court grants.

## BACKGROUND

Young founded BAM Labs, a company that developed sleep-related technology, in 2005 or 2006, and Hewitt joined the company a few years later. (ECF No. 133 ("Young Decl.") ¶ 4.) In 2012, Sleep Number partnered with BAM Labs to develop sleep monitoring technology. Three years later, it acquired BAM Labs, renaming it SleepIQ

LABS. (ECF No. 119 ("Am. Compl.") ¶ 26.) Young and Hewitt worked for SleepIQ LABS until November 2017. (*Id.* ¶¶ 26–27.) At that point, Young and Hewitt told Sleep Number that they wished to pursue their own venture. (*Id.* ¶ 27.) In December 2017, Young and Hewitt both entered into Confidential Consulting Agreements with Sleep Number, allowing them to consult for Sleep Number while starting their own company. (*Id.* ¶ 28; ECF Nos. 125-1, 125-2 (collectively, "Consulting Agreements").)

Under the Consulting Agreements, Young and Hewitt agreed to, among other things, "[f]acilitate transition to [a] new leadership team at SleepIQ LABS," help retain employees, transition their work to other personnel, and support Sleep Number "as an on-call resource for guidance and advice." (Consulting Agreements at 1–4.[1]) The Consulting Agreements also required Young and Hewitt to disclose and assign to Sleep Number the rights to any invention within a defined Product Development. (Consulting Agreements at 1, 6.) The Product Development Scope was defined as "any ideas, conceptions, inventions, or plans relating to sleep, mattresses, bedding, sleep monitoring, health or wellness as it relates to sleep (including biometric monitoring relating to sleep), or bedroom or sleep technologies." (Consulting Agreements at 1.) Though this scope is broad, Young and Hewitt specifically retained their rights to "monitoring technologies for sudden infant death syndrome" and "blood pressure monitoring technologies." (*Id.*)

---

[1] Page references to the Consulting Agreements refer to the documents' pagination.

Shortly after entering into the Consulting Agreements, Young and Hewitt incorporated their new venture, UDP Labs. (Am. Compl. ¶ 30.) Young and Hewitt are both officers of UDP. (*Id.* ¶¶ 79–80.) In October 2018, while Young and Hewitt were still Sleep Number consultants, UDP filed Provisional Patent Application No. 62/742,613, titled "Continuous Biometric Monitoring Sensors." (*Id.* ¶ 46; ECF No. 119-1 ("'613 Application").) The '613 Application named Young and Hewitt as inventors. ('613 Application at 10.[2]) In general terms, the application was for an invention that uses load-bearing sensors placed under a substrate, such as a bed, to measure biometric data such as respiration rate, heart rate, and weight. (*Id.* at 32–34.)

A few weeks after UDP filed the '613 Application, Young and Hewitt met with executive officers of Sleep Number and informed them that they wished to terminate their Consulting Agreements. (Am. Compl. ¶ 48.) On November 1, 2018, Young and Hewitt formally notified Sleep Number that they would be terminating their Consulting Agreements effective November 15, 2018. (*Id.* ¶ 49.)

In February 2019, UDP filed a second provisional patent application, No. 62/804,623, (ECF No. 119-2 ("'623 Application")), which included some of the diagrams and disclosure from the '613 Application. (Young Decl. ¶ 37.) Over the ensuing eleven months, UDP filed several patent applications: No. 16/549,367 (ECF No. 125-4 ("'367 Application")), No. 16/551,087 (ECF No. 125-5 ("'087 Application")), No. 16/595,848

---

[2] All references to page numbers for patent applications refer to ECF pagination.

(ECF No. 119-3 ("'848 Application")), and No. 16/777,385 (ECF No. 119-4 ("'385 Application")). These four applications all claim priority to both the '613 and the '623 Applications,[3] (Young Decl. ¶ 39; ECF No. 125 ("Toft Decl.") ¶ 9), meaning that UDP believed that the inventions in the later applications (the '367, '087, '848, and '385 Applications) were based on the same technology that was disclosed in the '613 Application. *See* 35 U.S.C. § 120 (granting an earlier priority date to later applications for inventions that were disclosed in a previous application); *In re NTP, Inc.*, 654 F.3d 1268, 1277 (Fed. Cir. 2011) ("[A] patent is entitled to the priority date of an earlier filed application if," among other requirements, "the written description of the earlier filed application discloses the invention claimed in the later filed application . . . .").

