## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Sleep Number Corporation,

                        Plaintiff,

v.

Steven Jay Young; Carl Hewitt; and
UDP Labs, Inc.,

                        Defendants.

Case No. 20-cv-1507 (NEB/ECW)


**ORDER**

This matter is before the Court on Plaintiff's Motion to Compel and for Rule 37 Sanctions (Dkt. 204) and Plaintiff's Motion to Compel (Dkt. 215). Since Sleep Number filed this lawsuit on July 2, 2020 (Dkt. 1), the Court has resolved a Motion for Order Preserving Evidence, Authorizing Expedited Discovery and Appointing Computer Forensics Expert (Dkt. 68); discovery disputes through its Informal Dispute Resolution ("IDR") process on five occasions (Dkts. 105, 148, 193, 214, 261); a prosecution bar dispute (Dkt. 120); and one dispute arising during a deposition (Dkt. 269). Sleep Number recently filed yet another motion to compel (Dkt. 277), and Defendants have since filed a motion for protective order (Dkt. 292). The parties' submissions regarding their discovery disputes contain numerous accusations of wrongdoing and bad intent, which do nothing to aid the Court in resolving the disputes. All counsel are reminded of their obligation to comply with the Minnesota Rules of Professional Conduct when practicing in this District, *see* D. Minn. LR 83.6(a), which state in their preamble "that a lawyer should 'maintain[ ] a professional, courteous, and civil attitude toward all persons

involved in the legal system.'"  *Blue Cross Blue Shield of Minn. v. Hyman*, No. 13-CV-0530 (PJS/SER), 2013 WL 12155779, at *1 (D. Minn. Apr. 9, 2013) (quoting Minn. R. Prof'l Conduct at 4).  "All persons involved in the legal system" includes opposing counsel, and the Court expects counsel to keep that in mind in the future.

Turning to the merits of the Motions, rather than summarize this action's extensive procedural history, the Court focuses on the relief requested and provides background only as necessary.  For the reasons set forth below, the Motions are granted in part and denied in part.

## I.     MOTION TO COMPEL AND FOR RULE 37 SANCTIONS (Dkt. 204)

The relief sought by Sleep Number in its Motion to Compel and for Rule 37 Sanctions (Dkt. 204) ("Motion") includes the following categories:

- **(Issue 1)** an order requiring Defendants to search for and produce documents from all custodians UDP Labs, Inc., Steven Young, Carl Hewitt, Eric Hewitt, Alan Luckow, Johnathon Olson, Robert Dobkin, Mike Puckett, Omid Sayadi, and Mark Seibert;

- **(Issue 2)** an order requiring Defendants to search all repositories, including all business email addresses and all personal email addresses used for work purposes by UDP's officers and employees, UDP's local hard drives, devices, and cloud-storage locations and all personal hard drives, devices, and cloud-storage locations of UDP's officers, employees, advisors, and/or consultants that are or have been, at any point, used for any work for UDP, and produce all responsive non-privileged documents with no deduplication from such a search;

- **(Issue 3)** an order requiring Defendants report to the Court where they searched;

- **(Issue 4)** an order requiring Defendants to fully and completely supplement their answers to Sleep Number's second set of interrogatories Nos. 9, 10, 13, 14, and 15;

- **(Issue 5)** an order requiring Defendants to comply with all discovery-related agreements reached between counsel throughout the remainder of this case; and

- **(Issue 6)** sanctions against Defendants related to their purported conduct or lack thereof with respect to discovery.

(Dkt. 211.)

## A.    Relevant Procedural History

On April 23, 2021, Sleep Number served its Second Set of Interrogatories to Defendants seeking information related to Defendants' trade secret misappropriation counterclaim, Defendants' inventorship and patent prosecution-related counterclaims, Defendants' relevant business partnerships, and Defendants' damages. (Dkt. 207 ¶ 18.) Defendants served their initial answers to the Second Set of Interrogatories on May 24, 2021. (*Id.*) On June 8, 2021, Sleep Number sent a letter to Defendants identifying several alleged deficiencies in Defendants' responses, including, but not limited to, Sleep Number's assertion that Defendants' answers to Interrogatory No. 9 (as to Defendants Steven Jay Young and Carl Hewitt) and No. 10 (as to Defendant UDP Labs, Inc. ("UDP")) were insufficient because the answers failed to name and identify the trade secrets and failed to adequately describe the trade secrets. (Dkt. 207-7 at 5-8.) Specifically, Sleep Number complained that it was unclear whether the description pertained to one or several trade secrets and asserted that the identifications of Defendants' trade secret(s) were vague/nonsensical, ambiguous, lacked sufficient detail to provide a clear picture of what was purportedly misappropriated by Sleep Number, and failed to differentiate whether the trade secrets between UDP and Young and Hewitt listed in the responses to Interrogatory Nos. 9 and 10 were the same. (*Id.* at 5-8.) In addition, Sleep Number took issue with UDP's answer to Interrogatory No. 14, which

sought information as to each potential or actual business partnership that UDP sought in connection with its business. (*Id.* at 13.) Sleep Number argued that while UDP incorporated Defendants' response to Interrogatory No. 3 to Young and Hewitt, that Interrogatory sought the identity of all persons or entities from whom they have requested, sought, or otherwise discussed investing in or providing funding for UDP, as opposed to the information regarding business partnerships sought in Interrogatory No. 14. (*Id.*)

The parties met and conferred regarding Sleep Number's claimed deficiencies on June 23, 2021, and agreed to a July 16, 2021 deadline for Defendants to provide supplemental responses. (Dkt. 207 ¶ 20.) During that meet-and-confer, Defendants objected to providing the requested information with respect to Interrogatory No. 14 on relevance grounds, but agreed to provide information as to Ikea and Samsung (since they had already provided information as to these entities) and said they would consider whether to supplement as to any other actual or potential partnerships and would confirm the scope of supplementation by July 2, 2021. (*Id.* ¶ 32.) Sleep Number also claims as part of the same meet-and-confer that the parties agreed to mutually exchange privilege logs, as ordered by the Court in its May 14, 2021 Order (Dkt. 193 at 2), by July 16, 2021 (Dkt. 207 ¶ 21).

Defendants failed to provide any information on July 2 related to the scope of supplementation as to Interrogatory No. 14. (*Id.* ¶ 32.) After Sleep Number again asked Defendants on July 3 to provide this information, Defendants responded on July 6, 2021 and stated, "[f]or the avoidance of doubt, Defendant UDP Labs agrees to supplement is

[sic] response to Interrogatory 14 and its production in response to RFP 51 with regards to third parties Ikea and Samsung." (*Id.*)

Sleep Number served its privilege log on July 16, 2021, but Defendants did not serve their supplemental interrogatory responses and privilege log on that date. (*Id.* ¶ 23.) Instead, Defendants' counsel sent an email serving supplemental responses to document requests and notifying Sleep Number that they would serve their privilege log on July 19 and their supplemental responses to Plaintiff's Second Set of Interrogatories by July 23, 2021. (*Id.*) Sleep Number threatened to contact the Court on July 19, 2021 to schedule a motion to compel or an IDR conference unless the privilege log and supplemental responses were received by the morning of July 19, 2021. (*Id.* ¶ 24.) Defendants explained during a July 19, 2021 meet-and-confer that unspecified technical issues as to the privilege log had impeded its timely production and that they had discovered more information that they wanted to include in their supplementary interrogatory responses. (*Id.* ¶ 26.) Ultimately, Defendants served their privilege log on July 19, 2021 and supplementary interrogatory responses on July 23, 2021. (*Id.* ¶ 27.)

On July 19, after Sleep Number confirmed it would be raising the issue with the Court, Defendants stated they would supplement their response to Interrogatory No. 14 as to each of its actual or potential partnerships, but that at last some of these partnerships included nondisclosure agreements ("NDAs") that limited what Defendants could disclose without prior permission. (*Id.* ¶ 33.) Sleep Number asserts that Defendants had not provided it with the NDAs nor supplemented their response to Interrogatory No. 14 as of the date of the present Motion. (*Id.*)

On July 26, 2021, Sleep Number's counsel sent another letter to Defendants asserting that their supplemental responses remained deficient, including as to Defendants' identification of their trade secret(s), how many trade secrets Defendants were asserting, who contributed to those trade secrets, which business partnerships UDP had pursued, and what repositories of information Defendants had reviewed in connection with discovery. (*Id.* ¶ 28.) Sleep Number noted that Defendants had also failed to provide any supplemental response to Interrogatory No. 14 to UDP. (*Id.*)

On July 27, 2021, Sleep Number sent an IDR letter to the Court asserting that Defendants had continued to refuse to search for documents from relevant custodians and repositories, including the personal emails and personal or work devices of Defendants Young and Hewitt, despite telling the Court almost a year earlier that they would preserve that information. (Dkt. 228-6 at 2.) According to Sleep Number, "Defendants recently made the baseless assertion that anything outside of udplabs.com email accounts is beyond their possession, custody, or control." (*Id.*) Sleep Number noted that it would need a Rule 30(b)(6) deposition on document collection and preservation, to which Defendants objected. (*Id.* at 2, 7.) Sleep Number also claimed that Defendants continued their refusal to produce emails from Defendants Young and Hewitt and refused to produce personal emails despite evidence that they used their personal email for UDP work purposes. (*Id.* at 5-6.) In addition, Sleep Number continued to assert that Defendants had failed to produce information regarding UDP's partnerships as part of its response to Interrogatory No. 14 despite their promise to do so and their representations to the Court. (*Id.* at 3, 5.)