Then in November 2020, after this suit was filed, UDP filed several "Request[s] for Corrected Filing Receipt" with the United States Patent and Trademark Office ("USPTO") seeking to amend the '087, '367, '385, and '848 Applications to eliminate their claims of priority to the '613 Application, leaving only the claims of priority to the '623 Application. (ECF No. 125-6 at 2–3, 16–17, 30–31, 43–44.) As a result of UDP's amendment to the applications' claims of priority, the '087, '367, '385, and '848 Applications now only claim priority to an application filed after Young and Hewitt terminated their Consulting

---

[3] The '385 Application only claims priority to the '623 Application, but it is a continuation-in-part of the '848 Application, which claims priority to the '613 Application. ('385 Application at 19.) A continuation-in-part application is one that repeats some or all of a previous patent application while "adding matter not disclosed in the earlier . . . application." MPEP § 201.08 (9th ed. June 2020).

Agreements. Additionally, by moving the priority date forward, the applications are now subject to several additional months' worth of potentially invalidating prior art.[4] (ECF No. 124 at 25.) Sleep Number then filed this Motion for a Preliminary Injunction, which the Court grants. (ECF No. 122.)

## ANALYSIS

The Court must consider four factors in deciding whether to grant a preliminary injunction: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the movant if the injunction is not granted; (3) the balance between this harm and the injury that granting the injunction will inflict on the other parties; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. As the party seeking injunctive relief, Sleep Number bears the burden of showing that these factors support the issuance of a preliminary injunction. *Lankford v. Sherman*, 451 F.3d 496, 503 (8th Cir. 2006).

---

[4] Prior art is "the information available to the public at the time of the application." *Return Mail, Inc. v. U.S. Postal Serv.*, 139 S. Ct. 1853, 1859 (2019). A patent application will be rejected if it overlaps with prior art or prior art renders the invention obvious. 35 U.S.C. §§ 102(a), 103.

## I.      Likelihood of Success on the Merits

The likelihood of success on the merits is the most important *Dataphase* factor. *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citation omitted). When assessing the likelihood of Sleep Number's success on the merits, the Court need not determine whether Sleep Number will ultimately succeed, but rather it must decide whether Sleep Number has a "fair chance of prevailing." *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 731–32 (8th Cir. 2008). To show it has a "fair chance of prevailing," Sleep Number need not show that it is more likely than not to prevail on the merits. *Jet Midwest Int'l Co. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044–45 (8th Cir. 2020) (citing *Dataphase*, 640 F.2d at 113). Additionally, Sleep Number only needs to establish that it is likely to succeed on the merits of one of its claims. *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (citation omitted).

Sleep Number has shown that it has more than a "fair chance of prevailing" on the merits. *Planned Parenthood*, 530 F.3d at 731–32. In support of its argument that it is likely to succeed on the merits, Sleep Number focuses on its declaratory judgment and breach of contract claims. (ECF No. 124 at 15–23.) These claims depend heavily on whether Young and Hewitt were required to assign their rights in the inventions to Sleep Number, a question which in turn hinges on whether the inventions are within the Product Development Scope.

It is likely that the inventions disclosed in the patent applications are covered by the Product Development Scope. The Product Development Scope includes inventions related to "mattresses, bedding, sleep monitoring, health or wellness as it relates to sleep, . . . [and] bedroom or sleep technologies." (Consulting Agreements at 1.) Each of the patent applications concerns an invention that relates to one or more of these categories. First, the '613 Application is for an invention that is designed to be placed under an object such as a bed, can predict bed exits, and can differentiate between multiple people on a bed. ('613 Application at 33.) The application includes several images of people lying on what appear to be beds, (*id.* at 36–39), and states that embedding sensors in the floor or in a mat would allow them to "work with any type of bed." (*Id.* at 39.)