In response, Defendants in their July 27, 2021 IDR letter claimed that with respect to partnerships, they had explained to Sleep Number that to the extent Defendants would not be violating an NDA with an actual or potential partner, Defendants would produce non-privileged, responsive documents as soon as practicable and that otherwise, Defendants were required to give notice and an opportunity for third parties to object to disclosure, which they had committed to doing by July 30, and they had produced approximately 2,000 documents to date containing information related to UDP's actual or potential partnerships.  (Dkt 207-5 at 4.)  Defendants further asserted that they had supplemented their answer to Interrogatory No. 13 with respect to the repositories.  (Dkt. 207-5 at 5-6.)

Sleep Number filed the present Motion on July 29, 2021.  (Dkt. 204.)

As part of the July 30, 2021 IDR hearing, the Court ordered in relevant part as follows:

> Regarding Request for Production to UDP No. 51 and Interrogatory Nos. 3 and 14 to UDP and nondisclosure agreements (NDAs): To the extent Defendants are not withholding production or supplementation of their interrogatory responses based on an NDA, they are **ORDERED** to supplement their production responsive to Request for Production to UDP No. 51 and supplement their responses to Interrogatory Nos. 3 and 14 to UDP by **August 5, 2021**. To the extent they have not already done so, Defendants are **ORDERED** to provide all required notices pursuant to the NDAs to affected third parties by **July 30, 2021**. Defendants are also **ORDERED** to produce documents responsive to Request for Production No. 51 and to serve a fulsome response to Interrogatory Nos. 3 and 14 on or before **August 20, 2021**. The responses and documents may be designated Attorneys' Eyes Only as necessary. To the extent any of the third parties object to Defendants producing these documents and information, they should seek relief directly from the Court on or before **August 20, 2021**.

Regarding Defendants' search and production of documents from personal emails and certain repositories: Defendants are **ORDERED** to search and produce responsive documents from the email accounts listed on pages 4-5 of Plaintiff's letter, along with any other personal email account which Defendants themselves or Defendants' employees or consultants have used for UDP work-related purposes, on or before **August 31, 2021**. This imposes a duty on Defendants' counsel to inquire of those employees/consultants whether they used their personal email for work purposes, and if so, which accounts, regardless of whether the account was identified on pages 4-5 of Plaintiff's letter. Defendants are further **ORDERED** to search and produce responsive documents from UDP's Google cloud storage, if it has not already been searched and responsive documents produced, on or before **August 31, 2021**. Counsel are **ORDERED** to meet and confer regarding text messages and whether they are within the scope of the ESI Agreement in this case; if the parties do not reach a resolution by **August 6, 2021**, counsel shall contact chambers by **August 9, 2021** to schedule an IDR or formal motion hearing regarding the dispute.

(Dkt. 214 at 2 (emphasis in original).)  The Court also ordered that a Rule 30(b)(6) deposition take place with respect to Defendants' document production.  (*Id.*)

In its August 5, 2021 opposition to the present Motion, Defendants' counsel represented to the Court that: "Pursuant to the Court's recent IDR order, Defendants are currently in the process of collecting and reviewing the personal email accounts of UDP's employees for relevant information, and otherwise complying with the Court's order." (Dkt. 228 ¶ 6.)

## B.    Discovery Related to Custodians and Repositories (Issues 1, 2, and 3)

At the hearing, Sleep Number's counsel conceded that Issues 1 and 2 relating to custodians and repositories had been addressed by this Court at the July 30, 2021 IDR hearing.  Sleep Number's counsel stated that they had brought the issues in front of the Court via IDR because it was faster than formal motion practice, but also raised the issues

as part of the present Motion to obtain an appealable Order.[1]  As the Court warned counsel at the hearing, such duplicative requests for relief related to discovery will not be tolerated in the future.  Given the history of this case, such duplicative requests could give rise to sanctions pursuant to 28 U.S.C. § 1927 for unreasonably and vexatiously multiplying the proceedings.[2]  The Court denies the Motion with respect to Issues 1 and 2 as moot.  In addition, given that the Court ordered as part of the IDR that a Rule 30(b)(6) deposition take place with respect to Defendants' document production, the Court denies as moot Sleep Number's request that Defendants be required to report to the Court where they searched for documents (Issue 3) as well as Sleep Number's request for relief as to Interrogatory No. 13.  However, the Court reminds Defendants of their obligation to seasonably supplement their interrogatory responses, including as to Interrogatory No. 13, pursuant to Federal Rule of Civil Procedure 26(e).

## C.    Interrogatories (Issue 4)

The Court next addresses Issue 4 related to interrogatories.  The Interrogatories at issue in Sleep Number's Motion as to UDP are as follows:

**INTERROGATORY NO. 10:**

Describe in detail each and every trade secret You claim was misappropriated by Sleep Number. As part of your Response, state the name or short title of each trade secret, provide a detailed description of each trade secret, and

---

[1]    Pursuant to the undersigned's IDR process, an IDR decision is not appealable to the district judge or an appellate court, which is why all parties must agree to proceed by IDR before the undersigned decides a dispute using that process.

[2]    Magistrate judges in this District have slightly different procedures.  If counsel have questions about the undersigned's procedures, they should seek clarification from the undersigned's chambers.

identify the person(s) who created, modified, or contributed in any way to the development of the trade secret.

## INTERROGATORY NO. 13:[3]

Describe where and how Your electronic information, documents, and technology are stored, including a description of any computers, external storage devices, servers, cloud based systems, or other systems or drives that You use to store electronic information or documents. Your Response should Describe what specific types of information and documents are stored (e.g., emails, technical documents, business plans, financials, marketing and advertising materials, presentations, etc.), the date You started (and stopped, if applicable) using each storage location, and the individual with the most knowledge or experience in handling or maintaining each storage location.

## INTERROGATORY NO. 14:

Describe each potential or actual business partnership You have sought in connection with Your business, including but not limited to any partnerships with Ikea, Samsung, Medically Home, or Bruyere Research Hospital. Your Response should Identify each individual, company, organization, or entity You sought to partner with, the timing of any discussions related to the proposed or actual partnership, any proposed or agreed upon terms, whether any partnership was reached, and the individual with the most knowledge about each potential or actual partnership.

## INTERROGATORY NO. 15:

Describe in detail how any action or inaction by Sleep Number has resulted in any loss or damage to Your investing or financing efforts. Your Response should identify each investor or financier that declined to, reneged on, or failed to continue to invest, finance, or otherwise support UDP, the amount of the investment, financing, or support that was withdrawn or lost, the date(s) on which the loss or damage occurred, and the facts supporting Your claimed loss or damage.

(Dkt. 207-6 at 3-4; Dkt. 207-9 at 16.)

---

[3]      The Court has addressed Interrogatory No. 13.  (*See supra*, Section I.B.)

Interrogatory No. 9 as to Hewitt and Young, which is the corollary to

Interrogatory No. 10 to UDP regarding Defendants' trade secrets, follows:

**INTERROGATORY NO. 9:**

Describe in detail each and every trade secret You claim was misappropriated by Sleep Number. As part of your Response, state the name or short title of each trade secret, provide a detailed description of each trade secret, and identify the person(s) who created, modified, or contributed in any way to the development of the trade secret.

(Dkt. 207-10 at 8.)

As to Interrogatory No. 9 (as to Hewitt and Young) and No. 10 (as to UDP), on

October 8, 2021, Sleep Number sought additional relief from the Court through IDR,

namely that the Court order UDP to supplement its interrogatory response to

Interrogatory No. 10 in order to identify the trade secrets at issue as part of Defendants'

counterclaims.  In its October 13, 2021 IDR Order (docketed on October 15, 2021), the

Court ordered as follows:

UDP is **ORDERED** to supplement its response to Interrogatory No. 10 by **October 22, 2021**. To the extent UDP supplements after that date, UDP will need to show that the supplementation is based on newly acquired evidence or information. To the extent Plaintiff sought sanctions with respect to Interrogatory No. 10 in its Motion to Compel and for Sanctions (Dkt. 204), the Court will issue a written order as to sanctions.

(Dkt. 271 at 2.)  In its oral ruling during the October 13 IDR hearing, the Court granted

this Motion insofar as it sought supplementation as to Interrogatory No. 10 to UDP and

reserved the issue of sanctions for a written order.  In this Motion, Sleep Number also

requested relief as to Interrogatory No. 9 to Young and Hewitt.  As part of their objection

to Interrogatory No. 9, Young and Hewitt objected to the interrogatory "as repetitive

because it is the same as Interrogatory No. 10 to UDP." (Dkt. 208-3 at 9.) Given Young and Hewitt's representation that Interrogatory No. 10 to UDP and No. 9 to Young and Hewitt are "the same," Young and Hewitt will similarly be bound by UDP's response (or lack thereof) to Interrogatory No. 10 made as of the October 22 deadline. In other words, to the extent Hewitt and Young supplement their response to Interrogatory No. 9 to them after October 22, 2021, they will need to show that the supplementation is based on newly acquired evidence or information.

Similarly, with respect to Interrogatory No. 15, the Court ordered as part of the October 13, 2021 IDR proceeding as follows:

> With respect to the lost investment/financing in response to Interrogatory No. 15 to UDP, UDP is **ORDERED** to supplement its response **by October 22, 2021**. This includes, but is not limited to, identifying: actual damages or profits; lost licensing royalties (identify the parties and provide information); and/or investors who, but for this litigation, would have continued to invest in UDP. To the extent UDP supplements after that date, it will need to show that the supplementation is based on newly acquired evidence or information. To the extent Plaintiff sought sanctions with respect to Interrogatory No. 15 in its Motion to Compel and for Sanctions (Dkt. 204), the Court will issue a written order as to sanctions.

(Dkt. 271 at 3 (emphasis in original).) Again, as the Court noted during the October 13 IDR hearing, that ruling granted this Motion insofar as relief was sought with respect to Interrogatory No. 15.[4]

As to Interrogatory No. 14, which seeks information regarding partnerships, the July 30 IDR Order required Defendants to supplement their response to Interrogatory No.