Second, the '623 Application relates to sensors designed to be placed under a substrate, and it enumerates beds as a specific type of substrate with which the sensors may be used. ('623 Application at 10, 11.) Like the '613 Application, the invention in the '623 Application can predict bed exits. (*Id.* at 10.) It can also predict sleep apnea and measure one's position on the bed. (*Id.* at 10, 12.)

Third, the '367 Application is titled "Load Sensor Assembly for Bed Leg and Bed with Load Sensor Assembly" and features numerous images of beds and bed frames. ('367 Application at 2–5, 16 (confirming that figures 2A and 2B are illustrations of bed frames).) Fourth, the '087 Application states that the sensors are meant to be placed under beds, among other things. ('087 Application at 17.) It also features numerous images of

people on beds, including people sleeping on beds. (*Id.* at 12–15, 16 (confirming that some of the figures represent people in a sleeping position).)

Fifth, the '848 Application also includes several images of beds. ('848 Application at 2–3.) It features graphs displaying how the invention determines when someone is out of bed, getting into bed, in bed, or getting out of bed. (*Id.* at 19, 21.) Data obtained by the sensors can predict patterns of sleep for the subject and can measure time spent asleep, the time the subject woke up, and the amount and type of motion while asleep. (*Id.* at 26–27.)

Sixth and finally, the '385 Application features several images of beds, bed frames, and people lying in beds. ('385 Application at 2–5.) The invention in the '385 Application can "learn and predict patterns of sleep . . . for a subject." (*Id.* at 21.) Data from the sensors can be used to measure time spent in bed, the time when the subject fell asleep, and the time the subject woke up. (*Id.* at 22.)

As these descriptions illustrate, the applications all include numerous references to beds, images of beds, and people lying on beds. Some of the inventions have the ability to measure bed presence and aspects of sleep. Thus, they are likely to fall within the Product Development Scope, and the scales tip towards Sleep Number's likelihood of success on the merits.[5]

---

[5] More than three weeks after the hearing, Sleep Number filed a letter alerting the Court to a March 2020 post on UDP's Facebook page and UDP's August 2019 trademark application. (ECF No. 152.) But because Sleep Number could have discovered the

Defendants advance several arguments opposing this view, but none tip the scales back in their favor. First, they argue that the term "sleep" has a specialized meaning in the "smart mattress and biomonitoring industries," and that none of the inventions relate to this narrower definition of sleep. (ECF No. 132 at 25.) But the definition of "sleep" that Defendants propose is not contained in the Consulting Agreements, and the Court will not read it into the contracts. *See Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) (explaining that a court should focus on the four corners of the contract when interpreting a contract).[6]

Defendants also claim that the '613 Application does not concern sleep at all but is instead designed to measure cardiac and respiratory signals. (ECF No. 132 at 26–27.) But just because the '613 Application measures things in addition to sleep-related data does not mean it does not relate to sleep or bedding or otherwise fit within the Product Development Scope. As detailed above, the '613 Application makes numerous mentions of beds and can measure things such as bed exits.

_____

Facebook post and the trademark application before the hearing, the Court will not consider Sleep Number's letter.

[6] The parties appear to agree that Delaware law governs the underlying dispute. (ECF No. 124 at 22.) Defendants, in a brief in support of an earlier motion, analyzed Sleep Number's claims under Delaware law, but reserved the right to later object to the applicability of Delaware law. (ECF No. 56 at 6 n.2.) Based on the lack of objection from Defendants to the application of Delaware law, and the Consulting Agreements' Delaware choice of law provision, the Court will apply Delaware law in this order. (Consulting Agreements at 11.)

Defendants contend that each Application aside from the '613 Application was developed after the termination of their consulting relationship with Sleep Number, and thus need not have been assigned to Sleep Number. (ECF No. 132 at 27–28.) The consulting period ended on November 15, 2018 when Young and Hewitt terminated their Consulting Agreements, and each of the patent applications, except for the '613 Application, was filed after that. Since these applications no longer claim priority to the '613 Application, Defendants argue that the Consulting Agreements did not obligate them to assign those inventions to Sleep Number.