---

[4]     The Court notes that Sleep Number appears to have raised additional issues with respect to Interrogatory No. 15 as part of their upcoming Motion to Compel (Dkt. 277; *see also* Dkt. 279 at 15), which the Court will address separately.

14: (1) by August 5, to the extent information was not being withheld based on NDAs with third parties and (2) by August 20, to the extent information was being withheld based on NDAs. (Dkt. 214 at 2.) Sleep Number's counsel asserted at the hearing on the Motion that "theoretically" the Court's July 30, 2021 IDR Order resolved the Motion because that issue came up in the context of whether Defendants had sufficiently described their partnerships and whether they were producing documents despite the NDA issue. Nevertheless, Sleep Number asserted (and Defendants do not dispute) that while Defendants supplemented their response on August 5, Defendants only identified documents, as opposed to providing a narrative describing the partnerships. Sleep Number asserts that this complies with the July 30 IDR Order and Sleep Number asked that the Court review each of the documents relied upon by Defendants to determine if the response was appropriate, and filed those 31 documents, consisting of approximately 242 pages, on August 16, 2021. (Dkt. 240 ¶ 3; Dkt. 241; Dkt. 241-1 through Dkt. 241-30.)

The Court has reviewed the documents filed on August 16. As best as this Court can discern, they do identify some potential partners, but to the extent the documents constitute agreements or communications related to agreements, the agreements are primarily NDAs, and there is no indication whether any agreements as to **partnerships**—the subject of the interrogatory—were ultimately reached or discussed. Further, some of the documents are patent prosecution documents filed with the U.S. Patent & Trademark Office (*e.g.*, Dkts. 241-4, 241-5), and their responsiveness to an interrogatory seeking information about partnerships with UDP is unclear. Moreover, Sleep Number represents

that UDP had agreed to supplement its response to Interrogatory No. 14 with regard to third parties Ikea and Samsung by July 2 (Dkt. 207 ¶ 32), but it appears that none of the documents reference Ikea or Samsung. The Court is also concerned by the fact that Defendants apparently relied on approximately 31 documents in their supplementation, but had represented to the Court in their July 27, 2021 IDR letter that UDP had produced 2,000 documents relating to UDP's actual or potential partnerships. (Dkt. 207-5 at 4-5.) While there may be a reason why Defendants identified only 31 documents, the absence of any narrative response makes any such reason unclear.

At the August 13 hearing, Defendants' counsel represented to the Court that they believed their response was "complete" as of that date and that they intended to supplement as to partnerships for which third-party notification was required by the August 20 deadline. The Court is troubled by the representation that Defendants' response was "complete" as of that date. Defendants' scattershot identification of a few documents constituting or relating to NDAs does not meet the requirements of Federal Rule of Civil Procedure 33(d), and Defendants made matters worse by including apparently irrelevant documents in their response and failing to include any narrative explanation. Plainly, the August 5 response was not "complete," even as to partnerships for which no third-party notification was required. In the future, counsel for Defendants should take care when making representations to the Court.

Accordingly, the Court grants the Motion as to Interrogatory No. 14. While the Court expects Defendants to have supplemented their response as to third-parties who required notification on or before August 20, Defendants shall supplement their response

within 15 days of this Order to address the deficiencies identified in this Order. That supplementation should include a narrative response that fully responds to the question asked by Interrogatory No. 14, and to the extent Defendants identify documents, Defendants should explain why those documents are responsive and should make sure they do not identify irrelevant and nonresponsive documents. Failure to fully comply with this Order may result in sanctions against Defendants and their counsel, including, but not limited to, monetary sanctions, striking of counterclaims, and/or a finding of contempt of court. That said, the Court warns Sleep Number's counsel that it will not tolerate a request for sanctions if it is not brought in good faith.

**D.    Discovery-Related Agreements (Issue 5)**

As set forth above, Sleep Number seeks an order requiring Defendants to comply with all discovery-related agreements reached between counsel throughout the remainder of this case. Sleep Number bases its request on Defendants' failure to meet agreed-upon deadlines, including the July 16 deadline to exchange privilege logs and supplement discovery responses. What Sleep Number seeks is guidance with respect to future discovery disputes, which is tantamount to an improper advisory opinion, rather than a ruling on a pending discovery dispute after the parties have meet and conferred. *See Speed RMG Partners, LLC v. Arctic Cat Sales Inc.*, No. 20-CV-609 (NEB/LIB), 2020 WL 12442104, at *1 (D. Minn. Aug. 10, 2020). Further, the Court notes—without stating any opinion on Defendants' failure to meet the agreed-upon July 16 deadline— that there may be a valid good-faith reason why a party later cannot comply with an

agreement.[5]   Therefore, the Court is not inclined to grant such prospective relief.  If Sleep

Number thinks Defendants are not complying with the parties' agreements, they should

meet and confer in good faith regarding the issue and, if necessary, seek relief from the

Court.  For all of these reasons, the Motion is denied insofar as it seeks an order requiring

Defendants to comply with all discovery-related agreements reached between counsel

throughout the remainder of this case.

## E.   Sanctions (Issue 6)

Sleep Number seeks sanctions under Rules 37(a)(5)(A) and 37(b)(2)(A) of the

Federal Rules of Civil Procedure as part of the present Motion.  Rule 37(a)(5)(A)

provides in relevant part as follows:

> (A) If the Motion Is Granted (or Disclosure or Discovery Is Provided After
> Filing). If the motion is granted--or if the disclosure or requested discovery
> is provided after the motion was filed--the court must, after giving an
> opportunity to be heard, require the party or deponent whose conduct
> necessitated the motion, the party or attorney advising that conduct, or both
> to pay the movant's reasonable expenses incurred in making the motion,
> including attorney's fees. But the court must not order this payment if:
>
>> (i) the movant filed the motion before attempting in good
>> faith to obtain the disclosure or discovery without court
>> action;
>> (ii) the opposing party's nondisclosure, response, or objection
>> was substantially justified; or
>> (iii) other circumstances make an award of expenses unjust.

Fed. R. Civ. P. 37(a)(5)(A).

---

[5]      As shown by Sleep Number's failure to timely file its answer to Defendants'
counterclaims, which required Sleep Number to file a motion to extend the deadline for it
to do so based on excusable neglect (Dkt. 247), no one is immune from missing a
deadline.

Rule 37(b)(2)(A) provides for more onerous sanctions against a party for failing to abide by a court discovery order. *See* Fed. R. Civ. P. 37(b)(2)(A).

The Court has carefully considered whether to award sanctions against Defendants. The issue is muddled (to say the least) by the fact that much of the relief the Court awarded Sleep Number was awarded in connection with the July 29 IDR hearing (memorialized in the July 30 IDR minutes at Docket No. 214) and the parties neither proposed nor agreed to including sanctions as an issue to be decided as part of that IDR. As to the non-duplicative relief awarded to Sleep Number in this Order, the Court balances that relief against the fact that Sleep Number sought duplicative relief in this Motion (as to the custodians and repositories), thereby increasing the expense associated with the Motion and resulting in a denial of the Motion as to Issues 1, 2, and 3, as well as the fact that the Court denied the Motion as to Issue 5. Instead of attempting to divine the proper proportion of fees attributable to the relief awarded in this Order, and in view of the duplicative relief sought, the Court finds that "other circumstances make an award of expenses unjust." *See* Fed. R. Civ. P. 37(a)(5)(A)(iii). The Court denies the Motion insofar as it seeks sanctions under Rule 37(a)(5)(A).

As for Rule 37(b)(2)(A), Sleep Number relies on generalized assertions of "Defendants' continued refusal to comply with deadlines, to keep its promises, and to timely disclose relevant and responsive information" and "Defendants' pervasive disregard of this Court's orders, their discovery obligations, and their own agreements" as a basis for sanctions under this Rule, and asks for the Court's "consideration" of various potential sanctions. (Dkt. 213 at 28-29.) Sleep Number did not identify which Order it

believes Defendants failed to obey in connection with its request for relief under Rule 37(b)(2)(A), much less show that any of the available sanctions are warranted. The Court denies the Motion insofar as it seeks sanctions under Rule 37(b)(2)(A).

However, the Court does not want to leave any party or attorney with the impression that the Court will be reluctant to award sanctions in the future. As discussed above, the Court has serious concerns about whether Defendants have complied with their discovery obligations and about certain representations made by Defendants' counsel. And as previously stated during IDR hearings, the Court also has serious concerns that some of the specific relief requested by Sleep Number bears little relation to the actual discovery request at issue and is disproportionate to the needs of the case, which could lead to the conclusion that Sleep Number is unreasonably pursuing discovery with the intent to harass and oppress. In view of the fact that Sleep Number has filed another motion to compel and Defendants have filed a motion for protective order, both of which are set for hearing on December 17, 2021, the parties and counsel are cautioned that the Court will be carefully reviewing the relief requested in those motions, the basis for any objections, and whether the parties made a good faith effort to resolve their dispute. If sanctions are appropriate under Rule 37, the Court will award them, and if the Court believes sanctions may be appropriate under § 1927, the Court's inherent authority, or for another reason, the Court will issue an order to show cause.