But this timing does not lead to the conclusion that Defendants urge.  The Product Development Scope covers any product developed or ideated "during the Term of this Agreement." (Consulting Agreements at 1.) The fact that UDP did not file certain patent applications until after the consulting period ended does not mean that Young and Hewitt did not conceive of the inventions while consulting for Sleep Number. Further, the Consulting Agreements required Young and Hewitt to assign any inventions "conceived, discovered, authored, invented, developed, or reduced to practice . . . arising out of, or in connection with" Young and Hewitt's performance under the Consulting Agreement or by their use of Sleep Number's "equipment, supplies, facilities, or Confidential Information." (*Id*. at 6.) Evidence in the record suggests that the inventions presented in the patent applications UDP filed after Young and Hewitt terminated their consulting agreements were "conceived, discovered, authored, invented, developed, or

reduced to practice" by Young and Hewitt in connection with their consulting for Sleep Number. Specifically, until recently, the '367, '087, '848, and '385[7] Applications all claimed priority to the '613 Application, which was filed before the end of the Consulting Agreements, meaning that UDP, at least initially, believed that the later applications were based on the same technology as the '613 Application.[8] *See In re NTP*, 654 F.3d at 1277 (explaining that a patent is entitled to the priority date of an earlier filed application if the later application discloses the same invention as the earlier application).

Finally, Defendants claim that the inventions fit within the Product Development Scope's carveout for blood pressure monitoring and sudden infant death syndrome technologies. (ECF No. 132 at 29–30.) This argument relies on an unduly broad conception of the carveouts. For instance, Defendants claim that the technology underlying the '623 Application monitors for congestive heart failure and other illnesses, all of which "relate to blood pressure." (*Id.* at 29.) But the carveout does not confer on Young and Hewitt the right to retain any invention that monitors for conditions that are related to blood

---

[7] As noted above, the '385 Application does not itself claim priority to the '613 Application, but it is a continuation-in-part of the '848 Application, which does claim priority to the '613 Application. ('385 Application at 19.)

[8] Defendants claim that UDP erred in claiming priority to the '613 Application, because these later applications were based on new technology, and were thus not related to the '613 Application. (ECF No. 132 at 27–28.) Defendants claim they were simply honoring their duty of candor to the USPTO when they amended their applications to remove the claim of priority to the '613 Application. This contention is belied by the fact that UDP would have known this when it was filing the later applications, and gave no explanation for waiting, in some cases, nearly two years to seek to amend them.

pressure; it only gives them rights to "blood pressure monitoring technologies." (Consulting Agreements at 1.) Because it does not appear that the '623 Application monitors blood pressure, the carveout does not apply.

Defendants also argue that the '385 Application fits within the carveout because it monitors blood pressure. (ECF No. 132 at 29–30.) The words "blood pressure," however, appear nowhere in this application. Although the invention measures cardio-respiratory signals, (*e.g.*, '385 Application at 19), it is not clear from the application that blood pressure is one of the cardio-respiratory signals that the invention monitors. In light of the lack of evidence that the carveout applies and the overwhelming number of references to beds and sleep contained in this application, Sleep Number has shown a "fair chance" at succeeding on its claim that Young and Hewitt were required to assign the '385 Application to Sleep Number. *Planned Parenthood*, 530 F.3d at 731–32.

Based on the terms of the Consulting Agreements and the patent applications at issue in this case, Sleep Number has established a likelihood of success on the merits.

## II.    Irreparable Injury

Regardless of Sleep Number's likelihood of success on the merits, Sleep Number must also show a threat of irreparable injury without a preliminary injunction. *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 318 (8th Cir. 2009) (citations omitted). To establish irreparable injury, Sleep Number must show that its injuries would not be compensated by money damages. *Id.* at 319.