## II. MOTION TO COMPEL (Dkt. 215)

As part of Sleep Number's second Motion to Compel (Dkt. 215) ("Privilege Motion"), it seeks an order from the Court finding that Defendants have waived the

attorney-client privilege and any work-product privilege with respect to the following privileged documents and communications Defendants have produced in this litigation to date and now seek to claw back: UDP_0000001, UDP_0000003, UDP_0000129, UDP_0000538, UDP_0000540, UDP_0000581, UDP_0000665, UDP_0000710, UDP_0000745, UDP_0000747, UDP_0000783, UDP_0000830, UDP_0000832, UDP_0000855, UDP_0000868, UDP_0000874, UDP_0000880, UDP_0000894, UDP_0000908, UDP_0000911, UDP_0000916, UDP_0000921, UDP_0000925, UDP_0000926, UDP_0000927, UDP_0000997, UDP_0001066, UDP_0001067, UDP_0001068, UDP_0001257, UDP_0001260, UDP_0001263, UDP_0001272, UDP_0001280, UDP_0006032, UDP_0006039, UDP_0006042, UDP_0006056, UDP_0006290, UDP_0020922, UDP_0020927, UDP_0020966, UDP_0020970, UDP_0021255, UDP_0021255, UDP_0021256, UDP_0021258, UDP_0021259, UDP_0021260, UDP_0021269, UDP_0021272, UDP_0021291, UDP_0021292, UDP_0021305, UDP_0021305, UDP_0021876, UDP_0022066, UDP_0022072, UDP_0022078, UDP_0022096, UDP_0022106, UDP_0022108, UDP_0022127, UDP_0022855, UDP_0022857, UDP_0023876, UDP_0023930, UDP_0024123, UDP_0024128, and UDP_0024132.  (Dkt. 223 at 2-3.)

Sleep Number also seeks an order finding subject matter waiver of the attorney-client privilege and any work-product privilege based on the production of at least some of the above documents.  Specifically, Sleep Number contends that Defendants have waived the attorney-client privilege with respect to their patent applications and patent prosecution activities, as well as all related documents and communications, including

but not limited to:

- Documents and communications, with or without counsel, regarding patent applications, drafting of patent applications (including specifications, figures, and claims), inventorship determinations, and patent application strategy;

- Documents and communications, with or without counsel, regarding searches or investigations into patents and patent applications, including prior art or validity searches, reports, or analyses related to the Inventions-at-Issue[6] or any of Sleep Number's patents;

- Documents and communications, with or without counsel, related to the conception, reduction to practice, design, and development of the technology used to prepare and file any of the Inventions-at-Issue; and

- Documents and communications, with or without counsel, related to any initial claims of priority for the Inventions-at-Issue and the decision and process of changing the priority date for any of the Inventions-at-Issue.

(*Id.* at 1-2.)

## A.     The Parties' Agreement to Provide Discovery

Sleep Number served its initial discovery requests in November 2020.  (Dkt. 219 ¶ 3.)  Prior to the production of any documents, the parties engaged in negotiations in an attempt to resolve this action before incurring substantial discovery and litigation costs. (*Id.*)  As part of these negotiations, the parties agreed to provide each other with specifically targeted categories of documents and information and, to that end, Defendants agreed to provide documents relating to four limited categories of information, including Defendants' efforts in developing the Inventions-at-Issue and their patent prosecution activities.  (*Id.*)

---

[6]     The term "Inventions-at-Issue" is defined in the Complaints.  (Dkt. 1 ¶ 76; Dkt. 119 ¶ 82; Dkt. 254 ¶ 82.)

B.      **Privilege Claw-Back Provisions**

On November 12, 2020, the parties filed their Rule 26(f) Report, which included

the following request with respect to privilege:

> b) Claims of Privilege or Protection. The parties have discussed issues about
> claims of privilege and of protection as attorney work-product or trial
> preparation materials, as required by Fed. R. Civ. P. 26(f), including whether
> the parties agree to a procedure to assert these claims after production, or
> have reached any other agreements under Fed. R. Evid. 502, and **do** request
> the Court to include the following agreement in the scheduling order or as
> part of a protective order:
>
>> The parties agree to follow the procedure set forth in Fed. R. Civ. P.
>> 26(b)(5)(B) regarding information produced in discovery that is
>> subject to a claim of privilege or protection as trial-preparation
>> material. Pursuant to Fed. R. Evid. 502, the inadvertent production of
>> any documents in this proceeding shall not constitute a waiver of any
>> privilege or protection applicable to those documents in any this or
>> any other federal or state proceeding.

(Dkt. 91 at 9 (emphasis in original).)

The Court in its November 30, 2020 Pretrial Scheduling Order adopted this

agreement as follows:

> The parties agree to follow the procedure set forth in Fed. R. Civ. P.
> 26(b)(5)(B) regarding information produced in discovery that is subject to a
> claim of privilege or protection as trial-preparation material. Pursuant to Fed.
> R. Evid. 502, the inadvertent production of any documents in this proceeding
> shall not constitute a waiver of any privilege or protection applicable to those
> documents in any this or any other federal or state proceeding.

(Dkt. 106 at 10.)  This provision remained the same in a subsequent Amended Pretrial

Scheduling Order.  (Dkt. 246 at 9.)

The parties subsequently submitted both their stipulated E-Discovery order (Dkt.

107) and their stipulated protective order (Dkt. 108), on December 11, 2020.

As part of the parties' attempts to reach an agreement as to an E-Discovery order, Defendants sent a draft of the stipulation with the following edits:

> **V.   MISCELLANEOUS PROVISIONS**
>
> A.   As reflected in the Parties' Rule 26(f) Report, the Parties agree to the application of Federal Rule of Evidence 502(d) for the ~~inadvertent~~ production of privileged or trial-preparation material ("Protected Document").

(Dkt. 234-1 at 27.)

The parties adopted the modified language in their final stipulated E-Discovery order (Dkt. 107), and based on this stipulation, on December 15, 2020, the Court issued the operative Order Regarding E-Discovery which contained the following provision: "As reflected in the Parties' Rule 26(f) Report, the Parties agree to the application of Federal Rule of Evidence 502(d) for the production of privileged or trial preparation material ('Protected Document')."  (Dkt. 111 at 19.)

Pursuant to the parties' stipulated protective order (Dkt. 108), on January 14, 2021, the Court issued the operative Protective Order in this case, which also provided a specific claw-back provision related to privileged documents:

> 13. Inadvertent Disclosure or Production to a Party of a Protected Document.
>
> a) Notice.
>
> > i. A party or non-party who discovers that it has inadvertently disclosed or produced a protected document must promptly notify the Receiving Party and describe the basis of the claim of privilege or protection. If the party or non-party provides such notice and description, the privilege or protection is not waived.
> >
> > ii. A party who discovers that it may have received an inadvertently disclosed or produced protected document must

promptly notify the disclosing or Producing Party or non-party.

b) Handling of Protected Document. A party who is notified or discovers that it may have received a protected document must comply with Fed. R. Civ. P. 26(b)(5)(B).[7]

(Dkt. 121 at 14-15 (line spacing and tabs altered).)

## C.   Defendants' Production of Documents

Defendants made their first document production on January 22, 2021 comprising 82 documents ("Volume 1"), bates numbers UDP_0000001 through UDP_0000818. (Dkt. 219 ¶ 4.)  The production was to facilitate the parties' early settlement discussions as set forth above (*supra* Section II.A).  (Dkt. 235; *see also* Dkt. 219 ¶ 3.)  This production included documents from Defendants' patent prosecution counsel, the law firm of Young Basile.  (Dkt. 219 ¶ 4.)  The first two documents, bates numbers UDP_0000001 though 0000020, consist of an email and attachment from attorney Francine Nesti of Young Basile to Young and Hewitt attaching a "Preliminary Summary of Relevant Prior Art" related to the prosecution of the Inventions-at-Issue identifying

---

[7]      Rule 26(b)(5)(B) provides as follows:

If information produced in discovery is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The producing party must preserve the information until the claim is resolved.

Fed. R. Civ. P. 26(b)(5)(B).

potential prior art for purposes of filing an Invention Disclosure Statement ("IDS").[8]
(Dkt. 220; Dkt. 220-1.)  The other documents produced include emails with prosecution
counsel regarding patent filing strategies and decisions as well as invention disclosure
forms and draft applications for the Inventions-at-Issue, with embedded comments and/or
redlines: UDP_0000538; UDP_0000540; UDP_0000745; UDP_0000129;
UDP_0000581; UDP_0000665; UDP_0000710; UDP_0000747; UDP_0000783.  (*See*
Dkt. 219 ¶ 4; Dkts. 220-2 through Dkt. 220-10.)  According to Sleep Number, 11
documents that are now asserted by Defendants as privileged were produced as part of
Volume 1.  (Dkt. 217 at 8.)

Defendants' next production of documents occurred on February 5, 2021
("Volume 2") consisting of 100 documents, 30 of which were placeholders stating
"Document Withheld for Privilege" and 70 of which were actual documents.  (Dkt. 219
¶ 5; Dkt. 232 ¶ 2.)  Volume 2 is bates numbered UDP_0000819 through UDP_0001308.
(Dkt. 232 ¶ 4.)  Some of these documents were prepared by Defendants' litigation
counsel Goodwin Proctor, LLP ("Goodwin") and deal with UDP corporate governance as
well as employment and stock agreements.  According to Defendants, some of these
documents were part of document "families," and despite review of those documents for
privilege, some "family members" containing privileged communications were
unintentionally produced.  (Dkt. 232 ¶ 2.)  The privilege review for this document

---

[8]     An IDS contains "[a] list of all patents, publications, applications, or other
information submitted for consideration by the [Patent] Office" in connection with a
patent application.  *See* 37 C.F.R. § 1.98(a).

production, like Volume 1, was performed manually.  (Dkt. 232 ¶ 4.)  According to Sleep Number, 23 documents that were produced as part of Volume 2 are now identified by Defendants as privileged.  (Dkt. 217 at 8.)