Sleep Number has demonstrated that it would be irreparably harmed if UDP were permitted to control the patent prosecution process for the inventions Sleep Number claims it owns. Specifically, the parties agree that the USPTO is expected to issue an Office Action on UDP's applications within the next several months.[9] (ECF No. 124 at 26; ECF No. 132 at 33.) To elucidate the stakes of responding to an Office Action, a brief overview of the patent prosecution process is required.

To obtain a patent, an applicant must first "submit[] an application describing the proposed patent claims to the Patent Office." *Return Mail*, 139 S. Ct. at 1859 (citing 35 U.S.C. §§ 111(a)(1), 112). A patent examiner reviews the application and issues a First Office Action, which is typically the first substantive review of the patentability of the application. *First Office Action Estimator*, USPTO, https://www.uspto.gov/learning-and-resources/statistics/first-office-action-estimator (last accessed March 31, 2021). An Office Action may explain the reasons the examiner approved or rejected the patent claims, and may cite potentially invalidating prior art. *Id.* The applicant may then file a response with the USPTO requesting reconsideration and may also amend the application at this point. 37 C.F.R. § 1.111(a)(1). Responding to an Office Action is a critical stage in prosecuting a

---

[9] The parties differ as to the exact time when an Office Action is expected. Sleep Number claims that an Office Action is expected "any day now," (ECF No. 124 at 26), whereas Defendants claim that an Office Action is not expected until July 2021, at the earliest. (ECF No. 132 at 33.) But even if the USPTO does not issue an Office Action until July, this case will likely not be decided on the merits before then, meaning that, absent an injunction, UDP would be permitted to respond to an Office Action.

patent, because the application can be amended, narrowed, or otherwise altered through the applicant's response. *See, e.g., Sanofi-Aventis Deutschland GmbH v. Genentech, Inc.*, 473 F. App'x 885, 888 (Fed. Cir. 2012) (noting that terms in a patent can be "narrowed during prosecution through arguments made to distinguish prior art"); *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1381 (Fed. Cir. 2011) (holding that a patent applicant narrowed its application in a response to the examiner's rejection on prior art grounds); *Philips v. AWH Corp.*, 415 F.3d 1303, 1317 (Fed. Cir. 2005) (citations omitted) ("[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."). Hence, a response to an Office Action has critical implications for the scope of a patent.

If Sleep Number is the true owner of the patent applications, it would be irreparably injured if it were not able to control the patent prosecution process, including not being able to respond to any Office Actions. Although Defendants assert that their interests are aligned with Sleep Number's, this argument ignores the separate point that Sleep Number, if it owns these patent applications, has the right to prosecute them as it sees fit.[10] If UDP retains the right to prosecute the patent applications, it may narrow or

---

[10] The argument that Defendants' and Sleep Number's interests are aligned is undercut by UDP's amendment of the priority dates of the later applications. If Defendants retain control of the patent prosecution process for the patent applications at issue, they would naturally be incentivized to prosecute the patents in a way that bolsters their claim to ownership of the patents and weakens Sleep Number's. For instance, in response to an

alter the applications in ways that Sleep Number would not. Any such alterations would be permanently enshrined in the patent, if one issues.

Other courts have similarly found that a party would be irreparably harmed by not being able to control the patent prosecution process for a patent application it claims it owns. *See Compact Van Equip. Co., Inc. v. Leggett & Platt, Inc.*, 566 F.2d 952, 955 (5th Cir. 1978) (holding that the plaintiff would be irreparably injured if the defendant were allowed to prosecute the patent application that plaintiff claimed it owned); *Ethicon Endo-Surgery, Inc. v. Crescendo Techs., LLC*, No. 1:07cv1016, 2009 WL 2707805, at *6 (S.D. Ohio Aug. 24, 2009) (concluding that the plaintiff would be irreparably injured if the defendant retained control of patent applications that belonged to the plaintiff); *Hallmark Cards Inc. v. Tackbary*, No. 99 C 334, 1999 WL 688722, at *7–8 (N.D. Ill. Apr. 9, 1999) (finding irreparable injury where, in the absence of an injunction, "valuable patent rights . . . [would] be extinguished").