Sleep Number asserts that based on these previous productions, it decided to serve a subpoena on prosecution counsel Young Basile.  (Dkt. 219 ¶ 6.)  The subpoena requested documents related to patent file wrappers, documents and communications relating to the claim of priority of the patent applications at issue, and documents and communications with Defendants and the other named inventors of the Inventions-at-Issue.  (*Id.*)

On March 3, 2021, Young Basile served objections to the subpoena and Goodwin requested that Sleep Number work directly with litigation counsel Goodwin rather than Young Basile to resolve the issue.  (*Id.* ¶ 7.)  Sleep Number litigation counsel Lukas Toft ("Toft") of Fox Rothschild LLP states in a declaration that Defendants' litigation counsel Lucas Dahlin ("Dahlin") requested during a March 9, 2021 meet-and-confer that Defendants be able to produce responsive documents, including those already produced, rather than having patent prosecution counsel produce documents.[9]  (*Id.* ¶¶ 7-8.)  Toft also stated in his declaration that the following representations were made during that meet-and-confer:

> During the meet and confer I also pointed out there were several emails in Defendants' first production that contained seemingly privilege[d] material from Young Basile, which appeared to constitute a waiver of attorney-client

---

[9]    Toft states this meet-and-confer took place on March 9, 2020 (rather than 2021), but this appears to be an error given Sleep Number served the subpoena on Young Basile on February 22, 2021.  (Dkt. ¶¶ 6-7.)

> privilege related to Defendants' patent prosecution. I also stated Defendants
> could not use privilege as both a sword and a shield and requested
> clarification on whether Defendants were willing to waive their claim of
> privilege to the requested information. Mr. Dahlin stated he did not believe
> his client intended to or had waived privilege.  At no point during the call did
> Mr. Dahlin make a request to clawback any documents. The parties left the
> meet and confer with the understanding that Defendants would produce
> documents in response to the subpoena to Young Basile.

(*Id.* ¶ 9.)  According to Sleep Number, it also communicated to Dahlin that Defendants had waived privilege on the issue of Defendants' patent prosecution and patent activities and asked if it was Defendants' intention to produce additional documents and correspondence.  (Dkt. 232-1 at 4.)  Meanwhile, on March 8, 2021, Defendants had produced another 1,355 documents (Volume 3).  (Dkt. 233 ¶ 15.)  Sleep Number identifies four documents in Volume 3 as documents Defendants now identify as privileged.  (Dkt. 217 at 8.)

Dahlin disputes Toft's version of events, instead asserting that: Sleep Number discussed as part of their meet-and-confer that certain documents would be withheld from production based on privilege and were concerned that UDP would use privilege as a "sword and a shield," without explaining what they meant, and asked what documents would be withheld on privilege grounds.  (Dkt. 233 ¶ 12.)  Dahlin asserts that he responded to Sleep Number's counsel that a privilege determination would have to occur on a document-by-document basis and could not say in the abstract what UDP planned to withhold without having reviewed the documents.  (*Id.*)  Dahlin also represented as follows with respect to the parties' meet and confer:

> 14. I do not recall at any point during the discussion of Young Basile
> privileged documents or other topics, nor do my notes of the meeting reflect,

either Mr. Toft or Ms. Geneser stating their belief that Defendants had produced documents that were, or appeared to be, privileged. Nor do I recall Mr. Toft or Ms. Geneser stating any belief of theirs that Defendants had waived privilege through documents in their production.

15. In fact, by the time we had the March 9 phone call regarding the Young Basile subpoena, Ms. Geneser, Mr. Toft and I had already met and conferred and exchanged emails about the content of the first two productions in order to resolve Sleep Number's request to "downward designate" the confidentiality designations for those records. On March 8, the day before the meet and confer about the subpoena, Defendants produced (at 8:54 P.M. CT) a third volume of documents, containing 1,355 documents (nearly 5,000 pages). Neither Mr. Toft nor Ms. Geneser identified any specific documents from Defendants' prior two productions (and certainly not the third), or even categories of documents, that appeared to be privileged, or appeared that they might be privileged. The discussion was confined to documents that would be produced by Defendants in response to the subpoena on Young Basile.

16. During the meet and confer I took notes and subsequently sent an email with my notes to my team. My notes do not include any discussion of previously produced documents or any claims by Sleep Number that UDP waived privilege. I would certainly have noted if Mr. Toft or Ms. Geneser had asserted that UDP had produced privileged documents or waived privilege.

(Dkt. 233 ¶¶ 14-16.)

On March 10, 2021, Defendants reproduced all documents from Volumes 1 and 2 with the requested "downward designations" as to confidentiality. (Dkt. 219 ¶ 10.) However, when the documents were reproduced, Defendants made no request to claw back any privileged documents. (*Id.*)

After the first productions of Volumes 1 and 2, Defendants' counsel implemented an electronic screen, through consultation with Goodwin's third-party vendors, who have expertise in reducing inadvertent disclosures through the use of keyword searches and algorithms designed for that purpose. (Dkt. 232 ¶ 5.) According to Defendants' counsel

Eric Su ("Su"), the two productions immediately following implementation of this electronic approach included 10,000 documents.  (*Id.*)  These two productions appear to correspond to Defendants' Volume 3 production of 1,355 documents and a March 25, 2021 production of 5,509 documents (Volume 4).  (*See* Dkt. 217 at 8.)  Of Volumes 3 and 4, Defendants seek to claw back 10 documents, including on the basis that some of them involved handwritten notations on court documents and two draft declarations containing redlines that the electronic screen was unable to catch.  (Dkt. 232 ¶ 5; *see also* Dkt. 220-31 (UDP_0006034-38), Dkt. 220-32 (UDP_0006039-41), Dkt. 220-33 (UDP_0006042-6055), Dkt. 220-34 (UDP_0006056-63), Dkt. 220-35 (UDP_0020922-26), Dkt. 220-36 (UDP_0020927-32).)

On March 12, 2021, Sleep Number's counsel Katherine Geneser ("Geneser") sent an email to Dahlin summarizing the parties' March 9, 2021 meet-and-confer related to the subpoenas to Young Basile.  According to Geneser, "[o]verall Defendants stated that any documents in Young Basile's possession have already been given to Defendants and all responsive documents will be produced, subject to privilege."  (Dkt. 219-2 at 2.)  In addition, Geneser noted that:

> The parties also discussed the issue of privilege and Defendants' plans to produce all non-privileged documents and communications with Young Basile, and any privileged documents or communications would be logged in Defendants' privilege log. Sleep Number reserves further discussion on this issue in order to ensure the use of privilege is not used as both a sword and a shield.

(*Id.* at 3.)  There was no specific statement in the email that Sleep Number believed Defendants had already produced what appeared to be privileged communications.  (*Id.*)

Pursuant to the parties' March 9, 2021 meet and confer, on April 20, 2021, Defendants produced 528 documents ("Volume 5"), with Young Basile identified as the document custodian.  (Dkt. 219 ¶ 12.)  Six of these documents were placeholders indicating the document had been withheld on the basis of privilege.  (*Id.*)  Defendants did not use their new privilege filter because they believed these documents presented a difficult and unique situation with respect to reviewing for privilege.  (Dkt. 231 at 20; *see also* Dkt. 232 ¶ 5.)  Volume 5 included emails and attachments involving prosecution counsel discussing searches/investigations into patents, confirming necessary details of the Inventions-at-Issue, and discussing patent applications and strategies; an attachment to an email (where the email was withheld on basis of privilege) of a slide summarizing the development and patenting status of an Invention-at-Issue; drafts and notes related to the preparation and filing of patent applications for the Inventions-at-Issue; correspondence with prosecution counsel and other documents relating to Defendants' claims of priority to U.S. Provisional Application No. 62/742,613 ("the '613 Application") and subsequent withdrawal of those priority claims; and reports relating to supplemental IDS forms: UDP_0021255, UDP_0021272, UDP_0022066, UDP_0021257, UDP_0021258, UDP_0021259, UDP_0022072, UDP_0022078, UDP_0022096, UDP_0022855, UDP_0022857, UDP_0022106, UDP_0022108 UDP_0023876, UDP_0023930, UDP_0024123, UDP_0024128, and UDP_0024132. (Dkt. 219 ¶ 13; Dkt. 220-11 through Dkt. 220-28.)

Sleep Number also asserts that Defendants have also produced documents involving their litigation counsel Goodwin, including the following bates numbers:

UDP_0006290, UDP_0006899 (privilege later withdrawn by Defendants (Dkt. 219-5 at

3)), UDP_0006032, UDP_0006039, UDP_0006042, UDP_0006056, UDP_0020922,

UDP_0020927, UDP_0020966, UDP_0020970, UDP_0001257, and UDP_0000997.

(Dkt. 219 ¶ 14; (Dkt. 220-29 through Dkt. 220-40.)

According to Sleep Number, Defendants have produced at least 70 documents

through their first five productions containing privileged information, including

communications involving their patent prosecution counsel Young Basile and ligation

counsel Goodwin, summarized below.  (Dkt. 219 ¶¶ 14-15; Dkt. 217 at 8.)

| Production Volume and Date | Total Number of Documents Produced | Number of Documents Now Identified as Privileged |
|---|---|---|
| Vol. 1 – January 22, 2021 | 82 | 11 |
| Vol. 2 – February 5, 2021 | 100 | 23 |
| Vol. 3 – March 8, 2021 | 1,355 | 4 |
| Redesignated Vol. 1 & 2 – March 10, 2021 | 182 | 34 |
| Vol. 4 – March 25, 2021 | 5,509 | 6 |
| Vol. 5 – April 20, 2021 | 528 | 26 |

On May 28, 2021, Sleep Number's counsel notified Defendants in writing of

several categories of what appeared to be privileged documents that Defendants had

produced, providing examples of each, and asserting that the disclosures constituted a

subject matter waiver, and requesting that Defendants produce all documents related to at

least Defendants' patent prosecution activities.  (*Id.* ¶ 16.)  The disclosures according to

Sleep Number were as follows:

The privileged documents that Defendants have produced thus far cover multiple different subject matters.