Defendants claim that Sleep Number's delay in bringing a motion for a preliminary injunction cuts against a finding of irreparable injury. (ECF No. 132 at 30–32.) Sleep Number was not aware that UDP had filed these patent applications until June 2020, and it filed this suit soon after. (ECF No. 138 ¶ 3.) Sleep Number waited until

---

Office Action, Defendants may amend an application in a way that would cause the application to no longer fall within the Product Development Scope. Based on this incentive, the Court cannot conclude that Defendants' interests are aligned with Sleep Number's.

January 2021 to bring a motion for a preliminary injunction. (ECF No. 132 at 32.) This delay, Defendants claim, negates any claim of irreparable injury.

Although delay in seeking relief can "vitiate[] much of the force of . . . allegations of irreparable harm," *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013) (citation omitted), this principle does not apply with equal force when the claimed irreparable harm has yet to occur. *Cf. McKinney ex rel. NLRB v. S. Bakeries, LLC*, 786 F.3d 1119, 1125 (8th Cir. 2015) (explaining that delay in moving for an injunction is only significant if the harm has already occurred and the parties cannot be returned to the status quo) (citation omitted). Sleep Number's claimed harm is that it will not be able to control the patent prosecution process after the USPTO issues an Office Action. At the time Sleep Number filed this motion, no Office Actions were pending, and thus Sleep Number had incurred no irreparable injury. Rather, it complains of a risk of irreparable injury flowing from a future event.

Further, whether delay negates a claim of irreparable injury depends on whether the delay was reasonable, which "turns on the facts of each case." *Safety-Kleen Sys., Inc. v. Hennkens*, 301 F.3d 931, 936 (8th Cir. 2002). In other words, whether delay in seeking a preliminary injunction counsels against finding irreparable injury depends on whether the delay is explainable based on the plaintiff's knowledge of the defendant's actions. *Novus Franchising*, 725 F.3d at 894. Sleep Number's delay in bringing suit was both reasonable and explainable. As early as August 17, 2020, Sleep Number informed the

16

Court that it would consider moving for injunctive relief. (ECF No. 138 ¶ 6; ECF No. 70 at 24.) At that hearing, Sleep Number also noted that, before moving for an injunction, it wished to conduct discovery to determine what information Young and Hewitt took from Sleep Number, how they had used it, and whether Defendants had filed other patent applications. (ECF No. 70 at 24.) This is justifiable because it can make sense for the Court to consider a motion for a preliminary injunction on a fuller record. *See Millard v. Elec. Cable Specialists*, 790 F. Supp. 857, 863 (D. Minn. 1992) ("The court recognizes that it is more efficient for the parties and the court for [a motion for a preliminary injunction] to be brought when the record is sufficient to make a decision."); *see also Safety-Kleen*, 301 F.3d at 936 (concluding that a seven-month delay in moving for injunctive relief was reasonable when the movant spent that time "marshal[ling] its case for a preliminary injunction"). Sleep Number's delay in bringing a motion for a preliminary injunction is better explained by its desire to build a record before so moving, rather than an indication that the irreparable injury it asserts is not "great" and "imminen[t]." *Novus Franchising*, 725 F.3d at 895. Because Sleep Number's claimed irreparable injury is a future risk of injury and because its delay in bringing this motion is explainable, the delay does not negate a finding of irreparable injury.

## III.   Balance of the Harms

In balancing the harms, the Court weighs the threat of harm the movant would face absent an injunction against the harm the non-movant would incur if the injunction

were issued. *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 928 (8th Cir. 1994). As detailed above, Sleep Number faces a significant threat of harm if it is not able to control the patent prosecution process for the applications it claims it owns.

The risks of harms to Defendants if the Court issues an injunction are comparatively minimal. An injunction would merely delay their ability to prosecute the patent applications. Defendants also claim that an injunction would shorten the effective life of a patent, but this claimed injury relies on speculation about whether a patent will issue at all, which minimizes the risk of harm. Defendants' claims that they would be unable to attract new investors, and perhaps unable to retain current investors, are similarly too speculative to override the injuries Sleep Number will incur absent an injunction.