First, Defendants produced several emails with patent prosecution counsel regarding the prosecution of various patent applications and other patent validity issues. (*See*, *e.g.*, UDP_0000001-20; UDP_0000538; UDP_0000540; UDP_0000745; UDP_0021170-217; UDP_0021255; UDP_0022106.) Therefore, Defendants have waived privilege with respect to the prosecution of these applications.

Second, Defendants produced emails disclosing their attorney's proposed edits to the Consulting Agreements. (*See*, *e.g*., UDP0006290). Therefore, Defendants have waived privilege with respect to the negotiations of the Consulting Agreements.

Third, Defendants have produced draft correspondence—purportedly approved by their attorneys—and declarations from these proceedings that include comments for attorney review. (*See* UDP_0006899; UDP0020966; UDP0020970). Therefore, Defendants have waived privilege with respect to any and all communications related to the subject matter of these documents.

Accordingly, Defendants should immediately begin production of any and all responsive documents related to the above subject matter that it is or has been withholding on the basis of any privilege. Please confirm that Defendants are waiving privilege as it pertains to these documents and subject matter or, in the alternative, explain why these documents are not privileged or do not constitute a waiver of any or all privileges.

(Dkt. 219-3.) Defendants responded on the same day, asserting that any production of privileged documents did not waive the privilege, as any production was inadvertent, identifying specific documents that Defendants were clawing back, and stating that their investigation was ongoing. (Dkt. 219-4 at 4; Dkt. 232-1 at 14.)

In a May 29, 2021 email, Sleep Number disputed the unintentional nature of the production, especially as to UDP_0000001, UDP_0000538, and UDP_0000540, which it claimed were all "produced as part of a small and intentional production of just 82 documents in January 2021," and that Defendants' assertion four months after that

production that they were inadvertently disclosed was "dubious at best." (Dkt. 219-4 at 3.) In addition, Sleep Number claimed that it had previously notified Defendants that they had waived privilege based on the production of these documents, "including at least during a March 8 meet and confer." (*Id.*) Defendants countered the next day that: "As to the three documents you identify below, we have no record of any such conferral on March 8, nor any record of any representation that 'Sleep Number previously notified Defendants that it had waived privilege based on the production of these documents.'" (*Id.* at 2.)

During a June 3, 2021 meet-and-confer, the parties discussed whether Defendants intended to claw back any documents other than those identified in Sleep Number's May 28 letter. (Dkt. 219 ¶ 19.) On June 16, 2021, Defendants sent a letter with a chart of documents they wished to claw back, along with their explanation of the basis of privilege for each document. (Dkt. 219 ¶ 19; Dkt. 219-5.)

On July 23, 2021, Defendants served supplemental responses to Sleep Number's Second Set of Interrogatories to UDP, including Interrogatory No. 10, which seeks a description of UDP's trade secrets. (Dkt. 208-2.) UDP's original response to this interrogatory identified, pursuant to Rule 33(d), "its technical document production including UDP_0000001 through UDP_0000818"—which contains 11 documents that Defendants identified as privileged—and its July 23 supplemental response again identified "UCP_0000001 – UDP_0000818" (among other documents). (Dkt. 208-2 at 10, 12; Dkt. 219 ¶ 22.) Defendants claim they served a supplemental response to Interrogatory No. 9 to Young and Hewitt (which sought the same information) on the

same day from which they removed the response's reliance on UDP_0000001 through UDP_0000818, but that they "mistakenly overlooked" that reference in UDP's supplemental response to Interrogatory No. 10.  (Dkt. 232 ¶ 10; *see* Dkt. 231 at 27 n.5.) On August 5, UDP served a "corrected" version of its response to Interrogatory No. 10, which no longer refers to those documents.  (*Id.*)

## D.    Legal Standard

In general, confidential communications between individuals and attorneys for the purpose of obtaining or rendering legal advice are privileged.[10]  *See Upjohn v. United States*, 449 U.S. 383, 394-95 (1981); *see also United States v. Horvath*, 731 F.2d 557, 561 (8th Cir. 1984); *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 601 (8th Cir. 1977) (The attorney-client privilege is "the long established rule that confidential

---

[10]    Federal common law applies to the issue of privilege where subject matter jurisdiction is premised on a federal question, whereas state law applies to the issue of the attorney-client privilege when the subject matter jurisdiction is based on diversity.  *See* Fed. R. Evid. 501; *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 402 (8th Cir.), *cert. denied*, 484 U.S. 917 (1987); *see also Ewald v. Royal Norwegian Embassy*, No. 11-CV-2116 SRN/SER, 2014 WL 1309095, at *5 (D. Minn. Apr. 1, 2014) (citations omitted).  In this case, the parties have asserted both federal and state law claims.  Where there are both state and federal claims, if the evidence sought is only relevant to the state claims, then state law applies; however, if the evidence sought is relevant to both the state and federal claims, then federal common law applies.  *See Lykken v. Brady*, No. CIV. 07-4020-KES, 2008 WL 2077937 at *4 (D.S.D. May 14, 2008) (citing *Hansen v. Allen Memorial Hosp.*, 141 F.R.D. 115, 121 (S.D. Iowa 1992) (collecting cases)) ("The court then examined decisions from other courts and concluded that, where the issue is the discoverability of evidence that is relevant to both the federal and the state claims, courts have consistently held that federal law determines the existence and scope of any asserted privilege."); *see also Danielson v. Huether*, No. 4:18-CV-04039-RAL, 2020 WL 2922173, at *4 (D.S.D. June 3, 2020) ("Danielson's claims are predominantly federal, so federal common law governs any assertion of privilege by the State and City.").  The parties' arguments here are premised under federal common law.  As such, the Court will apply federal common law to the issue of privilege.

communications between an attorney and his client are absolutely privileged from disclosure against the will of the client."). The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn*, 449 U.S. at 389. As the proponent of the privilege, Defendants bear the burden of establishing that it applies. *See Triple Five of Minn., Inc. v. Simon*, 212 F.R.D. 523, 527-28 (D. Minn. 2002) (citing *Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir. 1985)).

Generally, "[v]oluntary disclosure of attorney client communications expressly waives the privilege. . . ." *United States v. Workman*, 138 F.3d 1261, 1263 (8th Cir. 1998) (citations omitted). The Eighth Circuit Court of Appeals has also explained waiver and protection of privilege generally, as follows:

> The attorney/client privilege is waived by the voluntary disclosure of privileged communications, and courts typically apply such a waiver to all communications on the same subject matter. Thus, a party wishing to invoke the privilege in responding to document discovery must assert it as to all documents to which it may apply.

*PaineWebber Grp., Inc. v. Zinsmeyer Trusts P'ship*, 187 F.3d 988, 991-92 (8th Cir. 1999) (citation omitted), *cert. denied*, 529 U.S. 1020 (2000).

Rule 502(a) of the Federal Rules of Evidence dictates the scope of waiver involving a voluntary disclosure of privileged information. *See U.S. S.E.C. v. Welliver*, No. 11-CV-3076 RHK/SER, 2012 WL 8015672, at *4 (D. Minn. Oct. 26, 2012) (citations omitted); *see also Prudential Def. Sols., Inc. v. Graham*, 517 F. Supp. 3d 696, 703 (E.D. Mich. 2021) (finding that a voluntary disclosure of privilege waived the privilege as to

those documents and Rule 502(a) governed the scope of the waiver); *First Am.*

*CoreLogic, Inc. v. Fiserv, Inc.*, No. 2:10-CV-132-TJW, 2010 WL 4975566, at *5 (E.D.

Tex. Dec. 2, 2010) (same).  Rule 502(a) provides:

> (a) Disclosure Made in a Federal Proceeding or to a Federal Office or Agency; Scope of a Waiver. When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:
>
> > (1) the waiver is intentional;
> > (2) the disclosed and undisclosed communications or information concern the same subject matter; and
> > (3) they ought in fairness to be considered together.

Fed. R. Evid. 502(a).

On the other hand, under Rule 502(b) of the Federal Rules of Evidence, an

inadvertent disclosure of a privileged document does not operate as a waiver of that

document if: "(1) the disclosure is inadvertent; (2) the holder of the privilege or

protection took reasonable steps to prevent disclosure; and (3) the holder promptly took

reasonable steps to rectify the error, including (if applicable) following Federal Rule of

Civil Procedure 26(b)(5)(B)."  Rule 502 does not define an "inadvertent" disclosure.

Courts that have examined this issue "have found that Rule 502(b) provides for a more

simple analysis of considering if the party intended to produce a privileged document or

if the production was a mistake."  *Amobi v. D.C. Dep't of Corr.*, 262 F.R.D. 45, 53

(D.D.C. 2009) (citing *Coburn Group, LLC v. Whitecap Advisors LLC*, 640 F. Supp. 2d

1032, 1037-1038 (N.D. Ill. 2009)).  The court in *Amobi* explained the reasoning of this

approach:

Other courts have found that Rule 502(b) provides for a more simple analysis of considering if the party intended to produce a privileged document or if the production was a mistake. This interpretation seems to be in line with one of the goals of the drafting committee: to devise a rule to protect privilege in the face of an innocent mistake. Additionally, defining inadvertent as mistaken comports with the dictionary definition of the word: "Of persons, their dispositions, etc.: Not properly attentive or observant; inattentive, negligent; heedless.... Of actions, etc.: Characterized by want of attention or taking notice; hence, unintentional." The Oxford English Dictionary (2d ed.1989), available at OED Online, Oxford University Press, http://dictionary.oed.com/cgi/entry/50113734. There is every reason to suppose that Congress uses this definition. Additionally, permitting "inadvertence" to be a function of, for example, the amount of information that had to be reviewed or the time taken to prevent the disclosure melds two concepts, "inadvertence" and "reasonable efforts," that should be kept distinct. One speaks to whether the disclosure was unintended while the other speaks to what efforts were made to prevent it.