Other courts have similarly concluded that the balance of the harms weighs in favor of a party claiming ownership of patent applications. *See Hallmark*, 1999 WL 688722, at *9; *Compact Van*, 566 F.2d at 955.

## IV.   Public Interest

Finally, the public interest supports issuance of a preliminary injunction. The public has an interest in enforcing contractual obligations, and because Sleep Number has shown a likelihood of success on the merits, the public interest would be served by pausing patent prosecution until the merits are decided. *See Paisley Park Enters., Inc. v. Boxill*, 253 F. Supp. 3d 1037, 1051 (D. Minn. 2017).

18

Defendants claim that the public interest would be served by denying Sleep Number's motion, because granting the motion would cut against the public interest in protecting intellectual property, disincentivize companies from developing potentially life-saving technologies, and would prohibit UDP from bringing its products to market. (ECF No. 132 at 39.) In fact, issuance of a preliminary injunction would have none of these effects. First, contrary to Defendants' argument, the public interest in protecting intellectual property will be served by issuance of a preliminary injunction. The purpose of the preliminary injunction in this case is to pause prosecution activities until it is determined whether Sleep Number or Defendants own the rights to these inventions. Ensuring that the true owner is able to prosecute these applications serves to vindicate the owner's intellectual property rights.

Second, UDP will not be prohibited from bringing its products to market; rather, it will be forced to temporarily pause its prosecution of several patents until the question of who owns the patents is resolved. Third, the Court doubts that issuing a preliminary injunction pausing patent prosecution in this case would discourage companies from developing and seeking to patent life-saving technologies. Issuance of a preliminary injunction in no way prohibits or disincentivizes companies from researching, developing, patenting, marketing, or selling medical technologies. Defendants' arguments are unavailing, and the public interest would be served by the issuance of a preliminary injunction.

## V.     Bond

Rule 65(c) of the Federal Rules of Civil Procedure provides that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "Courts in this circuit have almost always required a bond before issuing a preliminary injunction . . . but exceptions have been made . . . where the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin*, 826 F.3d at 1043 (citations omitted).

Defendants request a bond of at least $10 million, which is, in their view, a "conservative" estimate of the injuries they would sustain if the injunction were wrongly issued. (ECF No. 132 at 42.) The Court finds this amount to be excessive. A bond of $100,000 would be sufficient to compensate Defendants for the shortened life of the patent and legal fees incurred in relation to complying with the preliminary injunction.[11]

### CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

---

[11] Sleep Number claims that no bond is required when the moving party has shown a high likelihood of success on the merits. (ECF No. 124 at 33.) But in both of the cases Sleep Number cites, the non-moving party agreed that no bond was required, which is not the case here. (ECF No. 132 at 42–44 (Defendants arguing for a bond requirement)); *Eagle Creek Software Servs., Inc. v. Jones*, No. 14-CV-4925 (ADM/FLN), 2015 WL 1038534, at *11 (D. Minn. Mar. 10, 2015); *Country Inns & Suites by Carlson, Inc. v. 3 AM, LLC*, No. 14-CV-3126 (MJD/FLN), 2014 WL 5431621, at *4 (D. Minn. Oct. 24, 2014).

1.   Plaintiff Sleep Number Corporation's Motion for a Preliminary Injunction (ECF No. 122) is GRANTED;

2.   Defendants are enjoined from further prosecuting, amending, or abandoning claims that claim priority to either U.S. Patent Application No. 62/742,613 or U.S. Patent Application No. 62/804,623;

3.   Defendants are enjoined from further prosecuting or amending claims in U.S. Patent Application No. 16/549,367 ("the '367 Application") or from ultimately abandoning any property rights that stem therefrom. Defendants shall not respond or reply to any Office Action on the '367 Application that issues from the United States Patent and Trademark Office ("USPTO"). After the fifth month but prior to the six-month deadline to respond to the Office Action, per 37 C.F.R. Section 1.17(a)(5), Defendants shall (1) pay any and all necessary fees for a three-month extension (allowing for a six-month response period in total) and (2) file a continuation of the '367 Application that does not remove or limit any claims of priority nor alter or abandon any claims listed in the '367 Application;