*Amobi*, 262 F.R.D. at 53 (internal citations omitted).

Indeed, such an interpretation is consistent with the drafting committee's comments to Rule 502, which provide that Rule 502(b) was enacted to protect against the forfeiture of privilege when a disclosure in discovery is the result of an "innocent mistake." Fed. R. Evid. 502, Advisory Committee Letter.

Sleep Number argues that pursuant to Rule 502(a), Defendants' disclosure of privileged information constitutes a waiver that extends to undisclosed documents since the (1) the waiver was intentional, (2) the disclosed and undisclosed information concern the same subject matter, and (3) the undisclosed documents ought in fairness to be considered together. (Dkt. 217 at 15-25.) Even assuming that the disclosure of the privileged documents was inadvertent, Sleep Number contends that Defendants have waived the privilege as to those documents under the elements set forth under Rule 502(b) and relevant caselaw. (*Id.* at 25-33.) Sleep Number concedes that an inadvertent

waiver does not amount to a full subject matter waiver. (*Id.* at 14.)

Defendants counter that neither Rule 502(a) nor (b) applies to the issue of waiver in this case, as the relevant ESI Order and the Protective Order both incorporated Rule 502(d) and, when read together, "leave no doubt that Defendants' disclosure of privileged information and their reaction upon learning of the disclosure should not result in waiver of any kind in this matter." (Dkt. 231 at 12-14.) Defendants also argue that they are not required to prove they did not intend to disclose privileged information and that they adequately screened for privilege before production. (*Id.* at 13.)

Rule 502(d) provides: "A federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court — in which event the disclosure is also not a waiver in any other federal or state proceeding." Fed. R. Evid. 502(d). The Rule "is designed to enable a court to enter an order . . . that will allow the parties to conduct and respond to discovery expeditiously, without the need for exhaustive pre-production privilege reviews, while still preserving each party's right to assert the privilege to preclude use in litigation of information disclosed in such discovery." Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence, 154 Cong. Rec. H. 7817 (2008), reprinted in Fed. R. Evid. 502 Advisory Committee Notes subdivision (d). The Advisory Committee Notes support a finding that Rule 502(d) was meant to allow courts to fashion orders that preclude waiver of the privilege and forgoing the analysis under Rule 502(b) as to waiver when dealing with inadvertent disclosures that can occur with reviews of large amounts of electronic discovery in order to expedite discovery. *See* Fed. R. Evid. 502, adv. committee notes,

subd. d (Nov. 28, 2007) ("For example, the court order may provide for return of documents without waiver **irrespective of the care taken by the disclosing party**; the rule contemplates enforcement of 'claw-back' and 'quick peek' arrangements as a way to avoid the excessive costs of pre-production review for privilege and work product.") (emphasis added); *see also Rajala v. McGuire Woods, LLP*, No. CIV.A. 08-2638-CM, 2013 WL 50200, at *3 (D. Kan. Jan. 3, 2013) ("[A] court may fashion an order, upon a party's motion or its own motion, to limit the effect of waiver when a party inadvertently discloses attorney-client privileged information or work product materials.").

The Court first considers whether a disclosure of privileged material must be "inadvertent" in this case to result in non-waiver under Rule 502(d).  Defendants argue: "The ESI Order unambiguously incorporates Federal Rule of Evidence 502(d) for the production of privileged or trial-preparation material,' whether produced inadvertently or otherwise."  (Dkt. 231 at 12 (citing Dkt. 111 at 19 § V.A).)

The ESI Order does not explicitly state "whether produced inadvertently or otherwise."  (Dkt. 111 at 19 § V.A.)  While the word "inadvertent" was stricken from the draft ESI Order and not incorporated in the final ESI Order, the relevant paragraph also refers back to the parties' Rule 26(f) Report (*id.* ("**As reflected in the Parties' Rule 26(f) Report,** the Parties agree to the application of Federal Rule of Evidence 502(d) for the production of privileged or trial-preparation material.") (emphasis added)), which requested a Rule 502 order as to the "**inadvertent** production of any documents in this proceeding" (Dkt. 91 at 9 (emphasis added)).  The Rule 502 Order in the Pretrial Scheduling Order, consistent with the parties' request in the Rule 26(f) Report, was

limited to "inadvertent" productions (Dkt. 106 at 10; *see also* Dkt. 246 at 9 (same).)  The

Protective Order similarly provides: "A party or non-party who discovers that it has

**inadvertently** disclosed or produced a protected document must promptly notify the

Receiving Party and describe the basis of the claim of privilege or protection.  If the party

or non-party provides such notice and description, the privilege or protection is not

waived."  (Dkt. 121 at 14-15 (emphasis added).)  In view of the use of "inadvertent" in

the Rule 26(f) Report, the Rule 502(d) Order in the Scheduling Orders, and the language

in the Protective Order; the absence of any evidence that the parties discussed and agreed

to extend the Rule 502(d) Order entered on November 30, 2020 (Dkt. 106 at 10) to

encompass non-inadvertent productions in the ESI Order entered on December 15, 2020

(Dkt. 111); and the reference in the ESI Order to the parties' agreement as to production

of privileged or trial-preparation materials in the Rule 26(f) Report (also limited to

inadvertent production), the Court finds that the Rule 502(d) protections in this case

apply only to inadvertent productions—not voluntary productions.

Accordingly, to the extent the Court concludes that the Defendants' disclosures are

voluntary, the Court must engage in the Rule 502(a) analysis.  If the Court finds a

disclosure is inadvertent, or in other words, produced by virtue of a mistake, that ends the

inquiry and the privilege as to the document is not waived with no further analysis under

Rule 502(b).[11]

---

[11]     The Court notes that as to attorney work product, "[d]isclosure to an adversary
waives the work product protection as to items actually disclosed. . . ."  *In re Chrysler
Motors Corp. Overnight Evaluation Program Litig.*, 860 F.2d 844, 846 (8th Cir. 1988)
(citations omitted).

**E.     Analysis of Waiver**

**1.       Inadvertence of Production**

As to Volume 1, Defendants concede that their production was voluntary, but argue they did not intentionally disclose privileged material.  (Dkt. 231 at 15.)  They state that they disclosed the documents in Volumes 1 and parts of Volume 2, knowing that the documents "at the very least border on communications and documents that could be privileged," as part of settlement negotiations between the parties because Sleep Number requested those documents.  (*Id.*)  In particular, Sleep Number requested documents reflecting the conception and reduction to practice of each invention, including when each invention was conceived, by whom, and how it was reduced to practice, and identification and disclosure of any other patent applications that have been filed but not yet published, among other things, which "had the potential to include some close calls on attorney-client privilege issues."  (Dkt. 231 at 15-16; Dkt. 235 at 3.)

Defendants argue these communications were made pursuant to Rule 408 of the Federal Rules of Evidence.  (Dkt. 231 at 5, 15.)  Rule 408 bars the admission of evidence of "furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise [a disputed] claim" and "conduct or a statement made during compromise negotiations about the claim."  Fed. R. Evid. 408(a)(1), (2).  Rule 408 speaks to admissibility and not privilege.  *See United States v. Paulus*, No. 015 CR 00015 DLBEBA1, 2021 WL 4494607, at *7 (E.D. Ky. Sept. 30, 2021) (addressing Rule 408 and finding that "[t]he admissibility of the Shields Letter and the underlying expert review is an evidentiary

issue that should be addressed by the District Court Judge.  The admissibility of the letter does not affect whether the records and documents pertaining to KDMC's expert review are privileged.").  As such, the Court finds that Rule 408 affords no protection from waiver of the privilege of the documents themselves.  In any event, Defendants reproduced these documents on March 10, 2021 with the amended confidentiality designations, and there is no indication that this reproduction was for settlement purposes, and also relied on them in their initial interrogatory responses.  (Dkt. 208-2 at 10; Dkt. 232 ¶ 10; Dkt. 219 ¶ 22.)  Thus, even if the documents had originally been produced for settlement purposes, Defendants later used them for litigation purposes.

To support their argument that they did not intentionally disclose privileged material, Defendants argue that "[s]ome of the documents did not present a clear-cut privilege basis" and that the production of Volume 1 "had the potential to include some close calls on attorney-client privilege issues."  (Dkt. 231 at 16, 19.)  Defendants identify two documents in Volume 1 (out of the 82 produced) as not presenting a clear-cut privilege basis and, as to Volume 2, assert:

> Like the first production, Defendants' counsel screened the documents manually for obvious privileged material, but the nuances associated with privileged communications and arguably nonprivileged attachments resulted in the production of documents that Defendants clawed-back because they were related to attorney-client communications (though not necessarily privileged themselves).

(*Id.*)

It is difficult to understand Defendants' argument as to Volume 2, particularly when they suggest that some of the clawed-back documents are "not necessarily

privileged themselves."  In general, the Court understands Defendants to be arguing that they made the decision to produce certain documents in Volumes 1 and 2 because they believed they were **not** privileged, but now have changed their minds and believe those documents **are** privileged, and think they should be allowed to claw them back because the privilege determination was difficult and "imperfect."  (*See id.* at 16-19.)  The Court does not find this argument persuasive.  Indeed, the Eighth Circuit admonishes "a party wishing to invoke the privilege in responding to document discovery must assert it as to all **documents to which it <u>may</u> apply**."  *PaineWebber Grp.*, 187 F.3d at 991-92. (emphasis added).  This is especially true here where counsel only had to review two separate sets of documents (totaling 183 documents) on two separate occasions when producing Volumes 1 and 2.