4.   Defendants are enjoined from further prosecuting or amending claims in U.S. Patent Application No. 16/551,087 ("the '087 Application") or from ultimately abandoning any property rights that stem therefrom. Defendants shall not respond or reply to any Office Action on the '087 Application that issues from

the USPTO. After the fifth month but prior to the six-month deadline to respond to the Office Action, per 37 C.F.R. Section 1.17(a)(5), Defendants shall (1) pay any and all necessary fees for a three-month extension (allowing for a six-month response period in total) and (2) file a continuation of the '087 Application that does not remove or limit any claims of priority nor alter or abandon any claims listed in the '087 Application;

5. Defendants are enjoined from further prosecuting or amending claims in U.S. Patent Application No. 16/595,848 ("the '848 Application") or from ultimately abandoning any property rights that stem therefrom. Defendants shall not respond or reply to any Office Action on the '848 Application that issues from the USPTO. After the fifth month but prior to the six-month deadline to respond to the Office Action, per 37 C.F.R. Section 1.17(a)(5), Defendants shall (1) pay any and all necessary fees for a three-month extension (allowing for a six-month response period in total) and (2) file a continuation of the '848 Application that does not remove or limit any claims of priority nor alter or abandon any claims listed in the '848 Application;

6. Defendants are enjoined from further prosecuting or amending claims in U.S. Patent Application No. 16/777,385 ("the '385 Application") or from ultimately abandoning any property rights that stem therefrom. Defendants shall not respond or reply to any Office Action on the '385 Application that issues from

the USPTO. After the fifth month but prior to the six-month deadline to respond to the Office Action, per 37 C.F.R. Section 1.17(a)(5), Defendants shall (1) pay any and all necessary fees for a three-month extension (allowing for a six-month response period in total) and (2) file a continuation of the '385 Application that does not remove or limit any claims of priority nor alter or abandon any claims listed in the '385 Application;

7. In the event any Office Action issues for a continuation to the '367, '087, 848, and/or '385 Applications, Defendants are enjoined from further prosecuting or amending claims in the continuation or from ultimately abandoning any property rights that stem therefrom. Defendants shall not respond or reply to the Office Action on the continuation. After the fifth month but prior to the six-month deadline to respond to the Office Action, per 37 C.F.R. Section 1.17(a)(5), Defendants shall (1) pay any and all necessary fees for a three-month extension (allowing for a six-month response period in total) and (2) file another continuation that does not remove or limit any claims of priority nor alter or abandon any claims listed, as set forth above;

8. Defendants may invoice Sleep Number for the 37 C.F.R. Section 1.17(a)(5) fees, which Sleep Number must pay within thirty (30) days. Upon resolution of this proceeding, all fees paid under 37 C.F.R. Section 1.17(a)(5) shall, if not already done, be paid to the prevailing party; and

9.  For each continuation of the '367, '087, 848, and/or '385 Applications filed pursuant to this Order, Defendants shall, within five (5) business days of filing, provide a copy of the filing to Sleep Number's counsel. In addition, for each continuation filed, Defendants shall—until the publication of said continuation—provide Sleep Number a copy of any and all document(s) or communication(s) filed in the continuation's file wrapper. Defendants are enjoined, however, from further patent prosecution efforts including filing new applications, continuations, continuations-in-part, divisional applications, or requests for continued examination, etc. of any patents or patent applications, except to the extent necessary to prevent the patent family from being abandoned as outlined above.

10. If Defendants file any additional provisional patent applications during the pendency of this suit, they shall provide Sleep Number's counsel with a copy of the application within fourteen (14) days of filing it.

11. Within ten (10) days of the date of this Order, Sleep Number shall post a bond with the Clerk of this Court in the sum of $100,000 pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

Dated: March 31, 2021                    BY THE COURT:

                                         s/Nancy E. Brasel
                                         Nancy E. Brasel
                                         United States District Judge