Similarly, as to Volume 5, the Court notes that while it involved approximately 528 documents collected from prosecution counsel, reviewing 528 documents for privilege is not an onerous task.  In any event, Defendants conceded that they did not use their privilege filter given that they knew these documents presented a difficult and unique situation with respect to reviewing for privilege:

> For the documents collected by Young Basile, those documents were reviewed individually, as privilege-related keywords would have identified nearly all of them. Dahlin Declaration, ¶ 15. As those documents are communications between UDP and its patent prosecutors, they present complex issues on privilege. Though the law states that administrative, or transmittal emails are not privileged, beyond that, courts and practitioners can disagree.

(Dkt. 231 at 20; *see also* Dkt. 232 ¶ 5.)  In other words, Defendants again were cognizant of the privilege issue, yet produced at least 26 documents that they now assert are

privileged. Again, while it may be a complex issue as to whether the documents are privileged, which may be relevant to the intentional nature of the waiver of the privilege with respect to waiver of other undisclosed documents, it does not mean that the production of possibly privileged documents was not voluntary. Moreover, Defendants produced these documents intentionally to avoid a targeted subpoena on their patent prosecution counsel. (Dkt. 233-3.)

In sum, the Court finds that the production of the allegedly privileged documents in Volumes 1, 2, and 5 was voluntary, as opposed to an inadvertent mistake. Sleep Number's Privilege Motion is granted to the extent that Defendants will not be allowed to claw back the documents in Volumes 1, 2, and 5.

On the other hand, the Court finds that the production of the 10 documents from Volumes 3 and 4 now identified as privileged was inadvertent. Based on the examples provided, these were documents that accidently slipped through the scanning and screening of almost 7,000 documents, and at least some appear to have been missed by the screen because they were marked-up copies of court-related documents. Defendants have met their burden that their production in this regard was a mistake. Given that this was an inadvertent production, no other analysis is warranted under the Court's Orders pursuant to Rule 502(d), and Sleep Number's Privilege Motion is denied as to Volumes 3 and 4. Sleep Number will be required to destroy or return these documents to Defendants, and Sleep Number's counsel shall submit a declaration that Sleep Number has done so with 15 days of this Order, unless an appeal is filed by either party.

### 2.    Scope of Waiver

Given these rulings, the Court turns to whether the voluntary production of privileged documents in Volumes 1, 2, and 5 should result in waiver as to undisclosed documents under Rule 502(a).  As stated previously, Sleep Number specifically seeks a finding that Defendants waived the attorney-client with respect to their patent applications and patent prosecution activities.  (Dkt. 223 at 1-2.)

For such a waiver to occur, Rule 502(a) requires a "waiver that is intentional." Fed. R. Evid. 502(a)(1).  The requirement that the "waiver" of the privilege be "intentional" (rather than that the "disclosure" be "intentional") was added to the draft of Rule 502(a) at the Advisory Committee's April 2007 meeting to preclude subject matter waiver unless the party knew that the disclosure would operate as a waiver of the privilege:

> Committee members also considered whether the language on intentionality should refer to the intent to disclose the information or to the intent to waive the privilege. After discussion, the Committee determined that subject matter waiver should not be found unless it could be shown that the party **specifically intended to waive the privilege by disclosing the protected information**. The Committee voted unanimously to amend proposed Rule 502(a) to provide that subject matter waiver could only be found if "the waiver is intentional."

Advisory Committee on Evidence Rules, Minutes of Meeting of April 12-13, 2007, at 8; https://www.uscourts.gov/sites/default/files/fr_import/EV04-2007-min.pdf, at 8 (last visited on November 30, 2021) (emphasis added).  Here, Defendants argue that they did not intentionally waive the privilege because they produced the information for settlement purposes or because the law on whether the documents at issue are privileged

is unsettled, resulting in an imperfect privilege analysis, and offered representations from their counsel in declarations to the Court that they did not intend to disclose privileged information.  (Dkt. 231 at 14-16, 19, 25.)  However, as explained next, the Court finds that, even assuming the undisclosed documents sought by Sleep Number "concern the same subject matter," the undisclosed documents need not "in fairness be considered together" with the disclosed documents.  *See* Fed. R. Evid. 502(a)(2)-(3).  Accordingly, the Court need not determine the subjective intent of Defendants nor the hotly-disputed issue of when Defendants received notice of their production of privileged documents.

In support of their respective positions as to waiver, the parties cite to *Shukh v. Seagate Tech., LLC*, 848 F. Supp. 2d 987 (D. Minn. 2011).  In *Shukh*, Seagate produced five invention disclosures over which Seagate had previously asserted the attorney-client privilege.  *Id.* at 989.  However, Seagate continued to withhold a total of 575 documents on the basis of privilege.  *Id.*  Shukh moved to compel production of those privileged documents.  *Id.* at 989-90.  Shukh argued that Seagate's intentional waiver of any attorney-client privilege covering the five invention disclosures constituted waiver as to the subject matter of inventorship regarding the inventions involved in the case.  *Id.* at 990.  The court in *Shukh* found that under Rule 502(a), the purpose of the subject matter waiver doctrine is "to prevent a party from using the advice he received as both a sword, by waiving privilege to favorable advice, and a shield, by asserting privilege to unfavorable advice," and that the analysis boiled down to whether "fairness" dictated the expansion of Seagate's waiver.  *Id.* (marks and citation omitted); *see also Luminara Worldwide, LLC v. Liown Elecs. Co.*, No. CV 14-3103 (SRN/FLN), 2015 WL 9861106,

at *5 (D. Minn. Oct. 5, 2015), *obj. overruled*, 2016 WL 6774229 (D. Minn. Nov. 15, 2016) ("As recognized by the court in *Shukh*, the court's analysis boils down to determining whether fairness dictates the expansion of Disney's waiver.").  Indeed, pursuant to the Advisory Comments for Rule 502(a):

> The rule provides that a voluntary disclosure in a federal proceeding or to a federal office or agency, if a waiver, generally results in a waiver only of the communication or information disclosed; a subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary.  Thus, subject matter waiver is limited to situations in which a party intentionally puts protected information into the litigation **in a selective, misleading and unfair manner**.

*See* Fed. R. Evid. 502, adv. committee notes, subd. a (Nov. 28, 2007) (citations omitted) (emphasis added).

Seagate argued that Shukh had "actively inserted" the five invention disclosures into the case by disclosing them in pleadings, motions, and other filings, leaving Seagate with no choice but to rely on them in responding to Shukh's inventorship claims.  *Shukh*, 848 F. Supp. 2d at 991.  According to Seagate, this meant it was not trying to use the documents to gain tactical advantage.  *Id.*  The court rejected this argument because Seagate was not relying on other privileged documents that Shukh had referenced in the litigation.  *Id.*  Consequently, the *Shukh* court concluded "[b]ecause it appears that Seagate intends to use the five invention disclosures to support its case . . . it is only fair to find a subject-matter waiver based on their disclosure," and went on to determine the scope of the waiver.  *Id.* at 991-92.  Similarly, in *Luminara*, the court found that fairness required production of all documents related to the same subject matter as the produced

documents because "Luminara, through disclosures made by Disney, cannot use certain documents to support their claims while shielding other documents that may be relevant to the case under the guise of attorney-client privilege." 2015 WL 9861106, at *5.

Sleep Number argues that Defendants' conduct in producing privileged documents is the same as Seagate's and Luminara's because Defendants (according to Sleep Number) "cherry-picked" the documents they produced. (Dkt. 217 at 23, 25.) According to Sleep Number, this means Defendants should be required to produce "all documents, privileged or not, related to" their patent prosecution activities, including "Defendants' drafting of patent applications (specifications, figures, and claims), their decisions to file patent applications, their analysis of inventorship, their identification of material (or immaterial) prior art, and their strategy and decision-making regarding any claims of priority for any of the patent applications." (Dkt. 217 at 22-25.) Sleep Number's argument completely ignores Defendants' attempt to claw back the documents at issue, which is a key distinction between this case and *Shukh* and *Luminara*. It is Sleep Number who brought the Privilege Motion to prevent Defendants from returning the "cherry-picked" documents to the tree, so to speak, and Sleep Number who now apparently wishes to not only use the produced documents in this litigation, but also use them to force a subject matter waiver as to **all** of Defendants' documents relating to patent prosecution. Fairness does not remotely support the breadth of the waiver sought by Sleep Number. If Sleep Number has concerns that its own use of Defendants' allegedly privileged documents from Volumes 1, 2, and 5 will paint a misleading picture, then Sleep Number can decide not to use those documents and agree to return or destroy

them.  And Defendants should take care that their conduct with respect to the documents for which the Court has found waiver does not result in any additional waiver.  But the Court will not find the extraordinarily broad waiver sought by Sleep Number where Defendants would have been content with the documents' return or destruction by Sleep Number.

### III.   ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED** that:

1.    Plaintiff's Motion to Compel and for Rule 37 Sanctions (Dkt. 204) is **GRANTED in part and DENIED in part** consistent with this decision.

2.    Plaintiff's Motion to Compel (Dkt. 215) is **GRANTED in part and DENIED in part.**  The Motion to Compel is **GRANTED** insofar as Sleep Number will not be required to return or destroy the allegedly privileged documents produced in Volumes 1, 2, and 5.  The Motion to Compel is otherwise **DENIED**, including insofar as Sleep Number will be required to destroy or return the privileged documents produced in Volumes 3 and 4 to Defendants, and Sleep Number's counsel shall submit a declaration that Sleep Number has done so with 15 days of this Order, unless an appeal is filed by either party.


Dated: December 1, 2021                    *s/Elizabeth Cowan Wright*
                                           ELIZABETH COWAN WRIGHT
                                           United States Magistrate Judge